## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **GILBERT E. LINDER,** | : | **CIVIL ACTION** |
| | : | **NO. 02-CV-1956(JGM)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BYK-CHEMIE USA, INC., in its** | : | |
| **Capacity as Plan Sponsor of the** | : | |
| **RETIREMENT PLAN OF BYK-CHEMIE** | : | |
| **USA INC., and the SUPPLEMENTAL** | : | |
| **RETIREMENT PLAN OF BYK-** | : | |
| **CHEMIE USA INC.,** | : | |
| | : | |
| **Defendants.** | : | **November 8, 2005** |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

Come Now Defendants BYK-Chemie USA, Inc., in its capacity as Plan Sponsor of the Retirement Plan of BYK-Chemie USA Inc., and the Supplemental Retirement Plan of BYK-Chemie USA Inc. and hereby submit the following Memorandum of Law in support of their Motion for Summary Judgment.

### STATEMENT OF FACTS

Defendant BYK-Chemie USA, Inc., ("BYK-Chemie" or the "Company") is the U.S. subsidiary of a German corporation engaged in the manufacture of specialty chemicals. (Defendants' Appendix ("DApx") at Tab 1 at pp. 9, 17.) Plaintiff Gilbert E. Linder ("Plaintiff") was hired by BYK-Chemie in 1981 as controller. (DApx Tab 2 at p 7.) He was subsequently promoted to vice president of finance with primary

responsibility over accounting, purchasing, data processing and human resources.  (Id. at pp. 10-11.)    In addition to these responsibilities, Plaintiff was also a member of the BYK-Chemie Retirement Plan (the "Retirement Plan") Administrative Committee, which is the three member fiduciary body with the primary responsibility for administering the Retirement Plan.  (Id. at pp. 12-13.)    Plaintiff was also a participant in the Retirement Plan and the BYK-Chemie USA Inc. Supplemental Retirement Plan ("SERP"). (Complaint at ¶ 4.)  By way of this suit, Plaintiff seeks an order to include the income derived from the exercise of stock options in the calculation of his pension benefit under the Retirement Plan and the SERP.

**Overview of the BYK-Chemie Employee Benefit Plans**

***The Retirement Plan***

The Company established the Retirement Plan effective 1984, to provide retirement benefits to the employees of BYK-Chemie.  (DApx. Tab 3 at p. BYK 00097; Tab 4 at ¶ 3.)  The Retirement Plan is a tax qualified defined benefit pension plan intended to reward employees who stay with the Company until retirement by providing guaranteed annuity income to such employees when they reach retirement age.  (Id.)  The guaranteed annuity is designed to replace after retirement a specified percentage of an employee's normal pay that is based on the employee's years of service with BYK-Chemie.  (Id. Tab 4 at ¶ 3.)  The Retirement Plan provides for benefit accruals based on an employee's compensation and years of service with BYK-Chemie, and benefits are intended to accrue ratably over an employee's working career.  (DApx Tab 3 at § 5.1;

Tab 4 at ¶ 3.)  Plan benefits are funded entirely through employer contributions.  (DApx Tab 3 at § 3.1).

In this case, Plaintiff's benefit was calculated using the following assumptions: final average monthly compensation (excluding stock option income) of $13,300.46; multiplied by a fraction equal to his total years of credited service at termination over 30; and reduced by an early retirement factor. (See, DApx Tab 5)  There is no dispute in this case regarding the years of service or early retirement reduction factor.  Rather, the central issue is how "Compensation" is defined and whether income from the exercise of stock options should be included in "Compensation."

The Pension Plan defines "Final Average Compensation" as:

The average annual Compensation of a Participant over the sixty (60) consecutive calendar months of Plan participation within the one hundred and twenty (120) calendar month period immediately preceding the Participant's Normal Retirement Date during which he received the largest total amount of Compensation selected from all months in which he has received Compensation so as to provide the highest average . . . .

(DApx Tab 3 at § 1.16.)  "Compensation," in turn:

Means the regular remuneration actually paid or accrued by the Employer to or for the benefit of an employee during the period of reference, including, under rules uniformly applicable to all employees similarly situated, any bonuses and pay for overtime or special pay, and excluding the Employer's cost for any public or private employee benefit plan, including the Plan . . . .  Compensation shall not include the value of any fringe benefits provided by the Employer, including, but not limited to, auto allowances and group term life insurance. . . .  For Plan Years beginning on or after January 1, 1994, an employee's Compensation shall not exceed $150,000, as adjusted for cost-of-living increases in accordance with section 401(a)(17)(B) of the Code.

(Id. at § 1.10.)    Income derived from the exercise of stock options has never been included in the definition of Compensation under the Retirement Plan or SERP. (DApx Tab 4 at ¶ 5.)

**The SERP**

The SERP was established on May 27, 1994 for the sole purpose of providing retirement benefits to employees who were eligible to receive retirement benefits under the Retirement Plan, but who had their Retirement Plan benefits limited by the application of Internal Revenue Code Section 401(a)(17)[1], which limits the amount of compensation that may be taken into account in calculating benefits under a defined benefit pension plan.  (DApx Tab 6 at p. BYK 0001; Tab 4 at ¶ 4.)  The SERP is maintained solely for the purposes of providing unfunded retirement benefits to a select group of key employees and is therefore intended to be a "Top Hat" Plan.  (DApx Tab 6 at p. BYK 0001.); see also, 29 U.S.C. §1101(a)(1).  The use of Top Hat plans is common among companies and is intended to ensure executives receive the same level of retirement benefits as a percentage of compensation as the rank and file employees.  See Goldstein v. Johnson & Johnson, 251 F.3d 433, 436 (3d Cir. 2001).

The SERP provides, and was always intended to provide, benefits identical to those provided under the Retirement Plan, calculated in the same way, except that the SERP benefits are not subject to the compensation limits under the tax laws. (DApx Tab 4 at ¶ 4; Tab 7.)   Consistent with this intent, the SERP provides that the term

---

[1]    IRC 401(a) (17) provides: "A trust shall not constitute a qualified trust under this section unless, under the plan of which such trust is a part, the annual compensation of each employee taken into account under the plan for any year does not exceed $200,000."

- 4 -

"'Compensation' shall (except as modified below) have the same meaning given such term in the Pension Plan."  (DApx Tab 6 at § 2.03.)  Thus, as with the Retirement Plan, the term "Compensation" as used in the SERP has never been construed to include income from the exercise of stock options. (DApx Tab 4 at ¶ 5; Tab 8.)

**The SOP**

The Altana Stock Option Plan (the "SOP") was first established in 1999 and made available only to a select group of key managerial employees.[2]  (DApx Tab 9 at p. BYK 00248.)  As a prerequisite to participating in the SOP and receiving stock options, participants are required to make an individual investment in Altana shares. (Id. at p. BYK 00249 and BYK 00251.)  Participants must maintain their individual investment in Altana shares throughout their employment, otherwise they forfeit all options granted under the SOP.  (Id. at p. BYK 00256.)  The grant of options under the SOP is entirely discretionary, and the grant of options under one plan does not entitle participants to any future grants under another plan. (Id. at p. BYK 00257.) Participants also have discretion as to whether or not to exercise their options. (See id.)

Options granted under the SOP may be exercised only after the participant has held them for a two year period.  (Id. at p. BYK 00249.)  Additionally, an option can be exercised only after that two year period if certain profit objectives are achieved.  (Id. at p. BYK 00253.) The profit hurdle is a minimum 20% increase in the average earnings per

---

[2]    Each SOP was only effective for the period in which the options were granted.  Therefore, the Company adopted a new SOP each year new options were granted.  (See id.) The options at issue in this case were granted to Plaintiff under the 1999 SOP.  The material terms of each new SOP, however, were substantially the same, therefore, for simplicity sake, Defendants refer to the SOP as if it were a single plan.

share over the earnings per share from previous two years.  Extraordinary gains or losses are disregarded and the calculation of EPS is made by the Altana Board of Managers.   If the profit hurdle is not achieved, the options lapse after the two year period. (Id. at pp. BYK 00253-00254.)

The options at issue in the present case were granted to Plaintiff in 1999.  Per the SOP, Plaintiff was required to make an initial investment as a prerequisite to receiving a grant of options. (DApx Tab 2 at p. 20; Tab 9 at p. BYK 00249.)  He exercised 7000 options on August 31, 2001 at a cost of approximately $137,160.00.   From this investment, Plaintiff netted approximately $137,360.00. (DApx Tab 10.)   As noted, Plaintiff contends that these profits should be included in the definition of Compensation for purposes of determining his benefit under the Retirement Plan and SERP.  This contention is at the heart of the present dispute.

**<u>Plaintiff's Employment History & Separation of Service</u>**

On or about September 13, 2001, Plaintiff was notified that a management reorganization was going to be implemented by the German parent, which was intended to realign the subsidiaries and their management along their respective business lines. (DApx. Tab 2 at pp. 7-8.)  In connection with the reorganization, Plaintiff was given the opportunity to take early retirement, but declined.  (Id. at p. 51.)  In addition to Plaintiff, at least two other high ranking executives were severed in connection with the reorganization, Zachary Lavine, president and Jeffrey Converse, vice president of marketing.  (Id. at p. 8.)  Mr. Lavine and Mr. Converse were also the two other members of the three-member Administrative Committee.  (Id. at p. 13.)  Mr. Lavine's last day of

- 6 -

employment was on or about December 31, 2001 and Mr. Converse's was several months earlier.  (Id. at p. 36.) Plaintiff's last day of employment with the Company was January 31, 2002.  (Id. at p. 37.)  At the time, Plaintiff had an annual salary of $115,000 plus an annual bonus of approximately $40,000.  (Id. at p. 10.)

Shortly after learning of the restructuring, Plaintiff began to inquire about whether income derived from the exercise of his stock options under the SOP was included in the definition of "Compensation" under the Retirement Plan and the SERP.   On or about November 21, 2001, Plaintiff emailed his administrative assistant, Carol Foley, who had day-to-day responsibilities for the Plans, asking whether the stock option income would be included in his pension calculation. (DApx Tab 11.) Despite the fact that the other member of the Administrative Committee, Mr. Lavine, was still employed with the Company, Plaintiff did not direct any of his inquiries to him, nor did he contact legal counsel or his superiors in Germany, who were involved in the management of the U.S. subsidiaries.  (DApx Tab 2 at pp. 30-31, 35-37.)

Apparently dissatisfied with Ms. Foley's response, Plaintiff emailed his counterpart Arthur Dulik, who was vice president and treasurer of Altana Inc., another wholly-owned subsidiary of the same German parent and the sister corporation of BYK-Chemie. (DApx Tab 12; Tab 2 at p. 26.)  Plaintiff explained to Mr. Dulik that he suffered from a "conflict of interest" which prevented him from interpreting the definition of Compensation under the Retirement Plan in a manner that would result in the inclusion of stock option income as he stood to benefit from such an interpretation.  (Id.)  Plaintiff then went on to do just that – he provided Mr. Dulik with a self-serving interpretation of

ATL01/12058515v2

Compensation which included the stock option income and asked Mr. Dulik to opine on whether this interpretation was correct. (DApx Tab 12.)  Mr. Dulik, who was a participant in an identical retirement plan maintained by Altana Inc., responded that Plaintiff's interpretation was correct and that one of the Retirement Plan's actuaries had told him a year earlier that this reading was correct. (Id.)  Mr. Dulik of course, suffered from the identical conflict of interest as Plaintiff, since he too held stock options and stood to benefit from this interpretation under his (identical) retirement plan.  (DApx Tab 13 at ¶ 3; Tab 2 at pp. 40-41.)

The actuary identified by Mr. Dulik, Richard Sych, does not recall ever having told Dulik that the stock option income was included in the definition of Compensation. (DApx Tab 14 at ¶ 5.) In fact, he stated that it would be highly unlikely that he would have said this because, in his experience, most employers do not include stock option income in the definition of compensation and, in any event, he did not have authority to interpret the Retirement Plan.  (Id. at ¶ 5.)  Furthermore, the actuary who was primarily responsible for the BYK-Chemie and Altana employee benefit plans testified that she specifically told both Plaintiff and Mr. Dulik that the stock option income was *not* included in the definition of Compensation and that she would not assist them in advancing this interpretation with the Company. (DApx Tab 15 at ¶ 5.)

Plaintiff's last day of employment with the Company was January 31, 2002.  On March 13, 2002, Plaintiff was provided with an early retirement package which included an estimate of his pension benefit. (DApx Tab 16 at ¶ 3, Ex. A.)  The cover page of his pension estimate specifically advised Plaintiff that: "[t]he calculation does not include

ATL01/12058515v2

any remuneration from the exercising of stock options." (<u>Id.</u>)  Consistent with this statement, the estimate itself clearly indicated that Plaintiff's pension benefit was calculated using only his base salary and annual bonus.  (<u>Id.</u> at Ex. A at p. 3.)  Moreover, Plaintiff knew that the inclusion of stock option income was a disputed issue.  Indeed, he testified in his deposition that it was no secret at the Company that the question of whether income from the stock options was included in Compensation was an issue. (DApx Tab 2 at pp. 41-42.)

Around the same time, Plaintiff was also provided with an Agreement and Release (the "Release"). (DApx Tab 16 at ¶ 5 and Ex. C.)  The Release required that Plaintiff "fully and forever release the Company from any and all claims, causes of action and charges, of whatever kind or nature whether known or unknown which he now or hereafter may have against any member of the Company Group."  Plaintiff also promised "not to bring any administrative or legal action arising out of his employment by the Company or rights released under this Agreement. . . ."  Plaintiff had forty-five (45) days to consider the Release and seven (7) days to revoke his acceptance.  (<u>Id.</u> at Ex. C at ¶ 10.)  In consideration for releasing his claims against the Company, Plaintiff would receive: $97,250.00 in cash; the right to vest in stock options that would otherwise expire after his termination (approximate value $300,000); ownership of his Company car; and the right to elect post-retirement health insurance coverage for a ten year period.  (<u>Id.</u> at Ex. C at ¶ 3.)  Plaintiff signed the Release on or about March 28, 2002. (<u>Id.</u> Ex. C at p. 000080.)

On or about May 8, 2002, Plaintiff was provided with a second estimate of his pension benefit under the Retirement Plan and the SERP.  (DApx Tab 5.)   As with the previous estimate, this one again excluded the income from the exercise of his stock options.  Even though he was previously advised before and after he signed the Release that the stock option income would not be included in his pension calculation, on May 29, 2002 Plaintiff wrote to his superiors in Germany expressing his "surprise."  (DApx Tab 17; Tab 18.)  Plaintiff was subsequently advised *again* that the stock option income was not intended to be included in the definition of Compensation under the SERP or Retirement Plan.  The instant lawsuit followed.

## ARGUMENT AND CITATION OF AUTHORITY

Pursuant to Federal Rule of Civil Procedure 56(c), the Court should enter summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See Sheppard v. Beerman, 317 F.3d 351, 354-55 (2d Cir. 2003) (quoting Rule 56).  When the moving party satisfies its initial burden of showing the absence of genuine fact issues, the non-moving party "may not rest upon the mere allegations or denials" in pleadings, but "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Koch v. Town of Brattleboro, Vt., 287 F.3d 162, 165 (2d Cir. 2002).  Under these well-established principles, "[s]ummary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " <u>Abramson v. Pataki</u>, 278 F.3d 93, 101 (2d Cir. 2002) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).  As shown below, Plaintiff cannot sustain his burden of demonstrating any genuine issue of material fact with regard to any claim asserted in the Complaint, and therefore the Court should enter summary judgment in favor of Defendants on all claims.

## I.   PLAINTIFF'S CLAIMS FAIL BECAUSE HE SIGNED A VALID RELEASE & COVENANT NOT TO SUE.

### A.   <u>The Second Circuit Recognizes the Validity of Releasing Claims Under ERISA.</u>

Plaintiff's claims should be dismissed because he knowingly and voluntarily signed a release of any and all claims including the claims at issue here.  The Second Circuit has repeatedly recognized that a plaintiff may waive/release his rights to benefits under an ERISA governed plan.  <u>E.g.</u>, <u>Yablon v. Stroock & Stroock & Lavan Ret. Plan & Trust</u>, 98 Fed. Appx. 55, 57, 2004 WL 1147075 (2d Cir. May 21, 2004); <u>Finz v. Schlesinger</u>, 957 F.2d 78, 80-82 (2d Cir. 1992); <u>see also</u> <u>Lockheed Corp. v. Spink</u>, 517 U.S. 882, 894 (1996) (upholding validity of release under ERISA).  In assessing the validity of a release of ERISA rights, the fundamental inquiry is "whether, in the totality of the circumstances, the individual's waiver of his right can be characterized as 'knowing and voluntary.'" <u>Sharkey v. Ultramar Energy Ltd.</u>, 70 F.3d 226, 231 (2d Cir. 1995) (internal quotation marks and citation omitted).  The Second Circuit has indicated the following factors are relevant to whether the release of an ERISA claim was knowing and voluntary:

1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, [as well as whether an employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so] and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan, 935 F.2d 1360, 1368 (2d Cir. 1991).  See also, e.g., Walker v. Asea Brown Boveri, Inc., 214 F.R.D. 58, 65-66 (D. Conn. 2003) (stating that the Second Circuit "requires an examination of [these] factors") (Covello, J.).   The absence of any single factor is not dispositive.  Laniok, 935 F.2d at 1368.

### B.  Plaintiff Knowingly and Voluntarily Waived His Right to the Benefits at Issue.

Application of Laniok factors to the case *sub judice* demonstrates that Plaintiff "knowingly and voluntarily" waived his claim to the benefits at issue.  On March 28, 2002, Plaintiff executed a document entitled "**AGREEMENT AND RELEASE**" which provides:

The Executive hereby fully and forever releases the Company Group from any and all claims, causes of action and charges, of whatever kind or nature, whether known or unknown, which he now or hereafter may have against any member of the Company Group, including, but not limited to, claims arising under or in any way connected with his employment with the Company or the termination of such employment. . . . .

The Executive further agrees . . . not to bring any administrative or legal action arising out of his employment by the Company or rights released under this Agreement . . . .

(DApx Tab 16, Ex. C at ¶ 4.)  In consideration for waiving his claims, Plaintiff received: $97,500 in cash; a continued vesting schedule for his stock options from 2000 and 2001 (with a net exercise value of approximately $300,000[3]); the option to elect ten years of post-retirement medical coverage; and retention of his Company car. (DApx Tab 16 at ¶ 5 and Ex. C at ¶ 3.)   In exchange, Plaintiff released all claims against Defendants, including the claims presently advanced in this action.  (Id. at Ex. C at ¶ 4.)

> 1.    *The Release is Clear and Unequivocal in its Meaning & Scope and the Undisputed Facts Demonstrate that Plaintiff had Actual Knowledge of the Disputed Claims When he Signed the Release.*

The terms of the Release are abundantly clear and are written in plain English.  As noted above, the Release provides in no uncertain terms that in exchange for the identified consideration Plaintiff agreed to waive "any and all claims, causes of action and charges, of whatever kind or nature, whether known or unknown, which he now or hereafter may have against any member of the Company."   (Id. at Ex. C at ¶ 4.) "Although the release does not specifically mention ERISA, it need not do so, as general 'any-and-all language covers a claim for ERISA benefits.' " Martino-Catt v. E.I. duPont Nemours and Co., 317 F. Supp. 2d 914, 922 (S.D. Iowa 2004) (quoting Chaplin v. NationsCredit Corp., 307 F.3d 368, 372-73 (5th Cir. 2002)).  See also Licciardi v. Kropp Forget Div. Employees' Ret. Plan, 990 F.2d 979, 982 (7th Cir. 1993) (concluding release covering "all claims of any sort that he might have against the company except those arising out of specified agreements" was fatal to "contestable pension claims"); Fair v. Int'l Flavors & Fragrances, Inc., 905 F.2d 1114, 1115-16 (7th Cir. 1990) (plaintiff's

---

[3]      See DApx Tab 2 at pp. 20-22.

ATL01/12058515v2

pension claim "constitute[d] a claim 'arising from any matter relating to her employment relationship' " and was thus barred by language of general release); <u>Spann v. AOL Time Warner, Inc.</u>, 219 F.R.D. 307, 319 (S.D.N.Y. 2003) ("An individual's general release of employment claims, however, may waive an employee's right to recover benefits under ERISA."); <u>Walker</u>, 214 F.R.D. at 65-66 ("an individual can waive his right to bring an ERISA claim by signing a general release").

There is simply no dispute, given Plaintiff's background, and the plain language of the Release, that Plaintiff was put squarely on notice that in signing the Release he was waiving his right to any and all claims including the specific claims he asserts here. Indeed, *two weeks* before he executed the Release Plaintiff was provided with a pension statement which specifically advised him:

> This calculation is in accordance with the current terms of the Pension Plan and is based on a termination date of January 31, 2002. The calculation *does not include any remuneration from the exercising of company stock options*.

(DApx Tab 16, Ex. A at p. 2 (emphasis added).)  Moreover, Plaintiff himself testified that it was no secret at the Company that there was an issue regarding whether stock option income was included in the definition of Compensation.  (DApx Tab 2 at pp. 41-42.) Thus, the undisputed facts, including Plaintiff's own testimony, establish that he had actual knowledge at the time he signed the Release that his stock option compensation would not be included, or at least that there was a dispute over the inclusion.

Under circumstances parallel to those in this case – execution of a release despite a lingering dispute about the signatory's entitlement to certain pension monies – the Second Circuit has concluded that the release was knowing and voluntary, and therefore

- 14 -

enforceable.  Finz, 957 F.2d at 82-83.  In Finz, an attorney signed a release of pension claims against his law firm while still believing he was entitled to pension benefits from the firm.  The Second Circuit concluded that the attorney knowingly released all pension claims because "there is no question that [the attorney] knew that he may have been covered under the plan when he relinquished his benefits."  Id. at 83.  Similarly, the Seventh Circuit has concluded that a release of pension claims and covenant not to sue were knowingly executed and therefore enforceable, because the employee "may have had actual knowledge of [her employer's] refusal to categorize the $85,000 as wages (for pension purposes), and, in any event, certainly had sufficient constructive knowledge to support the release and covenant not to sue."  Fair, 905 F.2d at 1116.

These authorities command the same result in this case.  As was true for the plaintiffs in Finz and Fair, Plaintiff could have: (i) waited to sign the Release until after he was satisfied with the calculation of his pension benefits; (ii) simply refused to sign the Release; or (iii) sought to modify the Release to carve out these claims.  Indeed that is exactly what Plaintiff did with regard to the vesting schedule for his stock options; thus demonstrating that he knew how to preserve his rights under the Release.[4]  See Finz, 957 F.2d at 82-83; Fair, 905 F.2d at 1115-17.  But, rather than seeking to modify or refusing to sign the Release, on March 28, 2002, Plaintiff accepted over $400,000 in monetary and other benefits offered by BYK-Chemie and voluntarily relinquished any claim for additional benefits against Defendants as well as his ability to sue Defendants.

---

[4]     As discussed below, Plaintiff modified the Release to extend the period in which he had to exercise his remaining unvested stock options from 12 months to 24 months. (See DApx Tab 16, Ex. C at p. 000076.)

- 15 -

Accordingly, Plaintiff "should not be permitted to strike a better bargain at this late date," and the Court should enforce the Release and grant summary judgment in favor of Defendants.  <u>Finz</u>, 957 F.2d at 83.  <u>See also</u> <u>Fair</u>, 905 F.2d at 1117 ("We refuse to give Fair for free what she evidently declined to purchase at the settlement negotiations for a price.").

2.    *Plaintiff's Education and Experience Demonstrate that he Knowingly and Voluntarily Released his Claims.*

Plaintiff's education and business experience, particularly his twenty-year tenure as a corporate executive for BYK-Chemie, are strong indicators that he knowingly and voluntarily executed the Release.  Plaintiff holds both bachelor's and master's degrees in business administration.  (DApx Tab 19 at p. 5.)   After obtaining his MBA from American University and before coming to work for a predecessor of BYK-Chemie, Plaintiff spent several years in the accounting and corporate budgeting departments of various corporations.  (<u>Id.</u> at pp. 5-6.)  In 1981, Plaintiff began work as the corporate controller and later assumed the title of vice president of finance.  (DApx Tab 2 at pp. 7, 10-11.)  During over two decades of employment with BYK-Chemie, Plaintiff had extensive responsibilities over financial and personnel matters, such as accounting for corporate profits and losses, creating corporate budgets and financial statements, and supervising data processing, and purchasing. (DApx Tab 19 at p. 6; Tab 2 at pp. 10-11.)

Indeed, Plaintiff was also responsible for overseeing the human resources department at BYK-Chemie.  He had significant responsibilities over the Company's employee benefit plans and even served on Retirement Plan Administrative Committee for more than a decade. (DApx Tab 19 at p. 6; Tab 2 at pp. 10-11.)  Plaintiff was

- 16 -

responsible for the Plans' government filings, handling claims disputes, and communicating with employees about benefits. Given the breadth of Plaintiff business experience, and in particular his human resources and employee benefits experience, there is simply no room to argue that Plaintiff was not fully aware of the implications associated with executing the Release.

3.    *Plaintiff Had Ample Opportunity to Review the Release & Covenant and to Consult Counsel.*

In addition to being a highly educated businessperson with over twenty years of experience, Plaintiff was provided with ample time to study and review the terms of the Release before signing. By its terms, the Release provided Plaintiff at least forty-five (45) days to review it before signing. (DApx Tab 16, Ex. C at ¶ 10.) Plaintiff was specifically advised in the Release to consult with attorneys and financial advisors of his own choosing before deciding whether to sign. (Id. at ¶ 9.) The Release also provided Plaintiff seven days *after* signing to change his mind, revoke his election in writing, and back out of the agreement. (Id. at ¶ 10.) Thus, the second factor also weighs in Defendants' favor.    Hogan v. Eastern Enters/Boston Gas, 165 F. Supp. 2d 55, 62 (D. Mass. 2001) (finding that 45 days to consider release and seven days to rescind election weighed in favor of finding that release was knowing and voluntary); Yablon v. Stroock & Stroock & Lavan Ret. Plan & Trust, No. 01-Civ-452, 2002 WL 1300256, at *5 (S.D.N.Y. June 11, 2002) (45 day period to review and eight day period to rescind election sufficient), aff'd, 98 Fed. Appx. 55 (2d Cir. 2004).

ATL01/12058515v2

> 4.    *Plaintiff Had the Ability to Modify or Negotiate the Release Terms*.

Although Plaintiff was not personally involved in drafting the Release, he certainly had the opportunity to renegotiate its terms if he saw fit. The original Release provided that Plaintiff would have a period of twelve (12) months to exercise his remaining stock options. Apparently dissatisfied with this time period, Plaintiff revised the Release to provide for a 24 month period in which to exercise his remaining stock options. (DApx Tab 16, Ex. C at ¶ 3(b).) Indeed, as a senior level executive with over 20 years of business and employee benefits experience, Plaintiff was more than capable of looking out for his own interests. This simply is not a case where a party with superior bargaining power dictated the terms of an oppressive release. Accordingly, the fourth factor also weighs in Defendants' favor.

> 5.    *The Value of the Consideration for the Release Vastly Exceeds the Value of Plaintiff's Present Claims*.

By agreeing to release "any and all claims" against Defendants and not to sue them, Plaintiff secured for himself abundant valuable consideration: nearly $100,000 in cash; the option to receive medical coverage for ten years; his Company car; and an extension of the vesting schedule for his stock options. (DApx Tab 16, Ex. C at ¶ 3.) Indeed, because, *and only because*, Plaintiff executed the Release, and consequently received an extension of the vesting period for stock options, Plaintiff was able to reap approximately $300,000 from the sale of options from the 2000 and 2001 plans, which occurred two years after he terminated. (See DApx Tab 2 at pp. 20-22.) Otherwise, due to his termination in January 2002, Plaintiff's 2000 and 2001 options would never have vested and Plaintiff would never have been able to exercise them. (See DApx Tab 9 at p.

ATL01/12058515v2

BYK 00258.)  In contrast, the present value of Plaintiff's claims is approximately $100,000 to $125,000. (See, DApx Tab 20.[5])  Thus, the fifth factor weighs heavily in Defendants' favor.

## II. PROCEEDS FROM THE EXERCISE OF STOCK OPTIONS ARE NOT INCLUDED IN "COMPENSATION" FOR PURPOSES OF CALCULATING PLAINTIFF'S PENSION AND SUPPLEMENTAL RETIREMENT INCOME.

Even if Plaintiff had not knowingly and voluntarily released all ERISA-based claims, this action should still be dismissed, because the only proper interpretation of the Plan is that "Compensation" does not include the proceeds from the exercise of stock options.  Because the question before Court is purely a question of plan interpretation, resolution of this claim is appropriate for summary judgment.

### A. Applicable Standard of Review.

In Defendants' first summary judgment motion, this Court found that Defendants failed to respond to Plaintiff's claim for benefits under the Plan in the time frame specified by the applicable claims regulations.  Linder v. BYK-Chemie USA Inc., 313 F. Supp. 2d 88, 92-93 (D. Conn. 2004).  As such, Plaintiff was not required to exhaust his administrative remedies before pursuing his claims in this Court. (Id.)  Although it is not entirely clear whether this ruling affects the application of the arbitrary and capricious standard of review, the Court need not tarry long over this issue, because Defendants prevail under either the arbitrary and capricious standard of review or the *de novo*

---

[5]    The difference in Plaintiff's pension benefit with and without the stock options is approximately $81.01 per month and the difference in his benefit under the SERP is approximately $734.09 per month, assuming a life annuity was elected. (See DApx Tab 20.)  Assuming Plaintiff has a 20 year life expectancy and further assuming a discount rate of 6%, the present value of Plaintiff's claim is approximately $113,772.29.

standard of review.  See Compagnie Financiere de CIC et de L'Union Europeene v.

Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 158 (2d Cir. 2000).

**B.  The Plain Language Plans Excludes Proceeds from Stock Option Sales from the Calculation of "Compensation."**

Plaintiff contends that he is entitled to an increased pension benefit or increased

supplemental retirement benefit because the proceeds from his 2001 exercise of his stock

options were excluded from the calculation of his "Compensation" for the year 2001.

Examination of the operative language of the Plans confirms that Plaintiff is wrong as a

matter of law and undisputed fact.

A participant's benefit under the Retirement Plan is a multiple of the participant's

"Final Average Compensation" and "Years of Service." (DApx Tab 3 at § 5.1.)  The

Retirement Plan defines "Compensation" as:

> the regular remuneration actually paid or accrued by the Employer to or
> for the benefit of an employee during the period of reference, including,
> under rules uniformly applicable to all employees similarly situated, any
> bonuses and pay for overtime or special pay, and excluding the
> Employer's cost for any public or private employee benefit plan, including
> the Plan . . . .  Compensation shall not include the value of any fringe
> benefits provided by the Employer, including, but not limited to, auto
> allowances and group term life insurance. . . .  For Plan Years beginning
> on or after January 1, 1994, an employee's Compensation shall not exceed
> $150,000, as adjusted for cost-of-living increases in accordance with
> section 401(a)(17)(B) of the Code.

(Id. at § 1.10.)  The SERP adopts the Pension Plan's definition of "Compensation,"

except for certain limitations not relevant here. (DApx Tab 6 at § 2.03; Tab 7.)

On its face, this definition does not encompass income derived from the exercise of

stock options.  Nowhere in the definition are stock options even mentioned.  Pursuant

- 20 -

to the well known maxim of contract interpretation *expressio unius est exclusio alterius*,[6] the Plans' omission of stock options from the extensive definitions elucidating "Compensation" indicates an intent to exclude them. See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) (utilizing *expressio unius* maxim to interpret an ERISA plan). Compare Soule v. Ret. Income Plan for Salaried Employees of Rexham Corp., 723 F. Supp. 1138, 1141, 1150-52 (W.D.N.C. 1989) (concluding that plan's definition of "Earnings" comprehended proceeds from stock options because it expressly *included*, *inter alia*, "distributions made under the . . . Executive Stock Option and Performance Share Compensation Plan").

Maxims aside, however, a plain reading of the definition demonstrates that stock option proceeds are not included. Only "regular remuneration" falls within the scope of Compensation. Webster's defines "regular" as "recurring, attending, or functioning at fixed or uniform intervals." Merriam-Webster's Collegiate Dictionary 985 (10th ed. 1995). In other words, Compensation encompasses only those forms of remuneration which are paid on a regular and recurring basis, such as wages and salaries. Nothing about the granting and subsequent exercise of stock options under the SOP is "regular." First, the grant of options under the SOP is entirely discretionary, i.e., the Company has the option to grant them once and never again if it sees fit. (DApx Tab 9 at p. BYK

---

[6] "The doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded." Plumbers & Steamfitters Local No. 150 Pension Plan v. Vertex Constr. Co., Inc., 932 F.2d 1443, 1449 (11th Cir. 1991). See also, e.g., Smith Barney, Inc. v. Critical Health Sys. of N.C., Inc., 212 F.3d 858, 861 (4th Cir. 2000) (employing this maxim in construction of a contract); Conn. Gen. Life Ins. Co. v. Sun Life Assurance Co. of Canada, 210 F.3d 771, 775 (7th Cir. 2000) (same); In re Ore Cargo, Inc., 544 F.2d 80, 82 (2d Cir. 1976) (same).

00257.)  Second, the ability to exercise stock options is also contingent.  Not only are Participants required to maintain a minimum investment in Altana stock, but options can only be exercised after at least a two year holding period and only then if the Company meets certain specified profitability benchmarks.   If the benchmark is not met, the options automatically lapse.  Thus, in stark contrast to salary and wages, stock option proceeds are irregularly paid and contingent in nature.[7]

The Second Circuit has affirmed precisely the same reasoning for excluding stock option proceeds from the calculation of a participant's "Earnings" for pension plan purposes.  O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 60-61 (2d Cir. 1994).  Noting that "the core concept of 'Earnings' was regular salary," the Second Circuit concluded that proceeds from stock options were excludable as beyond the scope of "Earnings" according to the following reasoning, which is fully applicable to this case:

> Third, the Committee considered that the general purpose of the RKO Plans was to replace a certain percentage of an employee's regular annual compensation upon retirement.  Inclusion of [stock option income] payments in "Earnings" would not further this purpose because such payments were not regular annual compensation, given that the awards did not vest when conferred and, absent an election by the employee, were paid at retirement or termination.

Id. at 60.

---

[7]    Moreover, as noted, to participate in the SOP, employees are required to make an initial investment in Altana stock which is a prerequisite to participating in the plan. (DApx Tab 9 at p. BYK 00249.)  Employees are required to maintain this investment throughout their participation in the SOP, otherwise the options lapse. (Id.)  The SOP also permits participants to exercise their options following their retirement or termination in certain instances.  Clearly, income derived from the exercise of options after employment ceases cannot be characterized as Compensation, much less regular remuneration.

- 22 -

Equally important, the second passage of the definition specifically excludes from the definition of Compensation "the Employer's cost for any public or private employee benefit plan" and "fringe benefits." These two exclusions cover the entire waterfront of possible employee benefits, including the stock option plan. (DApx Tab 3 at § 1.10.) Obviously, the SOP is a "plan" offered for the benefit of employees[8] or a "fringe benefit," a category often understood to encompass stock options, or both. (Id.) E.g., Hartley v. Dillard's, Inc., 310 F.3d 1054, 1062 (8th Cir. 2002) (listing stock options as one of several examples of "various fringe benefits of employment"); Kennedy v. Comm'r, 671 F.2d 167, 175 (6th Cir. 1982) (listing stock options among "fringe benefits"); In re Marriage of Hug, 201 Cal. Rptr. 676, 680 (Cal. Ct. App. 1984) ("stock options fall into the same category as, for example, fringe benefits . . . ."); Black's Law Dictionary 667 (6th ed. 1990) (defining "fringe benefits" as "Side, non-wage benefits which accompany or are in addition to a person's employment . . . . Such benefits are in addition to regular salary or wages. . . ."). See also In re Vasu, 129 F. Supp. 2d 113, 121-22 (D. Conn. 2001) (noting that stock options do not constitute "wages" under New York law). Viewing stock options as fringe benefits or otherwise beyond the scope of "Compensation" finds strong, authoritative support in regulations promulgated by the

---

[8]     The "Employer's cost" of maintaining the stock option plan includes the amounts paid to executives upon exercising and cashing in options. Indeed, when options are exercised under the Plan, the Company takes a charge against earnings which is equal to the value of the exercised options, which in turn reduces the capital value of the Company. (DApx Tab 1 at pp. 57, F-10 – F-11, F-22 – F-29.).

Internal Revenue Service, one of the federal agencies charged with responsibility over employee benefit plans.[9]

Finally, in Treasury Regulation 1.415-2(d), the IRS specifies which types of "remuneration" are includable as "compensation" for purposes of benefit plans pursuant to 26 U.S.C. § 415. Under the heading "Items not includable as compensation," the IRS states:

> "The term "compensation" does not include items such as –
>
> "Amounts realized from the exercise of a non-qualified stock option, or . . . . .
>
> "Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option."

26 C.F.R. § 1.415-2(d)(3)(ii)-(iii). See Scipio v. United Nat. Bankshares, Inc., 284 F. Supp. 2d 411, 422-24 (N.D. W. Va. 2003) (describing § 1.415-2(d) as the "default rule" for compensation definitions in benefit plans, and upholding a plan's exclusion of stock options from "earnings" based on the IRS regulations), aff'd, 119 Fed. Appx. 431 (4th Cir. Dec. 22, 2004). Because the Retirement Plan is a tax qualified plan, these regulations apply to it. Accordingly, while "compensation" normally includes items such as "wages, salaries, [and] fees for professional services," it normally excludes proceeds from the exercise of stock options. 26 C.F.R. §§ 1.415-2(d)(2)(i), (d)(3)(ii).

Moreover, when courts have reached the opposite conclusion – that stock option proceeds are not fringe benefits and therefore should be included in pension calculations

---

[9]     See Esden v. Bank of Boston, 229 F.3d 154, 169 (2d Cir. 2000) (holding that the IRS' " 'fair and considered judgment on [a pension benefit] matter' . . . is . . . entitled to deference").

– they have relied on plan language expressly including all earnings reported on an IRS Form W-2, an employer's prior practice of including proceeds from stock options in pension calculations, or evidence of the employer's intent to include these proceeds. E.g., Adams v. La.-Pac. Corp., 284 F. Supp. 2d 331, 338-39 (W.D.N.C. 2003); DiCiccio v. Duquesne Light Co., 911 F. Supp. 880, 886-88, 898 (W.D. Pa. 1995). But here, in contrast, no such plan terms, no such prior practice, and (as set forth below) no such evidence of intent exist. Rather, all evidence of intent indicates that Plaintiff's employer, the settlor of the Pension Plan and SERP, did not intend for the proceeds of stock options to be included in pension or supplemental retirement income calculations.

### C. All Evidence of the Settlor's Intent and Surrounding Circumstances Confirms that "Compensation" Does Not Include Proceeds from Stock Option Sales.

While Defendants do not believe that it is necessary to resort to extrinsic evidence, a review of this evidence further confirms that stock option income is not included in the definition of Compensation under the SERP and Retirement Plan. "The fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." Klos v. Polski Lini Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997). When a court in the Second Circuit construes a contract, it "must ascertain and implement the reasonable expectations of the parties who undertake to be bound by its provisions." Spear, Leeds & Kellogg v. Cent. Life Assurance Co., 85 F.3d 21, 28 (2d Cir. 1996). See also Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119, 124 (2d Cir. 2005) ("A court in determining the parties' intent should consider the

circumstances surrounding the transaction as well as the actual language of the contract.").

The evidence confirms that BYK-Chemie USA Inc. intended to exclude stock option proceeds from the calculation of benefits under the Pension Plan as well as the SERP. As Jörg Bauer, the head of human resources for BYK-Chemie's parent company – an official intimately familiar with the benefit plans established for employees of BYK-Chemie – has explained, BYK-Chemie has never included, and *intentionally excluded*, income from the exercise of stock options from benefit calculations under the Pension Plan and the SERP in order to safeguard the assets of the Plans and protect the reasonable expectations of Plan participants. (DApx Tab 4 at ¶¶ 2, 5-6.) Including stock option proceeds in benefit calculations would subject benefit and supplemental retirement income determinations (and thus the Plans' assets) to the volatility of the stock market and the individualized, unpredictable decisions by option holders on the timing of exercising options. (Id. ¶ 5.) BYK-Chemie rejected this risky course, opting instead for much more prudent and predictable criteria for determining pension benefits and supplemental retirement income. (Id.)

Mr. Bauer's explanation of BYK-Chemie's intent dovetails with the statements and conduct of the actuaries responsible for the Pension Plan and SERP. When determining BYK-Chemie's funding obligations for the Plans, the actuaries have never taken into account income which participants may receive from the exercise of stock options. (DApx. Tab 14 at ¶¶ 4, 7.) Consistent with this practice, actuary Barbara Sheldon in 2001 informed Plaintiff and Mr. Dulik (in response to their inquiry) that

income from the exercise of stock options was not includable in benefit and retirement income calculations under the Pension Plan and SERP. (DApx Tab 15 at ¶ 5.)  Moreover, as explained by Ms. Sheldon and actuary Richard Sych, BYK-Chemie's exclusion of stock options from Pension Plan and SERP benefit calculations follows the pattern and practice of most plan sponsors. (Id. at ¶ 5; DApx Tab 14 at ¶ 6.)  See also Scipio v. United Bankshares, Inc., 119 Fed. Appx. 431, 437 (4th Cir. Dec. 22, 2004) (concluding, in light of the IRS' exclusion of stock option proceeds from "compensation," 26 C.F.R. § 1.415-2(d), that qualified "plans would not normally consider stock option benefits in the calculation of annual retirement benefits").

The only extrinsic evidence to the contrary is the self serving interpretation of Compensation that Plaintiff procured from Mr. Dulik.  This "evidence," however, lacks probative value for at least three reasons.  First, Dulik had absolutely no authority to interpret the Retirement Plan or SERP.  Rather, this authority was vested exclusively in the Administrative Committee. (DApx Tab 3 at § 9.1.)  Second, both Plaintiff and Dulik suffered from the identical conflict of interest and under the express terms of the Retirement Plan they were precluded from making any determination that would, as here, impact the determination of their own benefit. (Id. at § 9.1.2.)  Third, the Dulik email was not the result of an administrative determination and therefore is not entitled to any deference.  See Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89, 92 (2d Cir. 2000) (citation and quote marks omitted).  See also Roberton v. Citizens Utilities Co., 122 F. Supp. 2d 279, 286-87 (D. Conn. 2001) ("If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the

ATL01/12058515v2

administrator's decision drops away and the court interprets the plan *de novo*" (quote marks and citation omitted)) (Smith, J.); <u>see also</u> <u>White v. Sustrand Corp.</u>, 256 F.3d 580, 584 (7th Cir. 2001).  (<u>See</u> DApx Tab 2 at p. 34 ("an administrator cannot participate in his own, you know, in a decision regarding himself").)

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted as to all Counts in the Complaint.

Respectfully submitted on November 8, 2005,

THE DEFENDANTS,

BY:  _____/s/_____
     CHARLES F. CORCORAN, III
FOR: Carmody & Torrance LLP
     195 Church Street, P.O. Box 1950
     New Haven, CT 06509-1950
     (203) 777-5501
     Federal Bar No. ct04299

     Gregory C. Braden
     Michael G. Monnolly
     Alston & Bird LLP
     1201 West Peachtree Street
     Atlanta, GA 30309
     (404) 881-7000

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed, postage prepaid, on

November 8, 2005, to:

        Lawrence H. Lissitzyn, Esq. , Dominic Fulco, III
        Todd S. Federico, Robert B. Huff
        Reid and Riege PC
        One Financial Plaza
        755 Main Street
        Hartford, CT  06103-3185

                       /s/_____
                      Charles F. Corcoran, III

ATL01/12058515v2