# TAB 2

**Part 1 of 2**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - -X

GILBERT E. LINDER, :
PLAINTIFF :

VS. :

BYK-CHEMIE USA INC., in its capacity as Plan Sponsor of the RETIREMENT PLAN OF BYK-CHEMIE USA INC., and the SUPPLEMENTAL RETIREMENT PLAN OF BYK-CHEMIE USA INC., :
DEFENDANTS :

- - - - - - - - - - - - - - - - - - -X

Civil Action No.

3:02CV1956(JBA)

ORIGINAL

Telephonic deposition of GILBERT E. LINDER taken at the offices of Reid and Riege, P.C., One State Street, Hartford, Connecticut 06103, before Clifford Edwards, LSR, Connecticut License No. SHR.407, a Professional Shorthand Reporter and Notary Public, in and for the State of Connecticut on October 25, 2005, at 3:30 p.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443

HARTFORD NEW HAVEN STAMFORD

A P P E A R A N C E S:

ON BEHALF OF THE DEFENDANTS:

MICHAEL MONNOLLY, ESQ. (VIA TELEPHONE)
ALSTON & BIRD, LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309

ON BEHALF OF THE PLAINTIFF:

LAWRENCE H. LISSITZYN, ESQ.
REID AND RIEGE, P.C.
One Financial Plaza
Hartford, Connecticut 06103

THE COURT REPORTER: Did you need this transcript expedited?

MR. MONNOLLY: If that's at all possible, it would be greatly appreciated.

THE COURT REPORTER: And Attorney Lissitzyn, did you need this expedited as well?

MR. LISSITZYN: I would like to have it expedited as well, yes.

THE COURT REPORTER: And am I taking the exhibits or are you guys keeping the exhibits?

How do you want to do that?

MR. MONNOLLY: I'm fine with having him take a copy.

I mean, did you make a separate copy for yourself, Larry, or --

MR. LISSITZYN: No, but I will.

MR. MONNOLLY: Okay.

MR. LISSITZYN: But I'd rather not make the copy until such time as the --

MR. MONNOLLY: -- exhibit stickers are on and everything?

MR. LISSITZYN: Yeah, exactly.

MR. MONNOLLY: Okay.

And there's a total of five -- hold on.

MR. LISSITZYN: We have six.

MR. MONNOLLY: Six exhibits, that's correct.

MR. LISSITZYN: Okay. And we have them as I think you sent them.

MR. MONNOLLY: Yes.

MR. LISSITZYN: But what I would like to do is to make sure when we take an exhibit, we just establish how many pages it is.

MR. MONNOLLY: Okay.

MR. LISSITZYN: That way --

MR. MONNOLLY: And I'll be frank with you, Larry, I may not go through all of them, and I certainly don't plan on going page by page.

MR. LISSITZYN: Okay. But I would like to agree that all of these exhibits, all six of them, are hereby authenticated.

MR. MONNOLLY: Okay.

MR. LISSITZYN: Would you swear in the witness, sir?

GILBERT E. LINDER

residing at 200 Nutmeg Place, Cheshire, Connecticut 06410, having first been duly sworn, deposed and testified as follows:

DIRECT EXAMINATION

BY MR. MONNOLLY:

Q Mr. Linder, I already introduced myself --

A Yes.

Q -- and I will be representing BYK-Chemie in the deposition this afternoon.

A Okay.

Q And I know you've previously given a deposition in this case so I don't think I need to go through all of the rules.

But since this is a telephonic deposition, which is new to me and probably to yourself as well, it's important that you respond verbally to any questions I pose as, one, that will help the court reporter to be able to take it down and, two, it will be able to let me know what your response is.

If you don't understand any of my questions, just let me know and I'll be happy to rephrase them. If you don't hear me, just let me

know.

If you need to take a break, obviously you are free to do. So just let us know and we'll be happy to excuse you.

A Okay.

Q I don't think this is going to take probably more than an hour, hour and a half tops, and so I guess we will jump right into it.

A Okay.

Q Do you have any questions for me before we get started or concerns?

A No. Shoot.

Q Okay. I know you have given some background information in the prior one so I won't go over everything, but are you currently employed now?

A Yes.

Q And where are you employed?

A I work for the East Haven, Connecticut school district.

Q And in what capacity?

A I am a high school math teacher.

Q Okay. And how long have you had that position?

A Since August.

Q Okay.
A Of this year.
Q Okay. And when did you first start working with BYK-Chemie?
A I was hired on May 11, 1981.
Q Okay. And in what capacity were you hired in as?
A Controller.
Q Controller, okay.
And when did you first learn that BYK-Chemie was going to terminate your employment?
A September 13th, 2001.
Q And who told you that?
A Dr. Klaus Oehmichen. That's spelled O-e-h-m-i-c-h-e-n.
Q Who was he at the time?
A Well, his -- the English title would be -- he was the gesheft fuhuer of the German parent company, and I guess we'd call him director, like the director of the company.
Q Okay.
A Like president, president of the company. Of the German -- of the BYK -- he represented BYK-Chemie GMBH, the German company.
Q Okay. And was he located in the offices

that you worked at?

A Was his primary --

Q Yes.

A His primary office was in Wesel, Germany.

Q And what did he tell you the reason was that you were being terminated?

A I don't know. It was very quick. He talked about -- he talked about restructuring the company. He talked about a bunch of things. He didn't like the way things were progressing in the company.

He didn't like -- he was unhappy with the relationships between the president and the two vice presidents, including myself, and he decided it was time to basically restructure the top three positions and he terminated all three of us.

Q Who were the other two individuals, if you know?

A I reported to the president, Zachary Levine.

Q Okay.

A And I had a colleague who was the vice president of marketing.

His name was Jeffrey Converse, like the sneaker.

Q Okay.

A He terminated all three of us on that day.

Q Okay. And at the time that you were let go in September, or told that you were being let go in September, what was your position at that time?

A I was a vice president of finance.

MR. LISSITZYN: Mike, this is Larry.

MR. MONNOLLY: Yeah.

MR. LISSITZYN: Just a point of clarification. I believe the date that Gil gave you was the date on which he was notified that he was going to be terminated.

MR. MONNOLLY: Yeah, I understood that.

MR. LISSITZYN: But I don't think that was the date on which he was actually terminated or his last day.

MR. MONNOLLY: No, I understood that. I understood that.

MR. LISSITZYN: Okay.

BY MR. MONNOLLY:

Q And how long had you been the vice president of finance at that point?

A You mean with that title?

Q Correct.

A Oh, somewhere in the mid '80s.

They -- my title changed from controller to vice president of finance. I can't tell you exactly when.

Q That's okay.

And do you recall roughly what your annual salary was then?

A When I left the company?

Q Correct.

A My direct salary was approximately 115,000.

Q Okay. And then did you also receive bonuses?

A I received -- they had an annual bonus plan which fluctuated based on my performance and company performance and, at that time upon leaving, I received a bonus of $40,000.

Q Okay.

A For my final year.

Q And could you briefly, very briefly describe what your responsibilities were as the vice president of finance?

A I was responsible for several functions: The accounting function, the purchasing function,

the data processing function, the human resource function.

Q Okay.

A The office, let's say receptionist function of the building.

Q Okay. And at that point in time, I guess 2001, would Mr. Levine have been your direct supervisor?

A Yes.

Q And who would have been above Mr. Levine in the hierarchy?

A He reported to Dr. Oehmichen.

Q Okay.

A In Germany.

Q At the time you learned of your termination or during that year 2001, did you have any responsibilities over the BYK-Chemie employee benefit plan?

A Yes.

Q With regards to -- and just for clarification, when I refer to the retirement plan, I'll be referring to the actual pension plan, the BYK-Chemie pension plan.

A Okay.

Q Did you have any responsibilities with

respect to the retirement plan?

A Yes.

Q What were those duties?

A They were to oversee the proper reporting to the government, proper and timely reporting to the government.

I had a person working for me. Her name is Carol Foley, F-o-l-e-y. She was my assistant and she completed all the proper government documents.

I also fielded questions from employees from time to time regarding the pension plan. That was basically it.

There was very little -- regarding the pension plan, there was very little activity. In fact, I don't think we had a retiree until -- I think we only had one or two retirees at that point.

Q Okay.

A It had been in existence for a while but there were no real retirees until just recently.

Q And were you a member of the administrative committee for the retirement plan?

A Yes.

Q And were you appointed to that position?

A Yes.

Q And who would have made that appointment?

A That was a board resolution.

Again, I can't tell you exactly when, but sometime in the either late '80s or early '90s, I was appointed by board resolution of BYK-Chemie USA, Inc.

Q Okay. And were there any other members during, I guess, almost 10 or 15 years that you served on that committee?

A Yes.

Q And do you recall who those were at the time you were terminated?

A Well, at one time, I originally reported to the president of BYK-Chemie USA, and his name was Wolfgang Zinnert, Z-i-n-n-e-r-t.

Q Okay.

A He retired. Zachary Levine took over, so he replaced him as a committee member.

And Jeff Converse was a committee member. I think it was just the three of us.

Q Okay. And so would Mr. Levine and Mr. Converse have both been on the committee in 2001?

A Yes.

Q Okay.

A At the time of their termination?

Q Yes.
A Yes.
Q Okay. At the time that you served on the committee, and I guess maybe just take maybe like the last four or five years, had the issue of whether or not stock option compensation under the SOP plan, which would be the Altana stock option plan, whether or not income that came from the exercise of those options, whether that would be included in the definition of compensation under the retirement plan?
A No, that never came up.
Q Okay.
A Could I add one thing?
Q Sure.
A As a matter of fact, I can't recall us ever meeting.
Q Okay.
A On any issue.
Because there really weren't any issues to meet on.
Q You didn't have any claims come up while you were on --
A No.
We had absolutely no claims. And, as I

said, there were only like two people retired and, again, I would get an occasional question from the current working body, but there were very few issues, if any.

MR. LISSITZYN: Mike, can I interrupt you for a second?

Let me ask, Cliff, how are we doing for you?

Is that any clearer?

THE COURT REPORTER: Fine. Thank you.

MR. LISSITZYN: Some of these names are worse than mine. We'll try and spell them for you at the end.

So, with that in mind, Counsel, please proceed.

BY MR. MONNOLLY:

Q Mr. Linder, did you have any responsibility with regard to the SERP?

A No, not really, other than -- no, not really.

Actually, the SERP, the administration of the SERP was handled by my colleague, Art Dulik, in Altana, Inc. in New York.

Q And he handled -- he handled the

administration with respect to -- and I guess because I'm not really clear on this -- with all of the companies who were participating in the SERP?

A Yeah.

Q Let me strike that.

A Yeah.

Q Let me ask that again.

A Yeah.

Q You said Mr. Dulik was in charge of the administration of the SERP?

A Yeah.

Q Was he the only person who was in charge of the administration?

A Well, again, I believe so. Again, he was my colleague working at a sister company and he was very close to the -- he was very close to the creation of the SERP.

In fact, it was his idea. It was his idea. He was the one who initiated the creation of the SERP in the late '80s -- I should say either late '80s or early '90s.

And he and his staff would collect salary data and then issue annual statements of benefits regarding the SERP to whoever -- to whatever officers were involved between the two companies

between Altana, Inc. and BYK-Chemie USA, Inc.

Q When you say he was involved in creating the SERP, was it your understanding that he had authority in his capacity as an officer of Altana to establish the SERP?

A No.

He made recommendations to management and he made recommendations to his management explaining the deficiencies of the pension plans of the Altana and BYK USA pension plans that they did not cover, that they did not cover officers' salaries to the extent he thought they should be covered.

And he was the one who initiated the idea of creating a SERP. He later got permission from the German officials who okayed the SERP, and board resolutions were passed by both companies, Altana, Inc. and BYK-Chemie USA, Inc., and the SERPs were created. I'm not sure who wrote the document. It may have been Saul Ben-Meir.

Q Okay. So he would have just made the proposal, he wouldn't have had the authority to --

A Right.

(THEREUPON, THE COURT REPORTER REQUESTS CLARIFICATION.)

BY MR. MONNOLLY:

Q So Mr. Dulik didn't have authority to so-call establish that plan himself.

Is that correct?

A Correct.

Q Okay. And do you know if there was anyone else involved with Mr. Dulik in administering the SERP?

I mean, for example, did he have a staff? You said you worked with Carol Foley.

Did he have someone in that similar capacity?

A Sure. Yeah.

I mean, he was a vice president of finance for a sister company but a much larger company and he had a staff of financial and accounting people, human resource people.

So I'm sure he had an assistant --

Q Okay.

A -- working with him.

Q Okay. And with regards to the stock option plan, did you have any responsibilities for that plan?

A Stock option plan. No.

Other than I -- other than -- other than

making sure that the checks issued to the BYK-Chemie USA, Inc. officers were calculated correctly.

Q No administrative responsibilities though?

A No. I don't -- no. No.

Q Okay. When you learned, I guess you said it was in September of '01, that you were going to be let go, at that point in time, did you own any stock options under the SOP?

A Yes.

Q Do you recall how many options you held roughly?

A Well, there were three -- I was a participant in three plans: The 1999, the 2000 and the 2001 stock option plans.

I'm just guessing now, but I think it was roughly -- roughly 7,000 shares each.

Q Okay.

A Give or take.

Q Each year?

A Each year. 7,000 for '99, maybe 6,000 or 7,000 for 2000, and I don't know what, you know, maybe 5,000 or 6,000 or 7,000 for the 2001 plan.

Q Okay. And did you have to purchase the options?

A No.

Did I purchase?

I don't understand that.

Q Did you have to buy into the plan to participate?

A At the very -- yes, at the very beginning, there was a very small voluntary payment.

Q Do you recall offhand how much that was?

A Maybe a thousand -- I'm not sure. Don't hold --

Q That's okay.

A Maybe a thousand dollars. Maybe a couple thousand.

I'm not sure.

Q Okay. And so you indicated that you had options granted in '99, 2000, and 2001?

A Right.

Q When was the first time you exercised any of those options under the plan?

A August 31, 2001.

Q And do you recall how many you exercised at that point?

A Well, roughly 7,000.

Q Okay.

A I don't have a document in front of me.

Q That's okay. That's okay.

A Yeah.

Q And did you exercise any of the other options at any point after that?

A Yes.

Q Do you recall when?

A Well, I exercised the options from the 2000 plan -- again, I'm guessing -- I think in 2002. I can't tell you when though.

Maybe somewhere during the summer of 2002.

Q So that would have been after you --

A After I left the company.

Q -- terminated employment?

A Right.

I still held the rights to those options.

Q And do you still currently hold any rights to the options or did they all expire?

A No, they didn't expire.

I actually just recently exercised the 2001 options.

Q Okay.

A This year. I exercised those in the spring of this year.

Q Okay.

A So -- I have no claims to any more -- no further options.

Q And you indicated that you exercised the second batch, I guess, within mid 2002?

A Yeah, I believe so.

Q Do you know what the payout was on those shares -- or those options, I'm sorry?

A On the 2002?

Q Yes.

A Again, I would say roughly a quarter of a million dollars.

Q Okay. And then what about on the 2001, the ones that you would have done this last spring?

A The value of those options were approximately 60 or 70,000 --

Q Okay.

A -- dollars.

MR. MONNOLLY: If the court reporter could hand Mr. Linder what is going to be marked as Defendant's Exhibit 1, and that is the e-mail from Art Dulik to Gil Linder.

The top header is dated Tuesday the 29th of January 2002. It's approximately two pages.

(THEREUPON, DEFENDANT'S EXHIBIT NO. 1, E-MAIL DATED 1/29/02, WAS MARKED FOR IDENTIFICATION.)

BY MR. MONNOLLY:

Q Mr. Linder, you've been handed what's been marked as Defendant's Exhibit 1.

Do you recognize that document?

A Yes.

Q And what is that document?

A The document is an e-mail from Art Dulik at Altana, Inc. to me.

Q Okay.

A Dated January 29, 2002.

Q And what is the bottom half? Is that --

A Okay. The paragraph on the top is his reply to me --

Q Okay.

A -- of my e-mail to him.

The bottom part is my e-mail to him. Looks like that was dated January 28th.

Q Correct. Okay. Thank you.

And prior to sending this e-mail to Mr. Dulik, had you discussed this issue of whether or not the stock option income was going to be included in the definition of compensation?

A Discussed with who?

Q With Mr. Dulik.

A We occasionally brought the subject up over the prior few years.

Q Do you remember any specific instances in which that issue came up?

A Not really.

I would -- since we were colleagues and -- he would visit Wallingford and I would visit Melville. We actually skied together once.

It could have come up from time to time -- it could have come up twice. I don't recall exactly when under any specific circumstance.

Q Do you remember any of the specifics from any of the discussions with him?

A Other -- nothing other than we -- we were both -- we both knew that we had stock options, and we both knew that it was a debatable situation regarding the option income as it would be interpreted by the plan.

Q Okay. And so there -- just so I'm clear, and I think you've probably already answered this for me, but, prior to this e-mail going out, there were no instances in which an employee had exercised options and that specific issue was raised with the

administrative committee?

A Well, I don't -- the -- the issue had never come up.

Q Okay.

A But I'm not sure about your -- I'm not sure about the administrative committee comment.

Q I meant the committee you served on under the retirement plan?

A It never came up to our administrative committee.

As I said, we never -- the committee almost -- I don't think we ever met because it wasn't -- I don't think we had any issues.

Q Okay. And at the time that you had sent this e-mail to Mr. Dulik -- and I think you kind of answered this -- were you friends with Mr. Dulik?

Were you just colleagues?

I mean, did you socialize with him?

A No, I didn't socialize -- no.

Again, we were colleagues. We worked closely because we worked at brother and sister companies and his company performed services for my company.

We were always in contact with each other regarding data processing questions and accounting

questions and auditor questions, closing the books questions. So, I mean, I was always in contact with him.

Q Okay. And do you know what his position was at the time he sent this e-mail?

A I believe he was the vice president of finance for Altana, Inc.

Q And did he sit on the committee, the administrative committee for the BYK-Chemie retirement plan at this time?

A No.

Q Had he ever sat on that committee, to your knowledge?

A No.

Q Okay. Do you know whether he sat on I guess what would be the analogous committee for the Altana retirement plan?

A My -- well, at this moment, I can't say for sure, but I would guess he did.

Q Okay. And if you turn to Exhibit 1, and I'm looking at the bottom half of the page, your e-mail, in the first paragraph there, if you read down, I think it's the third sentence where it starts, "Two issues have come up regarding compensation to employees."

And my question is: How did the two issues that you identified in that paragraph come up?

A I'm sorry, where?

Q The first paragraph in your e-mail where it starts, "As a member of the administrative committee."

A Right.

Q I believe it's the third sentence.

A Okay.

Q And you indicated two issues had come up, and my question is: How did those issues come to your attention?

A Well, I think the situation regarding myself I think was basically self-evident. I think I even explained it in my -- in my e-mail to him about my situation.

The second situation regarding the Altana investment plan -- I call it the AIP here -- and the stock appreciation rights, that came up during -- during a meeting I held with a BYK-Chemie USA Wallingford employees that fall, either that fall or winter where I -- I was asked to present the new stock investment plan that the employees were being introduced to.

And, during that meeting, I was asked about the income from those options related to pension.

Q Okay. And so that would have been -- you think that was back in the fall of 2001 when that --

A Yeah.

Q -- came up?

A Yeah. My meeting was -- I'm not sure when it was.

It was either late fall or winter. I have no recollection of the exact date of that meeting.

Q Did you participate in the AIP plan?

A No.

Q Okay. And so the first -- I guess the first issue, the issue dealing with stock options, that dealt solely with yourself and not any other employees.

Is that correct?

A Well, stock options regarding the stock option plan, that was for just management.

But the employees also received stock options under the Altana investment plan.

Q Let me clarify.

In terms of you approaching Mr. Dulik on this issue --

A Right.

Q -- and you telling him that this issue came up, I guess what I'm trying to get at, when you say "the issue came up," this was your concern over whether you personally would be able to count on the stock option income being deemed compensation under the retirement plan?

A Yes.

I was asking him, I was posing the question to him.

Q Okay. Okay. And then if you go a little bit further down to, I guess it's the third paragraph there where it says, "Per Hooker and Holcomb's actuarial evaluation report" --

A Yes.

Q And if you read down through there, it says, "Total wages in either amounts reportable in form W-2 but excluding the value of fringe benefits."

What was your point there?

A I was just giving him -- my point was to give him some background information whether he was aware of that or not.

Q I mean, was it your opinion that Hooker and Holcomb's characterization of total wages in

that report led you to conclude that the stock option would have been deemed compensation for purposes of the retirement plan?

A Well, I think at that time I think I may have thought that -- may have implied that question.

Q Did you ever speak to anyone at Hooker and Holcomb prior to that time regarding this report?

A No.

Q And did you understand that the Hooker and Holcomb report, that it was a summary of the plan provisions and not the actual plan provisions?

A Yes.

Q Okay. If you can go down to the next paragraph, which would be the last paragraph on that first page.

A Uh-huh.

Q And the second sentence in that paragraph says, "The reasons for my position are as follows: The SOP has been effective for each year on a regular basis since 1999 and the managing board intends to continue the plan."

On the last part there, the managing board, who were you referring to?

A The Germans.

Q Okay. And had you asked them whether they

had planned on continuing the SOP plan?

A No.

Q So what did you base that statement on?

A I think it was in writing.

I think -- again, I can't put my finger on it, but I think it may have been on one of the stock option documents.

Q Okay.

A Stock option plan documents.

Q So you think the plan itself said that it was going to be continued?

A Yeah.

Again, it may -- it might have been in that document and it may have also somewhere have been verbally communicated that their intention was to continue.

Q Do you recall ever having any conversations with anyone on the managing board regarding that?

A No.

But I certainly attended -- I attended a meeting in Germany in 1999. I was part of a meeting of all worldwide managers where we were given a presentation by the German management regarding the newly created stock option plan, and it could have