# TAB 2

1   come up in conversations there.  I mean --

2        Q    Do you recall any specific conversation?

3        A    Not really.  From what I can generally

4   remember is that the implication was that this was a

5   new plan, that the intention was to continue it,

6   that it was not just a one-shot deal, that 1999

7   would be the first and that, hopefully, if the

8   company, you know, if things went well, it would

9   continue.

10        I'm sure they also mentioned the legal

11   caveats that, you know, doesn't necessarily mean

12   that they are obligated to continue it, but I think

13   things like that were discussed.  I think it was

14   fairly well thought of among the managers that were

15   involved that this would be a regular type plan.

16        Q    Okay.

17        A    A regularly occurring plan.

18        Q    And do you recall any -- I mean, can you

19   attribute a statement to any specific member of the

20   managing board?

21        A    You mean an actual quote?

22        Q    Yes.

23        A    No, I can't, other than there may be

24   something similar to that in one of the documents.

25        Q    Okay.  That's fair enough.

33

1           Okay.  If you turn to the second page of

2    Exhibit 1 and, again, it's continuing in the same

3    paragraph there.

4           A    Right.

5           Q    If you go down to, I believe it says, "The

6    SOP is not a fringe benefit" --

7           A    Right.

8           Q    -- "as defined by the plan Section 1.10."

9           A    Right.

10          Q    And then the next sentence says, "The

11   intent here was to consider fringes like auto

12   allowances, etc."

13               How did you determine what the intent was?

14          A    Well, that was my -- that was my opinion.

15          Q    Okay.  So you didn't speak to the managing

16   board regarding what their intent was?

17          A    No.

18          Q    Okay.

19               MR. LISSITZYN:  I object to that

20               insofar as the managing board had an

21               intent.

22               But, please proceed.

23               MR. MONNOLLY:  Okay.

24   BY MR. MONNOLLY:

25          Q    Were you involved in drafting the stock

DEL VECCHIO REPORTING SERVICES
(203) 245-9583

1   option plan?

2       A    Absolutely not.

3       Q    And before or during the course of

4   drafting this e-mail to Mr. Dulik, did you ever

5   consult with legal counsel regarding this issue?

6       A    Absolutely not.

7       Q    Okay.  And then if you go down to the

8   second to last paragraph on the page there, second

9   page there where it starts, "Since I cannot

10  participate."

11      A    Right.

12      Q    And was it your understanding that you

13  could not participate or interpret the plan because

14  you had an interest in that determination or that

15  outcome?

16      A    Probably.  Actually, I don't know.  I

17  don't recall what Section 9.1.2 said, but 9.1.2 may

18  have said that an administrator cannot participate

19  in his own, you know, in a decision regarding

20  himself.

21          So again -- but I think common sense was

22  telling me that it was not my -- it was obviously

23  not my determination.

24      Q    Okay.  Understanding that that was not --

25  or that you couldn't make that determination because

1   of 9.1.2, is there a reason that you still gave

2   Mr. Dulik your interpretation?

3           In other words, if you had concluded that

4   you had a conflict of interest, why did you then go

5   on to give him your interpretation of that

6   provision?

7       A    Well, because in one respect I was acting

8   as an employee.  I mean, I was an administrator -- I

9   mean, I was on the administrative committee, I

10  should say, but I was also an employee.

11          And having been an employee, I felt at the

12  time that I had the right to ask the question

13  internally and to ask that question of somebody as

14  informative and as authoritative as possible before

15  I left the company.

16          And I decided that Art Dulik was, in my

17  mind, the most authoritative and knowledgeable

18  person about the stock option plan and the pension

19  plan, and that's why I posed those questions to him.

20      Q    Did you ask either Mr. Levine or -- I

21  believe you said the other gentleman was

22  Mr. Connors?

23      A    Converse, right.

24      Q    Did you ask either of them that question?

25      A    No.

1          They had left the company.

2      Q    Do you know approximately when they left?

3      A    Mr. Converse walked out the door on

4  September 13th.

5      Q    Okay.

6      A    And Mr. Levine's last date was, I think,

7  Christmas.  I think around Christmastime.

8      Q    And you had not discussed this issue with

9  them before they left the company?

10     A    No.

11     Q    Okay.  And you say in here that you are

12  the last remaining member of the committee at that

13  time?

14     A    Correct.

15     Q    Had the company not replaced Mr. Converse

16  and Mr. Levine on the committee?

17     A    Correct, there were no replacements.

18     Q    Did you speak to anyone at the company to

19  see whether or not they were going to appoint

20  someone else?

21     A    No.  You mean prior to my leaving?

22     Q    Correct.

23     A    No.

24          I think I would have known -- I think I

25  would have known if they were appointing new

1   committee members.

2       Q    Well, I guess my question wasn't clear.

3   Let me rephrase it.

4            Mr. Converse leaves and Mr. Levine leaves,

5   and you are the last person on the committee?

6       A    Right.

7       Q    Did you at any point after they had

8   terminated their employment go to someone at the

9   company and say, "Hey, we need to get two more

10  committee members, I'm the last one left"?

11      A    No.

12      Q    Okay.  And if we can go down to the last

13  paragraph here, you basically tell Mr. Dulik that

14  you appreciate if you could get his response before

15  2/1/02.

16           What, if anything, was the significance of

17  that date?

18      A    My last day at the company.

19      Q    Okay.  And so you wanted to get his

20  opinion before you left?

21      A    Well, other than -- well, I said -- I said

22  either to -- either -- by then, I said or to Carol

23  Foley.

24      Q    Okay.

25      A    I thought it would be better for me by

1    2/1.

2         Q    Okay.  So when you went to this process of

3    interpreting the provision as it's kind of laid out

4    in this e-mail here, did you consider any other

5    factors?

6         A    I'm not sure.

7         Q    Well, for example, did you consult -- I

8    think I asked you this question so apologize if's

9    getting redundant -- but did you consult with legal

10   counsel?

11        A    No, absolutely not.

12        Q    Did you consider what the impact of the

13   funding obligations of the plan would be if your

14   interpretation of the plan was correct?

15        A    Could you repeat that?

16        Q    Did you consider what the impact would be

17   of your interpretation on the company's funding

18   obligations for the pension plan?

19             So, in other words, if your interpretation

20   is correct and a broader spectrum of compensation is

21   going to be included within the definition, did you

22   look at whether or not that would increase the

23   company's funding obligations?

24        A    No.

25        Q    Did you consider how the impact -- or

1   whether it would impact the other plan participants?

2        A    The other participants of options?

3        Q    No, just anyone who was a participant in

4   the retirement plan.

5        A    Not other than it would have enhanced

6   their retirement, but I never made any calculations.

7        Q    Did you consult with what I would call the

8   settler, which I think would be the managing board

9   or the folks in Germany?

10       A    Did I consult with them regarding the

11  pension?

12       Q    Regarding your interpretation?

13       A    No.

14       Q    Did you consider whether Mr. Dulik was

15  operating under the same conflict of interest that

16  you perceived yourself to have?

17            MR. LISSITZYN:   Objection.

18            I don't think that he said he

19            perceived himself to be under a conflict

20            of interest at that point in time doing

21            what he was doing.

22            I think he said that he might be in a

23            conflict of interest position were he to

24            do more.  But that is my recollection of

25            his testimony.

1          MR. MONNOLLY:  Okay.  Well, then let

2      me ask the question.

3  BY MR. MONNOLLY:

4      Q    Did you consider you would have a conflict

5  of interest in interpreting this provision as a

6  member of the administrative committee?

7      A    Yeah, I think -- I think I said that when

8  I referred to Section 9.1.2.

9      Q    And so did you consider when you wrote

10  this e-mail to Mr. Dulik whether he had a similar

11  conflict of interest?

12      A    You know, I actually didn't.

13          I think I -- I think I may have known that

14  he had not exercised any options, but I -- whether

15  he did or not, I don't know, but I think I was

16  pretty sure that he hadn't exercised options that at

17  least he would be considering this from a standpoint

18  of somebody with who had not had any gains already.

19          And the other thing -- and I'm -- the

20  other thing that I think was in my mind at the time

21  was that he certainly had many, many years to go

22  before his retirement, so -- he was a little bit

23  younger than I was.

24          So I think I felt that he really could

25  answer the question from a fairly well unbiased

1   viewpoint because of that, because he hadn't

2   exercised the options and because he probably had

3   quite a few years to go before retirement.

4       Q    Well, would it -- strike that.

5            If he had exercised the options, do you

6   think he would have been in a conflicted position,

7   the same as you were?

8            MR. LISSITZYN:  Mike, would you use

9            that word again?  I didn't --

10           MR. MONNOLLY:  Let me strike that

11           question and ask it again.

12  BY MR. MONNOLLY:

13      Q    If at the time you wrote this e-mail, Mr.

14  Linder, you were aware that Mr. Dulik had, in fact,

15  exercised his options, would you still have gone to

16  him for this advice?

17      A    Probably.

18      Q    Okay.

19      A    Because certainly -- certainly by

20  discussing it and writing about it, and I had

21  already gone on -- I had already gone on record

22  requesting the same information of Carol Foley

23  earlier who I believed was communicating that back

24  to Germany.

25           In a way -- in a way, the whole issue is

1    out in the open.  This was not a secret issue.  I

2    mean, this was not -- this was an open issue.

3        Q    Okay.

4        A    So I felt if Art Dulik -- I actually felt

5    that Art Dulik wouldn't even reply to me.

6        Q    Okay.

7        A    So I felt that he probably -- it was up to

8    him whether he was in a conflicting situation.

9        Q    Okay.  Fair enough.

10            And you mentioned that you spoke to Carol

11    Foley about this issue.

12            Do you recall when you first spoke to

13    Carol about it?

14       A    Probably in the fall.

15            And I know there's an e-mail which I don't

16   have at my fingertips, but I believe I sent an

17   e-mail asking her about the determination of option

18   income, and I think -- I believe that was in the

19   fall.

20       Q    And do you recall whether she ever

21   responded?

22       A    Well, one of your exhibits has one of her

23   responses.

24       Q    Now you are jumping ahead of me.

25       A    You'll get to that, I guess.  But she did,

1  yeah.

2      Q    Okay.

3          MR. MONNOLLY:  If the court reporter

4      can go ahead and mark Exhibit 2, which is

5      going to be the January 34 -- I'm sorry,

6      January 31, 2002 letter to Mr. Linder, and

7      I believe it is -- well, Carol Foley is

8      the author, I believe, and it is seven

9      pages long.

10         MR. LISSITZYN:  It's Larry.  Hang on

11     a sec.

12         THE WITNESS:  It's not seven pages,

13     is it?

14         MR. LISSITZYN:  All I'm doing is just

15     making sure we are talking about the same

16     church and the same pew.

17         Okay?

18         MR. MONNOLLY:  Okay.

19         MR. LISSITZYN:  All of these --

20     Exhibit 2 has, I think, my Bates stamp

21     numbers on it.

22         MR. MONNOLLY:  That is correct.

23         MR. LISSITZYN:  And my Bates stamp

24     numbers go from 182 through and including

25     188.

1        MR. MONNOLLY:  That's correct.

2        MR. LISSITZYN:  Now, I don't know as

3    we speak what was included with what.  In

4    other words, we seem to have a letter that

5    was addressed to Linder dated January 31,

6    '02.

7        MR. MONNOLLY:  And the attachment is

8    the corporate continuation form which runs

9    from 184 through 188.

10        MR. LISSITZYN:  On that basis, I have

11    no problem with the identification.

12        MR. MONNOLLY:  Let's go ahead and

13    mark that Defendant's Exhibit 2.

14        MR. LISSITZYN:  Let me ask you

15    something, Counsel.  Do you want to mark

16    them all right now or --

17        MR. MONNOLLY:  Larry, I'm close to

18    being done.

19        MR. LISSITZYN:  Okay.

20        MR. MONNOLLY:  So, you know, if we

21    want to go through them.

22        MR. LISSITZYN:  Let me do this.  Let

23    me do this.  First of all --

24        MR. MONNOLLY:  You want to mark them

25    all?

1          MR. LISSITZYN:  I'd like to do that,

2     Point 1.

3          Point 2, I have to make a pit stop on

4     my hearing aid.

5          MR. MONNOLLY:  Okay.

6          MR. LISSITZYN:  And, Point 3, this is

7     a small local office so I have to find out

8     how to lock it up before I go, fearing

9     which the firm is going to divorce me.

10          MR. MONNOLLY:  Okay.  Want to take 10

11     minutes?

12          MR. LISSITZYN:  Yeah.  Why don't we

13     do this, why don't I just call you back?

14          MR. MONNOLLY:  Do you want to do that

15     instead of the conference call?

16          MR. LISSITZYN:  Why do a conference

17     call?

18          MR. MONNOLLY:  It doesn't matter to

19     me.  I just thought that since it's on the

20     speaker, it might be easier.

21          MR. LISSITZYN:  Well, I mean, I can

22     make a call to you --

23          MR. MONNOLLY:  Fine.

24          MR. LISSITZYN:  Okay.  So I'm not

25     going to call you back on that coded

```
 1              conference call.
 2                   MR. MONNOLLY:  Fine.  Just call me on
 3              my direct dial.
 4                   MR. LISSITZYN:  What's your direct
 5              dial?
 6                   MR. MONNOLLY:  (404)881-7816.
 7                   MR. LISSITZYN:  Okay.  We won't be
 8              long.
 9                   MR. MONNOLLY:  Thank you.
10                   (THEREUPON, DEFENDANT'S EXHIBIT NO.
11                   2, LETTER DATED 1/31/02 AND
12                   ATTACHMENT BATES STAMPED 182 THROUGH
13                   188, WAS MARKED FOR IDENTIFICATION.)
14   BY MR. MONNOLLY:
15       Q    Mr. Linder, you've now been handed what's
16   been marked as Exhibit No. 2?
17       A    Correct.
18       Q    Do you recognize that document?
19       A    Yes.
20       Q    And what is that document?
21       A    Oh, it's a -- appears to be a
22   communication from Carol Foley regarding my COBRA
23   rights.
24       Q    And do you recall whether you elected
25   COBRA continuation coverage?
```

1    A    I did not.

2    Q    You did not.  Okay.  All right.

3         MR. MONNOLLY:  Can we go to and mark

4    Defendant's Exhibit 3, which is a

5    March 13, 2003 letter from Carol Foley to

6    Gilbert Linder?

7         And, Larry, this has all been

8    produced.  I couldn't find our file copy

9    this morning.

10        MR. LISSITZYN:  Yeah.

11        MR. MONNOLLY:  Which is why there are

12   no Bates.

13        MR. LISSITZYN:  All right.  I

14   wouldn't worry about it, but I do want to

15   talk to you about the structure of the

16   letter.

17        Okay?

18        MR. MONNOLLY:  Okay.

19        MR. LISSITZYN:  Let's get it marked

20   so at least we know what we're going

21   to --

22        MR. MONNOLLY:  Okay.

23        (THEREUPON, DEFENDANT'S EXHIBIT NO.

24        3, LETTER DATED 3/13/02, WAS MARKED

25        FOR IDENTIFICATION.)

1              MR. LISSITZYN:  Okay.  Cliff has

2       marked this March 13, 2002 letter

3       addressed to Gil as Exhibit 3, Defendant's

4       Exhibit 3.

5              MR. MONNOLLY:  Okay.

6              MR. LISSITZYN:  I -- this is my

7       observation.

8              First of all, there's no -- it

9       appears or likely comes -- likely comes

10      from Carol Foley.

11             MR. MONNOLLY:  That's correct.

12             MR. LISSITZYN:  But I don't see any

13      kind of signature page.

14             MR. MONNOLLY:  And let me -- we can

15      go off the record, if we want, to discuss

16      this.

17             MR. LISSITZYN:  Okay.  Why don't we

18      do that.

19             (THEREUPON, THERE WAS A DISCUSSION

20             OFF THE RECORD.)

21 BY MR. MONNOLLY:

22      Q    You've been handed what's been marked as

23 Defendant's Exhibit 3.

24           Do you recognize this document?

25      A    Well, do I recognize it?

1          I mean, I -- I can't say that I do

2    recognize it because in just looking at the

3    attachments, they just don't look familiar to me.

4          It doesn't mean that I don't have the

5    document but I can't a hundred percent say oh, yes,

6    I know this document.

7          Q    Okay.  Well, let me start with my first

8    question then.

9          A    Okay.

10         Q    Which I think we've answered off the

11   record but that is:  Did you elect COBRA coverage

12   pursuant to this piece of correspondence?

13         A    I definitely didn't elect COBRA coverage.

14   I don't remember signing off on the document.

15         If you had asked me did I -- I would have

16   said I just ignored the whole --

17         Q    Okay.

18         A    So if I did sign it, fine.

19         Q    Okay.

20         A    But I know I declined it.

21         Q    You did not elect COBRA coverage?

22         A    Correct.

23         Q    Were you provided COBRA coverage at the

24   company's expense after you were terminated.

25         Do you recall?

1      A    No.

2      Q    Were you provided with any type of medical

3  coverage after your termination at the company's

4  expense or even at your own expense?

5      A    Well, I was -- I -- let me put it this

6  way:  I had health insurance coverage provided by my

7  wife.

8      Q    Okay.  I'm probably getting ahead of

9  myself, but if you could turn to what is the second

10  page, I guess the second and third page look like

11  the same document.

12      A    Right.

13      Q    Do you recognize that document?

14      A    Well, I don't recognize that single

15  paragraph.

16      Q    Okay.

17      A    But I do recognize the detailed

18  calculation.

19      Q    Okay.  So you don't think you got the page

20  before it, but you may have gotten the second page?

21      A    Well --

22      Q    Or you just don't recall?

23      A    I don't recall.  The third page, which is

24  the detailed calculation, looks very familiar.

25          I'm not -- whether I got it in this

1    particular letter or not, I can't say but at least

2    the document looks very familiar to me.

3         Q    Okay.

4         A    The document itself.

5         Q    Okay.  Fair enough.

6              And if you turn to the next page which has

7    the heading "Voluntary Early Retirement Program" --

8         A    Right.

9         Q    Do you recall receiving that document?

10        A    Again, you know, I'm not being -- I'm not

11   being coy --

12        Q    That's okay.

13        A    I couldn't say for sure.  As background, I

14   had absolutely no interest in this program, and I

15   never intended to accept it.

16             And if I did get this document, I may have

17   just tossed it into a pile without reading it.

18        Q    Did you elect --

19                    (THEREUPON, THE COURT REPORTER

20                    REQUESTS CLARIFICATION.)

21   BY MR. MONNOLLY:

22        Q    My next question is:  Did you elect to

23   participate in the voluntary early retirement

24   program as, I guess, reflected in this document?

25        A    No.

1        Q     Okay.  Well then, there's no sense going

2   through the rest of it.

3              Let's go through what's been marked as

4   Defendant's Exhibit 4, which is a one page e-mail,

5   subject "Pension" on top, from Carol Foley to Gil

6   Linder.  And I'm assuming -- well actually, after we

7   get it marked.

8                    (THEREUPON, DEFENDANT'S EXHIBIT NO.

9                    4, E-MAIL DATED 4/5/02, WAS MARKED

10                   FOR IDENTIFICATION.)

11  BY MR. MONNOLLY:

12       Q     Mr. Linder, you've just been handed what's

13  been marked as Defendant's Exhibit 4.

14              Do you recognize that document?

15       A     Yes.

16       Q     And what is that document?

17       A     It's an e-mail to me from Carol Foley at

18  BYK-Chemie dated April 25, 2002.

19       Q     And we previously discussed the fact that

20  you had asked Carol the question -- or asked Carol

21  to look into the issue of whether or not stock

22  option income would be included in the definition of

23  compensation.

24              Do you recall roughly when it was -- I

25  think you said earlier it may have been November,

1    somewhere around that time frame when you asked her

2    that question the first time?

3        A    Right.

4        Q    And, to your knowledge, is this her

5    response, or did you speak to her verbally between

6    the time you first asked and the time you got this

7    e-mail?

8        A    This is -- I believe this is definitely

9    first time she ever communicated to me, either

10    verbally or by e-mail, that the pension -- the

11    options would be excluded.

12        Q    Okay.

13        A    I did commun- -- I may have had some phone

14    conversations since I left the company, but we

15    talked about other things.

16            You know, we may have talked about oh, one

17    of my -- you know, severance pay or vacation

18    pay.  You know, we may have had other

19    conversations.

20        Q    So was it your understanding then that she

21    was trying to get an answer to your question and

22    just hadn't gotten back to you yet?

23        A    Yeah.  I hadn't really thought about

24    it.

25        Q    Okay.

1          A      I mean, yeah.

2          Q      And then if we could go to Exhibit 5,

3    which is a May 8, 2002 letter to Mr. Linder from

4    Miss Foley and that runs from BYK 00190 through

5    203.

6                      (THEREUPON, DEFENDANT'S EXHIBIT NO.

7                      5, LETTER DATED 5/8/02 BATES STAMPED

8                      00190 THROUGH 203, WAS MARKED FOR

9                      IDENTIFICATION.)

10   BY MR. MONNOLLY:

11         Q      Mr. Linder, you've just been handed what's

12   been marked Defendant's Exhibit 5.

13                Do you recognize that document?

14         A      Yes.

15         Q      And what is that document?

16         A      It's letter from Carol Foley to me dated

17   May 8, 2002, explaining my pension benefits.

18         Q      Okay.  And if you would turn back to the

19   page that is marked BYK 00195, the heading says

20   "Pension Election Form"?

21         A      Correct, got it.

22         Q      Did you ever elect which form of benefit

23   you were going to take under the pension plan?

24         A      Yes.

25         Q      And do you recall what form that was?

1        A    Roman numeral III.

2        Q    Okay.

3        A    $2,207.76.

4        Q    And then if you would go back, I guess

5   it's three more pages, BYK 00198, and I believe

6   that's the election form for the nonqualified

7   plan?

8        A    Correct.

9        Q    Do you recall what option you selected on

10  that?

11       A    Roman numeral III.

12       Q    Okay.

13       A    $73.

14       Q    Okay.  That's it for that one.

15            MR. MONNOLLY:  If we could go ahead

16            and mark the last one, Defendant's Exhibit

17            6, which is a May 29, 2002 letter from

18            Mr. Linder to Dr. Roland Peter, and it

19            runs from BYK 00359 through 00365.

20            (THEREUPON, DEFENDANT'S EXHIBIT NO.

21            6, LETTER DATED 5/29/02 BATES STAMPED

22            00359 THROUGH 00365, WAS MARKED FOR

23            IDENTIFICATION.)

24  BY MR. MONNOLLY:

25       Q    Mr. Linder, you've just been handed what

1    has been marked as Defendant's Exhibit 6.

2            Do you recognize that document?

3    A    Yes.

4    Q    Okay.  And what is that document?

5    A    Well, the letter -- it's a letter from

6    myself to Dr. Roland Peter in -- well, addressed to

7    him in Wallingford and dated May 29, 2002.

8    Q    Okay.  And this is a letter where you are

9    essentially asking Dr. Peter why the stock option

10    comp wasn't included.

11            Is that correct?

12    A    Correct.

13    Q    And why did you direct this to Dr.

14    Peter?

15    A    Dr. Peter was running the company.  He had

16    dual responsibilities.

17            He was a high level manager in the German

18    operation --

19    Q    Okay.

20    A    -- BYK-Chemie GMBH, and he was also the

21    acting president of the Wallingford operation.

22    Q    And had you previously discussed this

23    issue with him?

24    A    No.

25            MR. MONNOLLY:  Okay.  Larry, that is

```
 1          all I have.

 2     A    Could I just make one comment?

 3  BY MR. MONNOLLY:

 4     Q    Sure.

 5     A    The letter is attached to some other

 6  documents and those other documents have nothing to

 7  do with --

 8     Q    They do not?

 9     A    No.  They have nothing to do with that

10  letter.

11     Q    These were not attached to the

12  letter?

13     A    Absolutely not.

14     Q    Oh, I appreciate you letting me know.

15     A    I don't believe.

16     Q    I appreciate that.  I'll take your word

17  for it.

18     A    Yeah.

19          I'm almost positive that they hadn't

20  anything to do with that letter.

21          MR. MONNOLLY:  Okay.  It's Larry's

22          fault for including them all together.

23          That's all I have.

24          MR. LISSITZYN:  You are without a

25          conscience.
```

1          Listen, we have Gil here.

2          Wouldn't it be a good idea to have

3    him trace the corporate relationship

4    between the Altanas and BYK and the sister

5    relationship, or are you sufficiently

6    familiar with that so we can --

7          MR. MONNOLLY:  I think we'll be fine

8    with that.  He actually did some of that

9    in his previous deposition, and so I think

10   we can use what he did there and it will

11   get you what you need.

12         If it doesn't, I don't anticipate

13   that we'll have any problem stipulating to

14   the facts on that issue, Larry.

15         MR. LISSITZYN:  Very good.  So

16   tomorrow I'm calling you at your office at

17   ten o'clock and we'll proceed with the

18   logistics from there.

19         MR. MONNOLLY:  Sounds good.

20         Thank you Mr. Linder.  I appreciate

21   it.

22         MR. LISSITZYN:  Right now I have

23   4:49.

24         MR. MONNOLLY:  Yup.

25



1                (THEREUPON, THE DEPOSITION WAS

2           CONCLUDED AT 4:49 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  INDEX OF EXAMINATION

 2                                        PAGE

 3   DIRECT EXAMINATION BY MR. MONNOLLY     5

 4

 5                  INDEX OF EXHIBITS

 6   DEFENDANT'S                           PAGE

 7   NO. 1, E-MAIL DATED 1/29/02            23

 8   NO. 2, LETTER DATED 1/31/02 AND ATTACHMENT

 9         BATES STAMPED 182 THROUGH 188    46

10   NO. 3, LETTER DATED 3/13/02            47

11   NO. 4, E-MAIL DATED 4/5/02             52

12   NO. 5, LETTER DATED 5/8/02 BATES

13         STAMPED 00190 THROUGH 203        54

14   NO. 6, LETTER DATED 5/29/02 BATES

15         STAMPED 00359 THROUGH 00365      55

16

17

18

19

20

21

22   (Reporter's Note:  Original exhibits sealed with

23   original transcript.)

24

25
```

1                   C E R T I F I C A T E

2        I hereby certify that I am a Notary Public,

3  in and for the State of Connecticut, duly

4  commissioned and qualified to administer oaths.

5        I further certify that the deponent named in

6  the foregoing deposition was by me duly sworn, and

7  thereupon testified as appears in the foregoing

8  deposition; that said deposition was taken by me

9  stenographically in the presence of counsel and

10 reduced to typewriting under my direction, and the

11 foregoing is a true and accurate transcript of the

12 testimony.

13       I further certify that I am neither of

14 counsel nor attorney to either of the parties to

15 said suit, nor am I an employee of either party to

16 said suit, nor of either counsel in said suit, nor

17 am I interested in the outcome of said cause.

18       Witness my hand and seal as Notary Public

19 this ___27th___ day of ___October___ , 2005.

20

21

22       _____

23            Clifford Edwards

24            Notary Public

25 My commission expires:  9/30/2006

```
 1                    J U R A T

 2

 3          I have read the foregoing 61 pages

 4        and hereby acknowledge the same to be a

 5        true and correct record of the testimony.

 6

 7

 8

 9                        _____

10                        GILBERT E. LINDER

11

12   Subscribed and sworn to

13   _____.

14   Before me this _____ day of _____,

15   2005.

16

17

18

19

20   _____

21   Notary Public

22   My Commission Expires:

23

24

25
```