**TAB 16**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GILBERT E. LINDER,<br><br>              Plaintiff,<br><br>VS.<br><br>BYK-CHEMIE USA INC., in its capacity as<br>Plan Sponsor of the RETIREMENT PLAN OF<br>BYK-CHEMIE USA INC., and the<br>SUPPLEMENTAL RETIREMENT PLAN OF<br>BYK-CHEMIE USA INC.,<br><br>              Defendants. | CIVIL ACTION NO.<br>3:02cv1956 (JBA)<br><br><br>NOVEMBER 2 , 2005 |

## DECLARATION OF CAROL M. FOLEY

I, Carol M. Foley hereby declare and attest as follows:

1.

I voluntarily and freely make this declaration of my own personal knowledge for use as evidence in support of Defendants' Motion for Summary Judgment in the above-styled action, and for any other use or purpose authorized by law. I am over the age of twenty-one years, am suffering from no legal disability, and am competent and authorized to make this declaration and to testify to the statements and facts contained herein.

2.

I have been employed by BYK-Chemie USA, Inc. ("BYK-Chemie"), for over 17 years. Since 1992, I have been the Employee Benefits Administrator for BYK-Chemie. As Employee Benefits Administrator, I am responsible for payroll, benefits and human resources issues. Part of my job responsibilities include providing administrative services

for the BYK-Chemie Retirement Plan ("Retirement Plan") and the BYK-Chemie

Supplemental Retirement Plan ("SERP"), including sending out correspondence to

participants and/or beneficiaries regarding plan benefits.

3.

Attached hereto as Exhibit A is a true and correct copy of a letter, with

enclosures, dated March 13, 2002 that I sent to Mr. Gilbert Linder in connection with his

retirement. This letter was mailed to Mr. Linder on or about March 13, 2002. It

contained a number of enclosures including a benefit statement, with cover sheet, for the

Retirement Plan.

4.

Although the second page of this letter was not contained in my file copy, Exhibit

B hereto is a true and correct copy of the same letter, including the second page, which

was executed by Mr. Linder and returned to me on or about May 1, 2002.

5.

Attached hereto as Exhibit C is a true and correct copy of an executed Agreement

and Release which was signed by Mr. Linder on or about March 28, 2002. A copy of the

Release and Agreement was originally provided to Mr. Linder in early March 2002.


[SIGNATURE FOLLOWS ON NEXT PAGE]

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on this _2nd_ day of November, 2005.

_Carol M Foley_
Carol M. Foley

3

# Exhibit A



BYK-Chemie USA Inc. • P.O. Box 5670 • Wallingford, CT 06492-7651

March 13, 2002


Gilbert Linder
200 Nutmeg Place
Cheshire, CT 06410

Dear Gilbert:

RE: COBRA Continuation Rights

As you know, a federal law known as COBRA provides certain individuals covered under group health plans (includes medical and dental benefits) the right to continue their benefits if coverage is lost under certain conditions. The following "qualifying event" will occur sometime between March 13, 2002 to May 31, 2002 and, as a result, coverage will be terminated for the individuals listed as of the date shown unless a COBRA continuation or the Early Retirement Program coverage (see Q&A 20 and 21 of the Early Retirement Program) is elected.

| Qualifying Event | Date of Qualifying Event | Date Coverage Terms |
| --- | --- | --- |
| Retirement | 3/13/02 – 5/31/02 | 3/13/02 – 5/31/02 |

Person(s) who will lose coverage due to qualifying event:

Gilbert Linder; Harriet Linder; Jeremy Linder; Ethan Linder

The individuals indicated above are entitled to elect COBRA continuation benefits as are fully described in the enclosed "Notice of Federal Continuation Rights." The actual election of continuation benefits is done by completing the enclosed "COBRA Continuation Form for Group Health Coverages." These forms should be carefully reviewed as the failure to follow the directions contained in these forms could result in the loss of your COBRA rights.

524 South Cherry Street
Wallingford, CT 06492-7651
Telephone (203) 265-2086
Telefax    (203) 284-9158
Internet    www.byk-chemie.com

GILBERT LINDER

ESTIMATED PENSION CALCULATION

The attached estimate of your monthly pension benefit has been calculated at Normal Retirement Date and the Earliest Retirement Date of May 1, 2002. This calculation is in accordance with the current terms of the Pension Plan and is based on a termination date of January 31, 2002. The calculation does not include any remuneration from the exercising of company stock options. Should your retirement date be later than May 1, 2002 your benefit will be recalculated.

# BYK CHEMIE USA, INC.

### RETIREMENT BENEFIT CALCULATION

| | | | |
|---|---|---|---|
| NAME: | **Gilbert E. Linder** | | |
| DATE OF BIRTH: | 6/19/1945 | SOCIAL SECURITY NUMBER: | 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 |
| DATE OF HIRE: | 5/11/1981 | NORMAL RETIREMENT DATE: | 7/1/2010 |
| CREDITED SERVICE DATE: | 1/1/1984 | SPOUSE'S DATE OF BIRTH: | 3/26/1947 |
| TERMINATION DATE: | 1/31/2002 | MONTHLY SOCIAL SECURITY | |
| SERVICE AT TERMINATION: | 18.083 | COVERED COMPENSATION (CC): | 4,884.00 |
| EARLY RETIREMENT DATE : | 5/1/2002 | SALARY IN EXCESS OF CC: | 7,732.73 |

AGES AT TERMINATION DATE:

| | |
|---|---|
| EMPLOYEE | 56.62 |
| SPOUSE | 54.85 |

60 MONTH AVERAGE SALARY (reflecting 401(a)(17) compensation limit):

| PERIOD | SALARY |
|---|---|
| 2/1/2001 - 1/31/2002 | 158,987.11 |
| 2/1/2000 - 1/31/2001 | 156,229.27 |
| 2/1/1999 - 1/31/2000 | 143,054.18 |
| 2/1/1998 - 1/31/1999 | 160,000.00 |
| 2/1/1997 - 1/31/1998 | 138,733.33 |
| TOTAL | 757,003.89 |
| AVERAGE (60 months) | 12,616.73 |

**TOTAL MONTHLY NORMAL RETIREMENT LIFE ANNUITY BENEFIT:**

| | |
|---|---|
| A. 39.5% x AVERAGE (60 months) + 18.5% x (AVERAGE (60 months) - COVERED COMP) | 6,414.16 |
| B. YEARS of CREDITED SERVICE AT TERMINATION / 30 (MAXIMUM FRACTION = 1.000) | 0.602767 |
| C. MONTHLY LIFE ANNUITY PAYABLE AT NORMAL RETIREMENT DATE (A. x B.) | 3,866.24 |

D. EARLY RETIREMENT BENEFITS:

| | | |
|---|---|---|
| EARLY RETIREMENT DATE: | 5/1/2002 | |
| YEARS EARLY | 8.167 years | |
| EARLY RETIREMENT FACTOR | | 0.561 |
| MONTHLY EARLY RETIREMENT LIFE ANNUITY BENEFIT: | | 2,168.96 |

| MONTHLY BENEFIT OPTIONS: | AT EARLY RETIREMENT MAY 1, 2002 | AT NORMAL RETIREMENT JULY 1, 2010 |
|---|---|---|
| LIFE ANNUITY | 2,168.96 | 3,866.24 |
| 10 YEAR CERTAIN & LIFE | 2,097.82 | 3,582.30 |
| 50% JOINT & SURVIVOR | 2,007.31 | 3,461.10 |
| 100% JOINT & SURVIVOR | 1,868.08 | 3,132.81 |

Linderer.xls

2/26/2002

# VOLUNTARY EARLY RETIREMENT PROGRAM

Information Packet

For

Eligible Employees

You have already received the announcement about the BYK-Chemie USA Inc. Voluntary Early Retirement Program (the "Program"), which is being offered through April 30, 2002. This information packet has been prepared to provide eligible employees with additional details of the Program. Included in the packet are:

- The Summary of the Program and of Material Modifications to the Plan, which describes the eligibility requirements and benefits and provides other information required by the Employee Retirement Income Security Act (ERISA)

- A list of Questions & Answers, which answers many of the questions that may arise about the Program

- An Application form for you to fill out and sign if you decide to apply for application to the Program

- A Release form which you will be required to fill out and sign in order to participate in the Program

- Waiver of Participation form for you to use if you decide not to participate in the Program

- A Benefits Statement, which provides you with an estimate of the pension benefits you will be eligible for upon your retirement

- COBRA Notice

You should carefully review all the information contained in this packet and make an appointment with Carol Foley in Human Resources to discuss the terms of the Program and enable her to answer any questions or provide you with any additional information you may require.

**Summary Of The Program And Of Material Modifications To The
BYK Chemie USA Inc. MedSpan Health and Dental Care Plans
Effective March 1, 2002**

1.  **Introduction:**  BYK-Chemie USA Inc. ("BYK-Chemie" or the "Company") is offering a Voluntary Early Retirement Program (the "Program"), under which eligible employees who choose to retire from the Company will be entitled after their retirement to certain post-retirement benefits under the BYK Chemie USA Inc. MedSpan Health and Dental Care Plans (the "Plan").  The Plan is being modified to enable the Company to offer these benefits.

2.  **Eligibility:**  All regular full-time employees, except for all field sales staff and all lab support staff (Technical Service Labs and Quality Control), who (a) were employed on January 1, 2002; (b) had reached the age of 55 as of January 1, 2002; (c) will have completed 12 years of credited service under the Company's pension plan on the date of their retirement; and (d) elect retirement status through the Company's pension plan during the open enrollment period of March 1, 2002, through April 30, 2002, are eligible to elect these post-retirement benefits.  No other employees of the Company will be eligible for these special retirement benefits.

3.  **How to Elect to Participate:**  You must submit a fully completed and signed application to Carol Foley, using the form that is provided with this Information Packet (entitled "Application Form"), on or before the close of business on April 30, 2002.  If you submit an application, your employment with BYK-Chemie USA will end on the date you have selected to retire, which shall be no later than May 31, 2002.

4.  **Submission of Release Form:**  If you have submitted an application to participate in the Program, you must also submit a fully completed and signed release, using the form that is provided with this Information Packet (entitled "Release Form"), to Carol Foley.  This Release must be submitted on your retirement date.  You may thereafter revoke the Release — however, a revocation of a Release will be valid only if it is in writing, signed, dated, clearly states your intention to revoke your Release, and is delivered to and received by Carol Foley by no later than the seventh calendar day after your retirement date.  If you either (a) fail to submit a Release Form on your retirement date or (b) submit a Release Form and thereafter timely and properly revoke it, you will not be entitled to any of the Program Benefits set forth below.  In such instance, your right to post-retirement medical coverage will be governed exclusively by COBRA.  You will receive a notice from the Company describing your COBRA rights.

## Program Benefits

5.  **Insurance Coverage:**  You will be entitled to medical and dental benefits which are substantially the same as those provided to full-time active employees under the Plan.

6.  **Dependent Coverage:**  Your spouse and dependent children (until age 18, or until age 25 if a full-time student, regardless of employee coverage) will also be entitled to substantially the same medical and dental benefits as are provided to dependents under the Plan.

7.     **Coverage Period**: You will be entitled to this coverage from the date of your retirement under the Company's pension plan for a period of up to ten (10) years.

8.     **Employee Cost Sharing**: Your premium co-pay will be 50% of the Company's monthly COBRA rate minus 1.2% for each full year of service over 12 at your retirement date, subject to a minimum co-pay of 20% and to the limit on the company's cost-sharing described in paragraph 10 below.

9.     **Spouse or Dependent Cost Sharing**: If you elect coverage for your spouse, your spouse's premium co-pay will be 60% of the Company's monthly COBRA rate for single employees, minus 1.2% for each year of service greater than 12 at your retirement date, subject to a minimum co-pay of 30% and to the limit on the Company's cost-sharing described in paragraph 10 below. Your spouse's premium co-pay is in addition to your own co-pay described in paragraph 8 above.

If you elect coverage for your spouse and one or more dependents, your additional premium co-pay will be 60% of the difference between the Company's monthly COBRA rate for families and its rate for single employees, minus 1.2% for each year of service greater than 12 at your retirement date, subject to a minimum co-pay of 30% and to the limit on the Company's cost-sharing described in paragraph 10 below. Your spouse and dependents' premium co-pay is in addition to your own co-pay.

10.    **Company Cost Sharing**: The Company's subsidy of the COBRA premium will be limited to 150% of the current COBRA premiums (see paragraph 11 below).

11.    **Current Monthly COBRA Premiums**: Single employee $289.64; Family $796.52.

## OTHER INFORMATION

The Company's Identification Number for the Plan is 501.

Nothing in the Plan or the Program shall provide any pension or other benefit other than as expressly set forth above. BYK-Chemie USA Inc. has no present intention to reemploy any employee who takes advantage of this program. If you apply to take advantage of this Program, you expressly waive any and all rights to reinstatement or reemployment at any time.

BYK-Chemie USA Inc. may amend or modify the Plan at any time as it applies to active employees, retirees or both. You do not have the right to alienate, assign, commute or otherwise encumber your benefits under the Plan or the Program for any purpose whatsoever, and any attempt to do so shall be disregarded. The provisions of this Program shall be binding upon you.

Please refer to the Summary Plan Description for the Plan for an explanation of other important rights you have under ERISA, including the procedure for filing claims under the Plan.

This Summary of the Program and of Material Modifications to the Plan does not describe many of the features, provisions, limitations and exclusions that are contained in the documents and contracts that comprise the Plan. It is not a summary plan description, and it does not contain the information that is necessary to meet all of the disclosure requirements of the Employee Retirement Income Security Act of 1974 (ERISA) with respect to the Plan. This is only intended as a summary of the material modifications to the Plan that are being made to implement the Program, and it does not explain all of the details of the Plan. Other than with respect to the specific modifications to the Plan described above, if there is a discrepancy between the information in this memorandum and the official In-Area Plan Document, the In-Area Plan Document will govern. In all instances, therefore, the formal written terms of the In-Area Plan Document, as modified herein, govern, and these terms may not be modified by oral or informal written statements.

**BYK-CHEMIE USA, INC.**
**VOLUNTARY RETIREMENT PROGRAM**
**QUESTIONS & ANSWERS**

## I. ATTAINING AGE 65

**Q-1    What effect will my reaching age 65 have on my coverage?**
A-1    When you reach age 65, you will automatically become eligible for Medicare coverage. Medicare coverage will automatically become your primary coverage, and your coverage under the BYK Chemie USA Inc. MedSpan Health and Dental Care Plans (the "Plan") will become your secondary coverage. You could, of course, elect at that point to discontinue your secondary coverage under the Plan, in which event you would (a) no longer have to make premium co-payments for coverage under the Plan and (b) be covered only by Medicare (and any other health coverage you might have, such as through your spouse's employer or a Medicare Supplement plan).

**Q-2    What benefits will I receive after reaching 65 if I continue my coverage under the Plan?**
A-2    First of all, Medicare does not provide dental coverage. If you continue your coverage under the Plan, you will have the same dental coverage as an active BYK-Chemie employee. Secondly, in some circumstances the medical coverage provided by Medicare will not be as complete as the coverage you would receive under the Plan. If you maintain coverage under the Plan after you reach age 65, you will receive the same coverage that you would have had prior to reaching age 65, with the Medicare benefits you receive being "carved out" of the benefits under the Plan.

**Q-3    How will this be done?**
A-3    Regardless of whether you actually elect Medicare coverage, it will be assumed that you have elected Medicare Part A and Part B coverages, and the benefits that you either (a) actually receive or (b) would have received had you elected these Medicare coverages will be "carved out" of, or subtracted from the benefits that you will be entitled to under the Plan.

**Q-4    Do I have to pay for the Medicare coverage?**
A-4    You do not have to pay for Medicare Part A. You do have to pay for Medicare Part B. The current monthly premium for Medicare Part B is approximately $50.

**Q-5    Will the premiums that I have to pay for coverage under the Plan change as a result of my reaching age 65?**
A-5    No.

**Q-6    Can you give me some examples of how this coordination of coverage would work?**
A-6    Yes. Assume for the moment that you receive medical care from a provider that accepts assignment of Medicare benefits, i.e., gets paid directly by Medicare. Such a provider is limited by law to receiving the amount that Medicare considers to be covered expenses, even if the provider's normal charges for the services in question are higher. If

- 1 -

Medicare pays this entire sum, the Plan will not have to pay anything in connection with this service. If Medicare pays less than all this sum because the Medicare coverage is subject to a deductible or a co-pay requirement, the Plan will pay some or all of the difference. How much of this difference will be paid by the Plan will be determined based on what the Plan would have paid had it been your primary, rather than your secondary, coverage. Here is an example:

> You receive services from a health care provider whose normal charges are $5500. However, Medicare allows only $3500 of this amount as covered expenses. The $2000 difference between the normal charges and the Medicare amount is called the Medicare Adjustment, and neither Medicare nor the Plan will pay any part of this difference, which the provider has in any event waived by accepting direct payment from Medicare. If Medicare pays $2800 of the $3500 covered expenses, the Plan will pay some or all of the $700 difference. The exact amount that the Plan will pay will be determined in such a way that you will have the same payment responsibility that you would have had if you had been an active employee over age 65, calculated as if Medicare paid second rather than first.

**Q-7    What if my health care provider does not accept Medicare assignments?**
A-7    If your health care provider does not accept Medicare assignments, the method of determining payments will be somewhat different. Using the services described above, the coverage would be determined as follows:

> By hypothesis, Medicare has paid $2800 of your provider's charges of $5500. The Plan will pay some or all of the $2700 difference. The exact amount that it will pay will be determined as follows: first the Plan determines what its payment would be if you were an active employee over age 65; then the Plan subtracts Medicare's payments from this amount, and it pays this difference. Again, the exact amount that the Plan will pay will be determined in such a way that you will have the same payment responsibility that you would have had if you had been an active employee over age 65, calculated as if Medicare paid second rather than first.

**Q-8    What if I have a claim that Medicare does not cover at all?**
A-8    The Plan will pay as much of your claim as it would have if you had been less than 65 and therefore not eligible for Medicare.

**Q-9    Is there any reason that I might want to consider discontinuing my coverage under the Plan after I reach age 65, perhaps obtaining my own Medicare Supplement[1] plan?**

---

[1] Medicare Supplement plans are offered by Blue Cross and many other insurers and through AARP. Each plan offered must be one of ten different plans defined by law, three of which provide some level of outpatient prescription drug coverage.

- 2 -

A-9    Yes. This involves the availability of prescription drug coverage. Under Medicare, when you reach age 65 you have a six-month "window" of time within which you can elect a Medicare Supplement policy, several of which provide prescription drug coverage, on an open enrollment basis (i.e., without regard to your health at that time). After that "window" closes, the insurer offering the Medicare Supplement policy (for outpatient drug coverage) is permitted to reject applicants it deems medically unacceptable. Even though the prescription drug coverage available through a Medicare Supplement policy might not be as good as the coverage under the Plan, if you choose the Medicare Supplement policy before the "window" closes you will be entitled to continue that coverage, including prescription drug coverage, for the rest of your life (as long as you continue to pay the applicable premiums), whereas coverage under the Plan will terminate ten years from your retirement. At the time your coverage under the Plan terminates, your health may preclude you from obtaining prescription drug coverage under a Medicare Supplement policy at a reasonable cost, or at all. You will want to examine your individual financial and health circumstances very carefully once you reach age 65 and before the six-month "window" closes to determine whether to (a) discontinue your coverage under the Plan, which will relieve you of the need to make any further premium co-payments; and/or (b) enroll in a Medicare Supplement plan providing prescription drug coverage for the rest of your life.

**Q-10    What happens when my covered spouse reaches age 65?**
A-10    Your spouse will be subject to the same provisions as apply to you, described above.

**Q-11    Does my reaching age 65 affect my spouse's or my other dependents' coverage?**
A-11    No.

## II.  COST OF PARTICIPATION

**Q-12    If I elect to participate in this early retirement program and choose coverage only for myself, what will my premium co-pay be?**
A-12    Your premium co-pay will be 50% of the company's monthly COBRA rate for single employees minus 1.2% for each full year of service over 12 as of your retirement date, subject to (a) a minimum co-pay of 20% and (b) a limit on the monthly premium that the company will subsidize. After the monthly COBRA premium reaches $434.46 (which is 150% of the current monthly COBRA premium of $289.64), the company's subsidy will not go any higher, and you will pay all of any future increases in the company's monthly COBRA premiums. These premiums are adjusted annually on a fiscal year basis. For the current fiscal year (which ends May 31, 2002), your premium co-pay can be determined from the following table (see the third column; for an explanation of the fourth column, see Q&A 13 below):

- 3 -

**Table 1**

| Years at Retirement | Percentage of COBRA rate | Premium co-pay FY 2002 | Maximum Premium Payment by the Company |
|---|---|---|---|
| 12 | 50.0% | $144.82 | $217.23 |
| 13 | 48.8% | $141.34 | $222.44 |
| 14 | 47.6% | $137.87 | $227.66 |
| 15 | 46.4% | $134.39 | $232.87 |
| 16 | 45.2% | $130.92 | $238.08 |
| 17 | 44.0% | $127.44 | $243.30 |
| 18 | 42.8% | $123.97 | $248.51 |
| 19 | 41.6% | $120.49 | $253.72 |
| 20 | 40.4% | $117.01 | $258.94 |
| 21 | 39.2% | $113.54 | $264.15 |
| 22 | 38.0% | $110.06 | $269.37 |
| 23 | 36.8% | $106.59 | $274.58 |
| 24 | 35.6% | $103.11 | $279.79 |
| 25 | 34.4% | $99.64 | $285.01 |
| 26 | 33.2% | $96.16 | $290.22 |
| 27 | 32.0% | $92.68 | $295.43 |
| 28 | 30.8% | $89.21 | $300.65 |
| 29 | 29.6% | $85.73 | $305.86 |
| 30 | 28.4% | $82.26 | $311.07 |
| 31 | 27.2% | $78.78 | $316.29 |
| 32 | 26.0% | $75.31 | $321.50 |
| 33 | 24.8% | $71.83 | $326.71 |
| 34 | 23.6% | $68.36 | $331.93 |
| 35 | 22.4% | $64.88 | $337.14 |
| 36 | 21.2% | $61.40 | $342.35 |
| 37 | 20.0% | $57.93 | $347.57 |

**Q-13   What will my premium co-pay be in future years?**

A-13   Each year the company establishes new COBRA premiums for the Plan for the ensuing fiscal year. The single employee premium for fiscal year 2003 (June 1, 2002 to May 31, 2003) has not yet been determined, but it is likely to be higher than the fiscal year 2002 premium of $289.64. If you are eligible for and elect to participate in this early retirement program, you will be informed each year as to the new COBRA premium amounts for single employees and families. For fiscal year 2003 and later years, your premium co-pay will be the product of (a) the percentage that applies to you as set forth in the second column of Table 1 (based on the number of full years of service that you had at retirement) and (b) the then-current company COBRA premium amount for single employees (up to the maximum subsidized premium). If the COBRA premium exceeds the maximum subsidized premium, then you will also pay the excess.

• To give a hypothetical example **not involving** the maximum subsidized premium, if you retired with 20 years of service and the fiscal year 2003 COBRA premium

- 4 -

for single employees were set at $300, your co-pay amount for that year would be $121.20 ($300 x 40.4%).

- To give a hypothetical example **involving** the maximum subsidized premium, if you retired with 37 years of service and the fiscal year 2010 COBRA premium for single employees were set at $600, your co-pay amount for that year would **not** just be $120 ($600 x 20%); rather, it would be $252.43, calculated as follows: $252.43 is the sum of (a) $86.89 (20% of the $434.46 maximum premium the Company will subsidize) and (b) $165.54 (which is the difference between the $600 premium in the example and the $434.46 maximum premium that the Company will subsidize). **The fourth column of Table 1 above shows the maximum premium payment that the Company will ever make for a single employee with a given number of years of service at retirement.**

**Q-14    If I elect to participate in this program and choose coverage for myself and my spouse, what will my premium co-pay be?**

A-14    Your premium co-pay just for yourself will be the same as it would be if you had chosen coverage for yourself only (see Table 1). Added to this amount will be the premium co-pay for your spouse. This will be 60% of the company's monthly COBRA rate for single employees minus 1.2% for each full year of service over 12 as of your retirement date, subject to (a) a minimum co-pay of 30% and (b) the limit on the monthly premium that the company will subsidize. As described in Q&A 12 and 13 above in relation to coverage for you alone, the company's monthly subsidy for your spouse will not go any higher than its subsidy on a monthly COBRA premium of $434.46 minus the dependent premium co-pay percentage (from Table 2 below) times $434.46, and you will pay all of any further increases. For the current fiscal year, your premium co-pay for your spouse can be determined from the third column of the following table, which also shows (in the fourth column) the maximum monthly premium payment that the Company will ever make for your spouse:

### Table 2

| Years at Retirement | Percentage of COBRA rate | Premium co-pay FY 2002 | Maximum Premium Payment by the Company |
|---|---|---|---|
| 12 | 60.0% | $173.78 | $173.78 |
| 13 | 58.8% | $170.31 | $179.00 |
| 14 | 57.6% | $166.83 | $184.21 |
| 15 | 56.4% | $163.36 | $189.42 |
| 16 | 55.2% | $159.88 | $194.64 |
| 17 | 54.0% | $156.41 | $199.85 |
| 18 | 52.8% | $152.93 | $205.07 |
| 19 | 51.6% | $149.45 | $210.28 |
| 20 | 50.4% | $145.98 | $215.49 |
| 21 | 49.2% | $142.50 | $220.71 |
| 22 | 48.0% | $139.03 | $225.92 |
| 23 | 46.8% | $135.55 | $231.13 |
| 24 | 45.6% | $132.08 | $236.35 |
| 25 | 44.4% | $128.60 | $241.56 |
| 26 | 43.2% | $125.12 | $246.77 |
| 27 | 42.0% | $121.65 | $251.99 |
| 28 | 40.8% | $118.17 | $257.20 |
| 29 | 39.6% | $114.70 | $262.41 |
| 30 | 38.4% | $111.22 | $267.63 |
| 31 | 37.2% | $107.75 | $272.84 |
| 32 | 36.0% | $104.27 | $278.05 |
| 33 | 34.8% | $100.79 | $283.27 |
| 34 | 33.6% | $97.32 | $288.48 |
| 35 | 32.4% | $93.84 | $293.69 |
| 36 | 31.2% | $90.37 | $298.91 |
| 37 | 30.0% | $86.89 | $304.12 |

Thus, for example, if you retired with 25 years of service and elected coverage for yourself and your spouse, your total monthly premium co-pay for fiscal year 2002 would be $228.24 ($99.64 from Table 1 + $128.60 from Table 2).

**Q-15   Can I elect to participate in this program and choose coverage for my spouse only? If so, what will my premium co-pay be?**
A-15   Yes. If you make this election, your premium co-pay will be determined in accordance with Table 2. Thus, for example, if you retired with 18 years of service and elected coverage for your spouse only, your total monthly premium co-pay for fiscal year 2002 would be $152.93.

**Q-16   If I elect to participate in this program and choose coverage for myself, my spouse and one or more other qualified dependents, what will my premium co-pay be?**

- 6 -

A-16    Your premium co-pay just for yourself will be the same as it would be if you had chosen coverage for yourself only (see Table 1). Added to this amount will be the premium co-pay for your spouse and your other dependents. This will be 60% of the difference between the company's monthly COBRA rate for families and its rate for single employees (this difference is currently $506.88 ($796.52 family rate - $289.64 single employee rate), minus 1.2% for each full year of service over 12 as of your retirement date, subject to (a) a minimum co-pay of 30% and (b) a limit on the monthly premium that the company will subsidize. As described above in relation to coverage for you alone, the company's monthly subsidy for your spouse plus other dependents will not go any higher than its subsidy on a monthly COBRA premium of $760.32 (which is 150% of $506.88). Thus the maximum company subsidy toward the premium for two or more dependents is $760.32, minus the dependent premium co-pay percentage (from Table 3 below) times $760.32. You would pay all of any further increases. For the current fiscal year, your premium co-pay for your spouse and family can be determined from the third column in the following table, which also shows (in the fourth column) the maximum monthly premium payment that the Company will ever make for your spouse and family:

### Table 3

| Years at Retirement | Percentage of COBRA rate | Premium co-pay FY 2002 | Maximum Premium Payment by the Company |
|---|---|---|---|
| 12 | 60.0% | $304.13 | $304.13 |
| 13 | 58.8% | $298.05 | $313.25 |
| 14 | 57.6% | $291.96 | $322.38 |
| 15 | 56.4% | $285.88 | $331.50 |
| 16 | 55.2% | $279.80 | $340.62 |
| 17 | 54.0% | $273.72 | $349.75 |
| 18 | 52.8% | $267.63 | $358.87 |
| 19 | 51.6% | $261.55 | $367.99 |
| 20 | 50.4% | $255.47 | $377.12 |
| 21 | 49.2% | $249.38 | $386.24 |
| 22 | 48.0% | $243.30 | $395.37 |
| 23 | 46.8% | $237.22 | $404.49 |
| 24 | 45.6% | $231.14 | $413.61 |
| 25 | 44.4% | $225.05 | $422.74 |
| 26 | 43.2% | $218.97 | $431.86 |
| 27 | 42.0% | $212.89 | $440.99 |
| 28 | 40.8% | $206.81 | $450.11 |
| 29 | 39.6% | $200.72 | $459.23 |
| 30 | 38.4% | $194.64 | $468.36 |
| 31 | 37.2% | $188.56 | $477.48 |
| 32 | 36.0% | $182.48 | $486.60 |
| 33 | 34.8% | $176.39 | $495.73 |
| 34 | 33.6% | $170.31 | $504.85 |
| 35 | 32.4% | $164.23 | $513.98 |
| 36 | 31.2% | $158.15 | $523.10 |
| 37 | 30.0% | $152.06 | $532.22 |

Thus, for example, if you retired with 17 years of service and elected for coverage for yourself and your spouse and your other dependents, your total monthly premium co-pay for fiscal year 2002 would be $401.16 ($127.44 from Table 1 + $273.72 from Table 3).

### III. Other Questions

**Q-17   What if I elect coverage for my spouse and/or my other dependents and I die before the 10-year term of the program expires?**

A-17   If your spouse and/or other dependents were covered as of the time of your death, they will be entitled to continue their coverage by paying the applicable premiums (see Tables 2 and 3 for examples).  The duration of this coverage will be the same as it would have been had you continued to live, i.e., for ten years from the date of your retirement.

- 8 -

**Q-18**  What if I acquire another dependent while covered by this program?
A-18  That dependent will not be covered.

**Q-19**  If I do not elect to participate in this program at this time, are there any circumstances under which I could enroll in it later on?
A-19  No.

**Q-20**  If I (and/or any of my dependents) elect to participate in this program at this time but discontinue coverage before the end of the ten-year duration of the program, are there any circumstances under which we could re-enroll in it later on?
A-20  No.

**Q-21**  Will I and/or my dependents be entitled under COBRA to elect to continue medical coverage under the Plan at our own expense following the termination of my employment?
A-21  You will be given a notice that you are eligible for COBRA coverage immediately following your retirement. In effect, you can choose either COBRA coverage or coverage under this program, but not both. You may not want to elect COBRA coverage because coverage under this program will both last longer and be less expensive for you.

**Q-22**  Will I and/or my dependents be entitled under COBRA to elect to continue medical coverage under the Plan at our own expense following the end of the 10-year coverage period?
A-22  No.

- 9 -

### BYK-CHEMIE USA INC. VOLUNTARY RETIREMENT PROGRAM
### FULL AND FINAL WAIVER AND RELEASE OF CLAIMS
### ("RELEASE FORM")

Pursuant to the terms and conditions of the BYK-Chemie USA Inc. Voluntary Early Retirement Program (the "Program"), I, _____, on _____, 2002, submitted to BYK-Chemie USA Inc. (the "Company") a signed Application Form whereby I voluntarily elected to take advantage of the Program, and wherein I applied to retire from the Company effective at the close of business on _____, 2002.

I understand that I will receive the following benefits under the Program in lieu of any medical or dental benefits I might otherwise receive or be entitled to under any agreement, plan or program maintained by BYK-Chemie USA Inc. (the "Company"), including rights to continuation of medical and dental coverage pursuant to COBRA:

Continuation of medical and dental coverage for me and my dependents, if any, for a period of up to ten (10) years from the date of my retirement pursuant to the Program and the BYK Chemie USA Inc. MedSpan Health and Dental Care Plans.

I hereby acknowledge that the Company has advised me to consult a lawyer before signing this Release Form. I further acknowledge that I have been provided a period of at least forty-five (45) days to review and consider the Program, this Release Form, and information on the benefits available to me under the Program. I also have had the opportunity since my receipt of the Information Packet for Eligible Employees which included this form on _____, 2002, to attend an individual counseling meeting and to discuss the Program, this Release Form (including the attached Appendix A which contains information the Company is legally required to provide me in order to obtain a release of any rights or claims I may have under the Age Discrimination in Employment Act), and benefit information, both general and specific to myself, fully with whomever I wished. If I elected not to take the full period provided to me to sign this Release Form, I acknowledge that the period of time used by me prior to signing this Release Form was ample time for me to consider and review the Program and this Release Form and that I have freely and voluntarily applied to take advantage of

the Program. I understand that I may revoke this Release Form at any time prior to the end of the business day seven (7) calendar days after the date I sign and return this Release Form to the Company), by delivering a signed and dated written notice of revocation to Carol Foley in Human Resources. If this Release Form is not revoked by me within that time period, it will become effective and enforceable after such date.

In return for the benefits available to me under the Program, the sufficiency of which is hereby acknowledged, I fully and forever waive, discharge and release any and all claims and causes of action of whatever nature, known and unknown, against the Company, its current and future subsidiaries, affiliates, successors, assigns and their directors, officers, employees, attorneys and agents, including, without limitation, any and all rights and claims, whether in law or in equity, and whether related to my employment, my retirement or otherwise, which I or anyone acting through me, my estate or on behalf of me or my estate might otherwise have had or asserted, including but not limited to, claims or rights arising under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974, and all federal, state and local law claims, whether statutory or common law, including, but not limited to, those under the laws of the State of Connecticut (including, without limitation, the Connecticut fair employment practices law). I do not, however, waive rights or claims that may arise after the date I sign this Release Form, including rights or claims against the Company to enforce the terms of the Program, nor do I waive any rights or claims for any Company benefits which have been accrued, funded and vested to date.

I further agree, to the extent permitted by law, not to bring any administrative or legal action arising out of my employment by the Company or the rights released under this Release Form, and I agree that I will not seek or accept any award or settlement from any source or proceeding with respect to any claim or right released under this Release Form.

FINALLY, I HAVE CAREFULLY READ THE SUMMARY OF THE PROGRAM AND OF MATERIAL MODIFICATIONS TO THE PLAN AND THIS ENTIRE

DOCUMENT. I ACKNOWLEDGE THAT A COPY OF THE SUMMARY OF THE PROGRAM AND OF MATERIAL MODIFICATIONS TO THE PLAN WAS AVAILABLE SINCE MARCH __, 2002, FOR ME TO REVIEW AND I KNOW AND UNDERSTAND THE TERMS OF THE PROGRAM AND THIS DOCUMENT. I HAVE SIGNED THIS DOCUMENT OF MY OWN FREE WILL AND I HAVE VOLUNTARILY APPLIED TO TAKE ADVANTAGE OF THE PROGRAM. I ACKNOWLEDGE THAT I HAD THE OPPORTUNITY TO REVIEW THE ABOVE INFORMATION AND THIS DOCUMENT WITH LEGAL COUNSEL OF MY CHOICE.

IN WITNESS WHEREOF AND INTENDING TO BE LEGALLY BOUND HEREBY, the undersigned has executed this Release Form this _____ day of _____, 2002.


_____
Signature


_____
Name (please print) and Social Security Number

This Application and Release Form has been received this _____ day of _____, 2002 by me as a representative of BYK-Chemie USA Inc.

Employee Benefits Administrator
BYK-Chemie USA Inc.


_____
Carol Foley

DATE:

TO:         Carol Foley

FROM:

RE:         Waiver of Participation in the Voluntary Retirement Program

_____

I understand that I am eligible to apply to participate in the BYK-Chemie USA Inc. Voluntary Early Retirement Program.  My individual information packet has been available to me since March ____, 2002.

I do not wish to apply to participate in the Voluntary Retirement Program.

_____
Employee's Name (print or type)

_____          _____
Employee's Signature                                      Date

_____          _____
Human Resources Representative's Signature          Date

TO BE RETURNED TO HUMAN RESOURCES NO LATER THAN APRIL 30, 2002.

## BYK-CHEMIE USA INC.
## VOLUNTARY RETIREMENT PROGRAM
### APPLICATION FORM

<u>Retirement from Employment</u>.  Pursuant to the terms and conditions of the BYK-Chemie USA Inc. Voluntary Early Retirement Program (the "Program"), I,

_____, hereby voluntarily apply to take advantage of the Program, and I hereby apply to retire effective immediately after the close of business on_____, 2002.

<u>Retirement Incentive</u>.  I understand that if eligible for the Program I will receive the following benefits under the Program in lieu of any medical or dental benefits I might otherwise receive or be entitled to under any agreement, plan or program maintained by BYK-Chemie USA Inc. (the "Company"), including rights to continuation of medical and dental coverage pursuant to COBRA:

Continuation of medical and dental coverage for me and my dependents, if any, for a period of ten (10) years from the date of my retirement pursuant to the Program and the BYK Chemie USA Inc. MedSpan Health and Dental Care Plans.

<u>Release Requirement</u>.  I understand that I will receive the foregoing benefits under the Program only if on the date of my retirement I submit, and do not thereafter revoke, the Release Form that is included in the Information Packet for Eligible Employees, duly signed by me.

_____
Signature

_____
Name (please print) and Social Security Number

This Application Form has been received this _____ day of _____, 2002 by me as a representative of BYK-Chemie USA Inc.

Employee Benefits Administrator
BYK-Chemie USA Inc.

_____
Carol Foley

DISCLOSURE OF POSITIONS AND AGES OF
PERSONS ELIGIBLE FOR THE BYK-CHEMIE USA INC.
VOLUNTARY EARLY RETIREMENT PROGRAM

| POSITION | AGE |
|---|---|
| Executive Secretary | 55 |
| Vice President | 57 |
| Sales/National Account Manager | 57 |
| Purchasing/Materials Manager | 59 |
| Secretary | 59 |
| Employee Benefits Administrator | 59 |
| Sales Support Manager | 60 |
| Sales Support Manager – Plastics | 66 |

# Exhibit B

5-3-02



Additives + Instruments

BYK-Chemie USA inc. • P.O. Box 5670 • Wallingford, CT 06492-7651

March 13, 2002

Gilbert Linder
200 Nutmeg Place
Cheshire, CT 06410

Dear Gilbert:

RE: COBRA Continuation Rights

As you know, a federal law known as COBRA provides certain individuals covered under group
health plans (includes medical and dental benefits) the right to continue their benefits if coverage
is lost under certain conditions. The following "qualifying event" will occur sometime between
March 13, 2002 to May 31, 2002 and, as a result, coverage will be terminated for the individuals
listed as of the date shown unless a COBRA continuation or the Early Retirement Program
coverage (see Q&A 20 and 21 of the Early Retirement Program) is elected.

| Qualifying Event | Date of Qualifying Event | Date Coverage Terms |
|---|---|---|
| Retirement | 3/13/02 — 5/31/02 | 3/13/02 — 5/31/02 |

Person(s) who will lose coverage due to qualifying event:

Gilbert Linder; Harriet Linder; Jeremy Linder; Ethan Linder

The individuals indicated above are entitled to elect COBRA continuation benefits as are fully
described in the enclosed "Notice of Federal Continuation Rights." The actual election of
continuation benefits is done by completing the enclosed "COBRA Continuation Form for Group
Health Coverages." These forms should be carefully reviewed as the failure to follow the
directions contained in these forms could result in the loss of your COBRA rights.

524 South Cherry Street
Wallingford, CT 06492-7651
Telephone  (203) 265-2086
Telefax      (203) 284-9158
Internet     www.byk-chemie.com

**BYK 00330**

-2-

If a beneficiary is disabled as determined by the Social Security Administration, s/he may be entitled to up to 29 months of COBRA continuation. Please refer to the "Notice of Federal Continuation Rights" for additional information and instructions.

If you have any questions, please contact me at 203-265-2086 ext 3010 normal business hours (8:00 AM - 4:30 PM).

Sincerely,

BYK-CHEMIE USA

*Carol Foley*

Carol Foley
Employee Benefits Administrator

---

If you elect <u>not</u> to continue your group health/dental coverage through the COBRA option, please indicate this decision with your signature and date and return to me.

_____ **   5-1-02
         Signature                                    Date

eb        ** with the knowledge that the company has paid for
          coverage from 2-1-02 to 5-31-02 per Carol Foley.

**Subject: [Fwd: Undeliverable: VERP]**
**Date:** Fri, 19 Apr 2002 12:18:35 -0400
**From:** C Foley <cfoley@bykchemieusa.com>
**To:** hgl@prodigy.com

**Subject: Undeliverable: VERP**
**Date:** Fri, 19 Apr 2002 11:50:54 -0400
**From:** System Administrator <postmaster@BYKChemieUSA.com>
**To:** Carol Foley <cfoley@BYKChemieUSA.com>

Your message

```
   To:        hgl@prodigy.net
   Subject: VERP
   Sent:      Fri, 19 Apr 2002 11:52:09 -0400
```

did not reach the following recipient(s):

```
hgl@prodigy.net on Fri, 19 Apr 2002 11:50:54 -0400
    The recipient name is not recognized
        The MTS-ID of the original message is: c=us;a=
;p=byk-chemie-usa;l=NBCU0204191549JDZGT35P
    MSEXCH:IMS:BYK-Chemie-USA:BYKCHEMIEUSA:NBCU 3550 (000B09AA) 550
5.1.1 <hgl@prodigy.net>... Addressee unknown
```

**Subject: VERP**
**Date:** Fri, 19 Apr 2002 11:52:09 -0400
**From:** C Foley <cfoley@bykchemieusa.com>
**To:** hgl@prodigy.net

Gil,
I haven't received your application, release and COBRA notice pertaining
to the Voluntary Early Retirement Program (VERP). The deadline is April
30, 2002. Although you signed the Termination Agreement & Release on
3/28/02, this does not cover your automatic participation in the VERP.
As discussed in the VERP package previously given to you, election of
medical coverage requires your completion of the separate documents. If
you are planning on receiving the post retirement medical coverage, I
would appreciate you mailing the completed documents to me post marked
prior to April 30, 2002.
For your information Anna Croce will be leaving MedSpan on April 30th
and I would like her to set up the Retiree Medical Section before she
leaves. Hopefully by the end of next week she will be able to do so.
Please call should you have any questions.

**BYK 00332**

4/19/02 12:19 PM

# Exhibit C

## AGREEMENT AND RELEASE

In consideration of the payments and benefits described herein, Gil Linder (the "Executive") is entering into this Agreement and Release (the "Agreement") for the benefit of BYK Chemie USA Inc. (the "Company"), its affiliates and the respective shareholders, officers, directors, employees, agents, successors and assigns of the Company and its affiliates (together with the Company, the "Company Group").

1.    Termination of Employment.  The Executive acknowledges and agrees that his last day of employment with the Company will be January 31, 2002 (the "Termination Date").

2.    Entitlement to Compensation and Benefits. Regardless of whether the Executive signs this Agreement, he will (i) receive his regular base salary and benefits through the Termination Date; (ii) be paid for any unused vacation days earned through the Termination Date; and (iii) be reimbursed for any unreimbursed business expenses incurred by the Executive prior to the Termination Date in accordance with the Company's expense reimbursement policy.

3.    Consideration. Provided the Executive signs this Agreement and does not revoke it in accordance with Section 10 below, the Company will pay or provide to him the following payments and benefits:

   (a)    The Company will pay the Executive, on the fifteenth (15th) day after he has signed and returned this Agreement to the Company, a lump sum payment equal to the gross amount of Fifty five Thousand Dollars ($55,000).

   (b)    Provided the Executive remains unemployed through June 30, 2002, he will continue to vest in his stock options under the Altana Group 2000 stock option plan (the "2000 plan") following the Termination Date as if he continued to be employed by the Company until July 1, 2002, on which date he will be fully vested in such options under the 2000 plan. Provided the Executive remains unemployed through June 30, 2003, he will continue to vest in his stock options under the Altana Group 2001 stock option plan (the "2001 plan") as if he continued to be employed by the Company until July 1, 2003, on which date he will be fully vested in such options under the 2001 plan. Once the Executive has fully vested in either or both of the 2000 and 2001 plans, the Executive will have a period of twenty-four (24) twelve (12) months to exercise such options, notwithstanding any provision in the plan to the contrary.

000076

(c) The Company will pay the Executive, on the fifteenth (15th) day after he has signed and returned this Agreement to the Company, a lump sum payment equal to the gross amount of Forty-two Thousand Five Hundred Dollars ($42,500) as a bonus for 2001.

(d) The Executive will be included in the voluntary early retirement program ("VERP") which the Company intends to announce and implement shortly, whereby employees at least fifty-five (55) years of age and having at least twelve (12) years of service with the Company on a specified date will be given the option of retiring early and receiving post-retirement medical coverage for up to ten (10) years under terms to be set out in the VERP. Should the Company fail to implement the VERP, the Executive will be entitled to rescission of this Agreement.

(e) The Executive will be permitted to keep the leased automobile currently provided to him by the Company. The Company's cost in providing this benefit will be reported as taxable income paid to the Executive.

All payments and benefits provided to the Executive hereunder will be reported as taxable income to the extent required by law and will be subject to applicable federal, state and local income and payroll withholding taxes.

In the event the Executive breaches any of his promises or obligations hereunder (other than a challenge by the Executive of the validity of his waiver of age discrimination claims under this Agreement), he will be required to return to the Company any payments or benefits provided to him as consideration for this Agreement, and he will forfeit his right to receive any payments or benefits which have not yet been paid to him hereunder.

4. Release. The Executive hereby fully and forever releases the Company Group from any and all claims, causes of action and charges, of whatever kind or nature, whether known or unknown, which he now or hereafter may have against any member of the Company Group, including, but not limited to, claims arising under or in any way connected with his employment with the Company or the termination of such employment. The Executive acknowledges and agrees that the claims released hereunder include any claims or rights arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act ("ADEA"), the Connecticut Fair Employment Practices Law or any other federal, state, county, city or local law, statute, ordinance or regulation relating to discrimination on any basis, including age, sex, race, national origin, disability and religion, or under any other theory of law or contract, including but not limited to fraud, wrongful termination, retaliatory discharge, intentional infliction of emotional or

-2-

000077

mental distress, libel or slander. The Executive does not, however, waive rights or claims that may arise after the date he executes this Agreement.

The Executive further agrees, to the extent permitted by law, not to bring any administrative or legal action arising out of his employment by the Company or the rights released under this Agreement, and the Executive agrees that he will not seek or accept any award or settlement from any source or proceeding with respect to any claim or right released under this Agreement.

5.    Confidentiality. The Executive agrees that at all times hereafter, he will hold in strictest confidence, and will not use or disclose to any person, firm or corporation (except as may otherwise be required by law), any Confidential Information of the Company or any member of the Company Group. "Confidential Information" means any Company or Company Group proprietary information, technical data, trade secrets or know-how, including, but not limited to, sales, marketing and pricing information, product plans or other plans for future development, customer requirements, customer lists, inventions, processes, financial or other business information (including personnel information) disclosed to the Executive by the Company or any member of the Company Group, either directly or indirectly, in writing, orally or by drawings or observation of parts or equipment. "Confidential Information" does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of the Executive or of others. The Executive further agrees that he will not disclose the terms or existence of this Agreement to any third party (other than to his professional advisors or immediate family members or as may be required by law).

6.    Return of Property. The Executive represents that he has returned to the Company all Company information and property (without retaining any copies, whether electronic or otherwise) including, but not limited to, reports, files, records, keys, computer disks and software, computer files, credit cards, telephones and any and all other physical or personal property provided to the Executive by the Company or any member of the Company Group during the course of his employment by the Company.

7.    No Disparagement or Harm. The Executive agrees that he will not make any comments or statements relating to the Company or any member of the Company Group which are negative, critical or derogatory or which may tend to denigrate, disparage or otherwise injure the business or reputation of any of them.

000078

8.     <u>No Other Termination Benefits</u>. The Executive acknowledges that the consideration provided to him in this Agreement will be in lieu of any and all bonus, severance or other termination benefits to which he may otherwise be entitled under any Company plans or policies or agreements in effect at any time during his employment, and this Agreement will supersede all such plans, policies and agreements except as expressly provided in this Agreement.

9.     <u>Knowing and Voluntary Execution</u>. The Company hereby specifically advises the Executive to consult a lawyer before signing this Agreement. The Executive acknowledges that he has carefully read and understands the contents of this Agreement, that he has had ample opportunity to review this Agreement with his financial or legal advisors (if he chose to do so), and that he executed this Agreement of his own free will. The Executive further acknowledges that he has received and reviewed the attached Appendix A which contains information the Company is legally required to provide the Executive in order to obtain a release of any rights or claims he may have under ADEA.

10.     <u>Time for Execution/Right to Revoke</u>. The Executive hereby acknowledges that after receiving this Agreement, he will have forty-five (45) days to consider signing this Agreement. If he elects not to take forty-five (45) days to sign this Agreement, the Executive acknowledges that the period of time used by him prior to signing this Agreement was ample time to consider and review this Agreement. The Executive further acknowledges that he will have seven (7) days from the date this Agreement is signed by him to revoke this Agreement by advising the Company in writing of such revocation. If the Agreement is not revoked within seven (7) days from the date this Agreement is signed by the Executive, this Agreement will become effective and enforceable as to all parties on the eighth (8th) day following the date of the Executive's execution of this Agreement.

11.     <u>Remedies</u>. The Executive understands and acknowledges that a breach of the provisions of this Agreement would injure the Company Group irreparably in a way which could not be adequately compensated for by damages. The Executive therefore agrees that in the event a court of competent jurisdiction determines that the Executive has breached any of the provisions of this Agreement (other than a challenge by the Executive of the validity of his waiver of age discrimination claims under this Agreement), the Company will be entitled to an injunction, without bond, restraining such breach, as well as costs and attorneys' fees relating to any such proceeding or any other legal action to enforce this Agreement. Nothing herein will be construed, however, as prohibiting the Company from pursuing other available remedies or recovering on any claim for damages for such breach or threatened breach.

12.     <u>Applicable Law</u>. This Agreement will be deemed to have been made under and will be interpreted, construed and enforced in accordance with the laws of the State of Connecticut, without regard to its conflicts of law provisions.

000079

13.   Severability.  If any provision of this Agreement is deemed invalid or unenforceable, the validity of the other provisions of this Agreement will not be impaired.  If any provision of this Agreement will be deemed invalid as to its scope, then notwithstanding such invalidity, that provision will be deemed valid to the fullest extent permitted by law.

14.   Entire Agreement.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained herein and supersedes any and all prior and contemporaneous written or oral agreements, representations and understandings of the parties.

15.   Successors and Assigns.  This Agreement is binding upon and will inure to the benefit of the Executive, the Company and the Company Group, as well as the Company's successors and assigns.

16.   Counterparts.  This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts and all of the counterparts taken together will be deemed to constitute one and the same instrument.

          Executed and presented for consideration to Gil Linder by BYK Chemie USA Inc. this ___ day of February, 2002.

**BYK CHEMIE USA INC.**

By: _____

Name: Dr. Klaus Oehmichen
Title: Member of the Board


**For BYK-CHEMIE GMBH**

By: _____

Name: Dr. Roland Peter
Title: Chairman of the Board Additives Division


Agreed to and accepted:


_____          3-28-02
Gil Linder                                Date

000080

- 5 -

## APPENDIX A

### Data Pertaining to Release of Rights and Claims under the Age Discrimination in Employment Act

Because other employees are being offered agreements similar to the one the Executive is being offered, the Company is required to advise the Executive of the following:

1) All top management-level executives of the Company were eligible to be selected for this termination program. All persons who are being terminated as a result of the restructuring of the Company's management structure were selected for this termination program.

2) All persons who are being offered consideration under a Settlement and Release Agreement must sign the agreement and return it to the Company within forty-five (45) days after receiving it. Once the signed waiver is returned to the Company, the employee has seven (7) days to revoke the Agreement.

3) The ages and positions of the Company's employees who were selected for termination and the offer of consideration for signing a waiver are:

    President, age 53

    Vice President Finance, age 56

4) There are no eligible employees who were not selected for this termination program.

000081