# TAB 19

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


GILBERT E. LINDER,
          Plaintiff,


VS.                              CIVIL ACTION NO.
                                 3:02CV1956(JBA)

BYK-CHEMIE USA INC., in its
Capacity as Plan Sponsor of the:
RETIREMENT PLAN OF BYK-CHEMIE
USA INC., and the SUPPLEMENTAL
RETIREMENT PLAN OF BYK-CHEMIE
USA INC.,
          Defendant.



Deposition of GILBERT E. LINDER taken in accordance with the

Connecticut Practice Book at the offices of Carmody &

Torrance LLP, 195 Church Street, New Haven, Connecticut,

before Meghan M. English, LSR, a Licensed Shorthand Reporter

and Notary Public, in and for the State of Connecticut on

Friday, April 11, 2003, at 12:59 p.m.



          MEGHAN M. ENGLISH, LSR          ORIGINAL
            LSR NO. 211



          DEL VECCHIO REPORTER SERVICES, LLC
          PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE                 100 PEARL STREET, 14th FLOOR
MADISON, CT 06443               HARTFORD, CT 06103-4506
   203 245-9583                      800 839-6867

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:
LAWRENCE H. LISSITZYN, ESQUIRE
REID AND RIEGE PC
One State Street
Hartford, Connecticut  06103
(860) 240-1098

ON BEHALF OF THE DEFENDANT:
GREGORY C. BRADEN, ESQUIRE
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia  30309
Telephone (404) 881-7000
Facsimile (404) 881-4777

S T I P U L A T I O N S

It IS STIPULATED AND AGREED by and between counsel representing the respective parties that the reading and signing of the deposition by the deponent is not waived.

1     GILBERT E. LINDER, having first been duly

2 sworn, deposed and testified as follows:

3

4      DIRECT EXAMINATION

5 BY MR. BRADEN:

6    Q  Good afternoon, Mr. Linder.  My name is Greg

7 Braden.  I am here to take your deposition in connection with

8 the lawsuit that you filed against BYK-Chemie.

9     Have you ever given a deposition before?

10    A  No.

11    Q  Let me just go over a little bit of etiquette

12 with you, and I guess you weren't here at the start of

13 Mr. Lissitzyn's deposition of Miss Foley.  I probably could

14 short circuit some of this, but let me go over it

15 nonetheless.

16     When I ask you a question today -- and you

17 have been sitting here for the deposition of Miss Foley and

18 you see how the process works.  I am going to ask you

19 questions; you are going to give me answers.  The court

20 reporter is going to take down everything you say.  What I

21 want you to do is listen very carefully to that question I

22 ask you.  If there is anything about the question that you

23 don't understand, let me know.  I will be happy to repeat it

24 or rephrase it.  If you don't hear it, also let me know.  The

25 important thing is that you understand the question and you

1    give a truthful answer.  Okay?

2              Wait until I am finished with my question

3    before you speak.  I will try not to interrupt.  You try not

4    to interrupt me.  It will make our court reporter's life a

5    lot easier today if we can avoid talking at the same time.

6    It's very difficult for her to take down two people talking

7    at once.  I would like you to answer all my questions and,

8    again, answer truthfully unless you're instructed by your

9    attorney not to.  I would like to remind you today that you

10    have been sworn to and you have given an oath to tell the

11    truth and any deliberate failure to do so could subject you

12    to criminal penalties for perjury.

13              Are you taking any medication that would

14    prevent you from accurately answering my questions?

15        A      No.

16        Q      Can you tell me briefly about your educational

17    background?

18        A      I have a bachelor's degree in business

19    administration from Lehigh University, an MBA from American

20    University.

21        Q      And what is your work history prior to joining

22    BYK-Chemie and its predecessors?

23        A      After graduating from graduate school, I

24    worked for a few years at Perkin Elmer Corporation in

25    Norwalk, Connecticut.  Worked for Lone Star Industries in

1    Greenwich, Connecticut for a few years following.  Then I

2    worked for the Risdon Manufacturing Company in Naugatuck,

3    Connecticut.  During those periods of times I worked in the

4    accounting departments, corporate budgeting departments; and

5    then after Risdon Manufacturing I joined a company called BYK

6    Malincrod (Phonetic) which at that time was a joint venture

7    between BYK-Chemie and Malincrod in St. Louis which

8    eventually became BYK-Chemie USA.

9         Q    Did you have any responsibility for employee

10   benefits on any of those jobs?

11        A    Only during the -- only during the time at

12   BYK-Chemie.

13        Q    But I was referring to your time before

14   BYK-Chemie, before you joined BYK-Chemie.

15        A    No.  No.  Prior to BYK-Chemie, I did not.

16        Q    Now can you tell me what your job duties at

17   BYK-Chemie were?

18        A    Well, I was the controller of the company; and

19   my primary functions were to create budgets for the company,

20   account for the profit and loss of the company, create

21   financial statements for the company, oversee and supervise

22   the data processing department, the purchasing department and

23   the personnel department including oversight of employee

24   benefits.

25        Q    So you had responsibility for employee

1       benefits?

2            A       Yes.

3            Q       And you had responsibility for employee

4       benefits at BYK-Chemie?

5            A       Yes.

6            Q       Now BYK-Chemie was affiliated with Altana for

7       some period of time; is that correct?

8            A       Which Altana?  There is more -- there is more

9       than one Altana.

10           Q       Tell me which ones BYK-Chemie was affiliated

11      with.

12           A       Well, BYK-Chemie was --

13                   MR. LISSITZYN:  Have you got a time on

14                   that?

15                   THE WITNESS:  BYK-Chemie in 1984 was

16                   merged into a sister company with the name of

17                   Altana, Inc., a US Corporation, and both --

18                   that company was 100 percent owned by a German

19                   company by the name of Altana AG.

20      BY MR. BRADEN:

21           Q       And the affiliation was common parent?

22           A       The affiliation was -- well, at that time we

23      were a division of Altana, Inc.  In 1999, the companies were

24      split apart.  BYK-Chemie became a separate corporation,

25      BYK-Chemie USA, Inc.; and at that time we, BYK-Chemie USA,

1    Inc., became 100 percent owned by BYK-Chemie GMBH which is

2    owned by Altana AG.

3        Q    While BYK-Chemie was a division of Altana, did

4    it maintain its own separate employee benefits plans?

5        A    Yes.

6        Q    And what plans were those?

7        A    We had our own health insurance plan, our own

8    pension plan, our own 401k plan, our own SURP.

9        Q    And you were responsible for -- ultimately for

10    the administration of those plans; is that correct?

11        A    The administration of the plans from a

12    employee benefit -- an employee liaison view, from a

13    government reporting view but not from any structural change

14    to those plans.

15        Q    You were on the administrative committee for

16    those plans?

17            MR. LISSITZYN:  Let me object.  Which

18            plans is this, Greg?

19            MR. BRADEN:  The plans that he just

20            described.

21            THE WITNESS:  I was only on an

22            administrative committee for the BYK-Chemie

23            retirement plan for a period of time beginning

24            about 19 -- either 1998 or 1999 until the time

25            I left the company.

BY MR. BRADEN:

1     Q    So it's your testimony that prior to 1998 or 1999 you never served in the capacity of administrative committee member for the retirement plan?

     A    I acted as an administrator, but to my knowledge there was no -- there was no committee. I never thought of myself as being a committee member. To my knowledge, there was no committee ever appointed prior to 1999, approximately.

     Q    So prior to 1999, is it fair to say that you were the plan administrator of the BYK-Chemie retirement plan?

     A    I was -- I acted as administrator, yes.

     Q    And would you call yourself the plan administrator?

     A    I was probably the only one in the company acting in that capacity.

     Q    Now what is, if any, your understanding of the duties that you had with respect to the administration of the retirement plan?

              MR. LISSITZYN:  At what point?

              MR. BRADEN:  At any point.

BY MR. BRADEN:

     Q    Let's take it before and after 1999 since that's a point you have identified. Prior to 1999, what is

1   your understanding of your duties as plan administrator of

2   the retirement plan?

3       A       I acted as -- rather my office, either myself

4   or Carol Foley who reported to me, acted as liaison with law

5   firms that advised us and -- well, advised us and created

6   plan documents.  We acted as a liaison with employees if any

7   questions came up regarding the plan.  We were responsible

8   for governmental reporting for the plans.

9       Q       Did you have responsibility to interpret the

10  terms of the plan in the event of any dispute with employees?

11      A       Yes.  Yes.

12      Q       Now with respect to plans other than the

13  retirement plan, what were your responsibilities?

14      A       Well, with regard to the 401k plan, I acted

15  as -- rather myself and my assistant acted as overseers of

16  the plan.  We assisted in the dissemination of information

17  regarding the plan.

18      Q       Did you act in the same capacity with respect

19  to the 401k plan as you acted in relation to the retirement

20  plan, that being plan administrator?

21      A       Yes, I would say so.

22      Q       What about the other plans?

23      A       Well, regarding the health plans, again, we

24  acted as primarily liaison with employees and made sure that

25  the plans operated smoothly.

1      Q      Same capacity as you acted in relation to the
2  savings plan --
3      A      Yes.
4      Q      Let me finish.  We are talking at the same
5  time.
6             -- and the retirement plan?  You acted in that
7  same capacity with respect to the group health plan?
8      A      Pretty much.
9      Q      So you were the plan administrator of the
10  group health plan as well?
11      A      I didn't think of myself as that but the
12  functions were similar.
13      Q      Was that a yes answer or a no answer?
14      A      Yes.
15      Q      All right.  Now any other plans that you were
16  the administrator of before 1999?
17      A      Not to my knowledge.
18      Q      What, if anything, changed in 1999 when you I
19  guess were formerly appointed to an administrative committee?
20  Did any of your responsibilities change?
21      A      No, other than in conversations with I believe
22  it was Saul Bin-Meyer came to light that there was no
23  committee.
24      Q      Well, I don't want you to reveal
25  attorney/client communications.  You obviously were an

1     officer of the company, and to the extent you were

2     communicating with outside counsel I would instruct you to

3     answer to the extent that your answer would not reveal

4     confidential communications.

5                    MR. LISSITZYN:  Well, let me stop you

6                    there.  If I left the room, would that cure

7                    the problem?

8                    MR. BRADEN:  Well, I am certainly happy

9                    to hear what his answer is and then decide

10                   whether or not it's privileged in camera, if

11                   you will, and outside the presence of the

12                   reporter; but I don't want -- he is not at

13                   liberty to waive the privilege.  The privilege

14                   is not his, it's the company's; and so the

15                   only way the company would, you know, decide

16                   whether (a) it's privileged and (b) whether to

17                   grant an informed waiver would be to hear what

18                   he has to say.

19                   MR. LISSITZYN:  Well, I suppose that you

20                   can ask your colleague who would be a good

21                   source of the information.

22                   MR. BRADEN:  That's true, too, so let's

23                   just come back to the question which I asked

24                   you.

25    BY MR. BRADEN:

```
1          Q      And that was whether any of your
2    responsibilities changed as far as you're concerned after you
3    became appointed to the administrative committee?
4          A      No.
5          Q      Now you mentioned the SURP.  You had
6    responsibility for administration or some responsibility for
7    the SURP before 1999; is that correct?
8          A      I don't recall performing any functions
9    regarding the SURP.
10         Q      What reasonability did you have, if any, in
11   relation to the SURP?
12         A      None that I can think of.
13         Q      Who was responsible for the SURP?
14               MR. LISSITZYN:  Let me interrupt.  What
15               does "responsible" mean, Greg?
16               MR. BRADEN:  The responsibility for the
17               administration.  That's what we are talking
18               about.
19               MR. LISSITZYN:  So the question is:  Were
20               you responsible for the administration of the
21               SURP?
22               MR. BRADEN:  I previously asked him that.
23               THE WITNESS:  Yes.
24   BY MR. BRADEN:
25         Q      So you were responsible for the administration
```

1    of the SURP prior to 1999, correct?

2         A     Yes.

3         Q     And did your responsibility for the SURP

4    change in any way in 1999 or thereafter?

5         A     No.

6         Q     And again just so I am clear on this, you had

7    the same general responsibility for the SURP that you had for

8    the retirement plan, the savings plan and the health plan?

9         A     Yes.

10        Q     Now have you ever received any training in the

11   employee benefits field?

12        A     No.

13        Q     Have you ever received any training on the

14   legal obligations of somebody who is responsible for the

15   administration of an employee benefits plan?

16        A     No.

17        Q     As the administrator of the plans that we have

18   discussed, and let me just reiterate:  The health plan,

19   retirement plan, SURP, savings plan, as the administrator for

20   those plans, you were responsible for all aspects of plan

21   administration, correct?

22        A     Yes.

23        Q     And that would include, for example,

24   responsibility for handling any disputed claims?

25        A     Yes.

1     Q      Do you recall ever dealing with or handling in

2  that capacity any disputed claims under any of those plans?

3     A      The only claims that I can recall -- the only

4  complaints that I recall regarded the health plan and

5  regarding questions of whether particular medical procedures

6  would be covered by the insurance.  I can't recall any

7  complaints regarding either the 401k or the retirement plan.

8     Q      Let me show you a document that previously has

9  been marked as Plaintiff's Exhibit No. 3, and it's called the

10  Retirement Plan of BYK-Chemie USA Amended and Restated

11  effective January 1, 1994.  And let me just ask you whether

12  you recognize this document to be the retirement plan that we

13  have been referring to so far in the deposition?

14     A      Yes.

15     Q      Now were you ever called upon in your capacity

16  as a plan administrator for the retirement plan or the SURP

17  or the savings plan to -- and I am excluding the health plan

18  now -- to interpret any of the provisions of those plans for

19  any reason?

20     A      Yes.

21     Q      Can you describe when and what it involved?

22            MR. LISSITZYN:  Let me object.  I don't

23            see what this has to do with the claims

24            procedure to which you held me as a subject

25            during my examination of Miss Foley.

1           MR. BRADEN:  Well, if you will permit him

2       to answer, it may become clear.

3           MR. LISSITZYN:  Well, why don't you tell

4       me ahead of time and then I will permit him to

5       answer.

6           MR. BRADEN:  Well, what I am trying to do

7       is get an understanding of (a) whether he had

8       to interpret the plan as it related to any

9       matter involving the claims -- disputed claim

10      or claim procedure.  Okay.  And (b) obviously

11      what his understanding of the responsibility

12      of the administrator is.

13  BY MR. BRADEN:

14      Q    So can you tell me the context in which you

15  were called upon to interpret the plan?

16      A    Yes.

17      Q    And which plan?

18      A    The retirement plan.

19      Q    And what was the context?  In what regard were

20  you asked to interpret the plan?

21          MR. LISSITZYN:  Object as exceeding the

22      scope -- permissible scope of this deposition,

23      but you may answer the question.  Do you want

24      it read back?

25          THE WITNESS:  No.  One situation arose

DEL VECCHIO REPORTING
(203) 245-9583

```
 1              late in 2001.  I believe it was around
 2              October, November, whereby Altana AG was
 3              implementing a new stock option plan for
 4              employees other than officers.  I believe it
 5              was known as the Altana Investment Plan, and I
 6              was giving -- Carol and I were giving
 7              presentations regarding the plan to the
 8              employees for the first time, and I was asked
 9              by several employees if the options that they
10              exercised would be considered income as part
11              of the calculation of their retirement.
12    BY MR. BRADEN:
13         Q    Okay.  And what did you say?
14         A    Well, I didn't know, and I can't recall -- I
15    can't recall who specifically asked me but --
16         Q    That was my next question.  You don't recall
17    who asked you?
18         A    I don't recall exactly who, but that was a
19    question that as an administrator I thought needed answering.
20         Q    And did you give an answer?
21         A    No, I didn't.
22         Q    Prior to 1999, was there an administrative
23    committee or somebody formally designated with responsibility
24    other than yourself for plan administration --
25              MR. LISSITZYN:  Objection.  I don't think
```

1      that he has ever testified that he was

2      formally designated as the administrative

3      committee at any point in time before or after

4      1999.  My recollection of his testimony --

5      only my recollection, the record speaks best

6      for itself, is that he may have acted in that

7      capacity but that he was never formally

8      designated.

9           MR. BRADEN:  Larry, if you let me finish,

10          it was pretty clear that my question wasn't

11     asking him whether he was on the

12     administrative committee.  What I asked him

13     was whether there was anybody else formally

14     designated with responsibility for plan

15     administration other than him prior to 1999 as

16     committee member or otherwise.

17          MR. LISSITZYN:  And my objection to the

18          question is not having to do with anybody else

19          but the implicit or explicit assumption that

20          he was formally designated in any capacity.

21          MR. BRADEN:  Well, I thought that he had

22          previously agreed that he was responsible for

23          plan administration.

24          MR. LISSITZYN:  I think he -- I don't --

25          the record will say what it says.

1          MR. BRADEN:  And I am not sure I want to

2          debate it.

3    BY MR. BRADEN:

4          Q     But let me just ask you, Mr. Linder, we

5    previously have been talking about your responsibilities as

6    the administrator of the retirement plan, the savings plan,

7    the group health plan.  I am assuming that you didn't just

8    get those responsibilities by inertia, that they didn't just

9    drop from the sky.  Somebody asked you to take on those

10   responsibilities; is that correct?

11         A     Prior to 1999?

12         Q     Yes.

13         A     I think I had those responsibilities, but I

14   don't think anybody ever asked me, but by default I took

15   those responsibilities on in the function of the controller

16   of the company.

17         Q     So it is your testimony that you were never

18   either formally through a plan document or through a

19   management process asked to assume responsibility for plan

20   administration?

21         A     Well, I don't believe there was any board -- I

22   don't believe there was any board resolution appointing me or

23   anybody else prior to '99, but certainly I acted as an

24   administrator of the plan because it fell under -- it fell

25   under the financial function.

```
 1          Q      It was part of your job responsibility?

 2          A      Yes.

 3          Q      And it was in your job description somewhere,

 4   I assume?

 5          A      It probably was when the job description was

 6   created.

 7          Q      And I am assuming that --

 8              MR. LISSITZYN:  If I may interrupt and

 9          remind you that I have not heard anything

10          having to do with Mr. Linder's claim and the

11          claim process with respect to the issues that

12          are pertinent in this litigation and the

13          restriction that we have respected so far and

14          imposed on us by the judge.

15              MR. BRADEN:  I was headed in that

16          direction but you sort of sidetracked me.

17              MR. LISSITZYN:  It's a long trip,

18          Counselor.

19              MR. BRADEN:  Well, it's been made longer,

20          Larry, but we are headed in that direction.  I

21          just want to be sure I understand exactly what

22          Mr. Linder's responsibilities were which

23          included responsibility for claim procedures.

24              MR. LISSITZYN:  And what does that have

25          to do with the claims procedures that he
```

1              followed or didn't follow or that the plans,

2              plural, imposed on him or didn't impose on him

3              with respect to his claim?

4                   MR. BRADEN:  We are going to talk about

5              the claim procedures.  Are you ready?

6                   MR. LISSITZYN:  Yes.  Well, I am ready,

7              yes.

8                   MR. BRADEN:  Okay.

9    BY MR. BRADEN:

10        Q     All right.  Now you had responsibility for the

11   plans we have established by virtue of your job.  Now did you

12   ever have the authority to amend the plans in ways that

13   didn't involve any change in the financial obligations of the

14   company?  In other words, were you ever delegated authority

15   by the board or somebody else to make amendments to the

16   retirement plan as long as those amendments didn't effect the

17   company's financial obligations under those plans?

18        A     No, I don't believe so.

19        Q     So it's your testimony today that you never in

20   your view had any authority to amend the plans?

21        A     Correct.

22        Q     Now you did have authority to administer the

23   plans which included claim procedures that were set forth in

24   the plans, correct?

25        A     Yes.

1    Q    And you're aware that there were claim

2    procedures set forth in the plan documents; is that right?

3                   MR. LISSITZYN:  Which plan document are

4               you referring to?

5                   MR. BRADEN:  Retirement plan.

6                   MR. LISSITZYN:  As of which date?

7                   MR. BRADEN:  Exhibit 3.

8                   MR. LISSITZYN:  Will you look at Exhibit

9               3, sir, and tell me if there is a plan

10              procedure set forth?

11                  MR. BRADEN:  I will ask the questions,

12              Larry.

13                  THE WITNESS:  Repeat that question.

14   BY MR. BRADEN:

15        Q    Now the question was:  You're aware that there

16   were claim procedures in the plan documents, correct?

17                  MR. LISSITZYN:  And the plan document is

18              Exhibit 3 for identification; is that correct?

19                  MR. BRADEN:  Sure.

20                  THE WITNESS:  You're asking me if I am

21              aware that there is a procedure now?

22   BY MR. BRADEN:

23        Q    I am not asking you to read the document, what

24   Mr. Lissitzyn did.  I just want to know sitting here today

25   are you aware that there was a claim procedure that was

23

1    provided for under the retirement plan?

2        A    Am I aware now or was I aware while I was

3    employed?

4        Q    Let's take them both.  How about right now?

5        A    I am absolutely aware that there are claims

6    procedures.

7        Q    Now when you were responsible for plan

8    administration --

9            MR. LISSITZYN:  Excuse me.  I have a

10           question.  Claims procedures, at what point in

11           time was your question, sir?

12           MR. BRADEN:  He just clarified it.  He

13           just answered right now.

14           MR. LISSITZYN:  Right now -- in other

15           words, he is aware now of something he has

16           learned with respect to a claims procedure

17           that may have been embodied in Exhibit 3, or

18           he is aware right now of the claims procedure

19           that has come into being since his departure?

20           MR. BRADEN:  You're really trying to make

21           me miss this train, aren't you?

22           MR. LISSITZYN:  Any time you have to go,

23           you go, and I will give you my word I will

24           cooperate with you in taking his deposition by

25           telephone.

24

1              MR. BRADEN:  I think we can finish this

2              up, and I think we can finish this up

3              relatively easily.

4    BY MR. BRADEN:

5         Q    You testified that you're now aware that there

6    was a claim procedure under the retirement plan.  When did

7    you first become aware that there was a claim procedure under

8    the retirement plan?

9              MR. LISSITZYN:  You're referring to the

10             qualified plan?

11             MR. BRADEN:  Yes, we have established

12             that the retirement plan is Exhibit 3.  That's

13             the one we are referring to.

14             THE WITNESS:  When I received a copy of

15             the document that I requested.  I believe

16             January of this year.

17   BY MR. BRADEN:

18        Q    So is it your testimony, Mr. Linder, that

19   throughout the time you were responsible for the

20   administration of the retirement plan you were completely

21   unaware that there was a claim procedure provided for in the

22   plan?

23        A    Well, while I was administering the plans we

24   never had claims.  We never had retirees until very late in

25   my employment.

25

1         Q     Let me show you a document that previously has

2  been marked Plaintiff's Exhibit 4.  Do you recognize it?

3         A     Yes.

4         Q     And I assume that you received a copy of

5  Exhibit 4 sometime around October 25, 1990?

6         A     That I received it as an individual or --

7         Q     As a participant in the plan.

8         A     As a participant.  I recall the document.  I

9  don't know if I received it as an employee or as the

10  controller of the company.

11        Q     As the person responsible for the

12  administration of the retirement plan, you were responsible

13  for distributing Exhibit 4 to the participants in the

14  retirement plan; is that right?

15        A     Yes.

16        Q     And I assume you discharged that

17  responsibility and distributed that Exhibit 4 to the

18  participants?

19        A     I don't recall.  I assume we did back then.

20        Q     You don't recall not passing it out?

21        A     Right.

22        Q     So you have come in contact with Exhibit 4

23  before?

24        A     Yes.

25        Q     And are you familiar with it in general?

1     A     Yes.

2     Q     Let me direct your attention to page 8 of

3     Exhibit 4 under the heading Claims Procedure.  I assume that

4     being familiar with Exhibit 4 at some point you read the

5     section entitled Claims Procedure?

6     A     Recently?  Read it recently?

7     Q     Anytime.  Ever.

8     A     Yes.

9     Q     So when you read the section entitled Claims

10    Procedure set forth in Exhibit 4, didn't that make you aware

11    that there was in fact a claim procedure provided for under

12    the BYK-Chemie retirement plan?

13                    MR. LISSITZYN:  At what point in time?

14                    MR. BRADEN:  When he read it.

15                    MR. LISSITZYN:  We haven't established

16                when he read it.

17                    MR. BRADEN:  He said he has read it

18                sometime in the past.

19                    THE WITNESS:  I guess reading it I would

20                assume that there might be a claims procedure,

21                yes.

22    BY MR. BRADEN:

23    Q     Now during the time that you were responsible

24    for plan administration, did you ever have occasion to

25    conclude that the claim procedure set forth in Exhibit 4 or

1        Exhibit 3, that is, obviously the BYK-Chemie retirement plan,

2    was in any way inadequate?

3            A       I never thought about it.

4            Q       And are you aware of any amendments that were

5    ever made to the claim procedure of the retirement plan

6    during your tenure as the administrator of the retirement

7    plan?

8            A       I am not aware of any.

9            Q       Okay.  Let me show you a document that has

10   been previously marked Plaintiff's Exhibit 13.  That's a

11   letter that you wrote dated May 29th addressed to Carol

12   Foley, correct?

13           A       Correct.

14           Q       And that is your signature, correct?

15           A       Well, there is no signature on this.  There is

16   no signature.

17           Q       Oh, I am sorry.  I have one that is signed.

18                   MR. LISSITZYN:  Let me tell you what

19                   happened.  This is for purposes of the record.

20                   Gil sent it, it wasn't signed, so the document

21                   you have is signed.  The document I have was

22                   not.

23   BY MR. BRADEN:

24           Q       Had you spoken to Mr. Lissitzyn prior to

25   sending this letter, Exhibit 13?

1          A       Did I speak to him?

2          Q       Yes.

3          A       Yes.

4          Q       Do you remember when you first spoke to

5     Mr. Lissitzyn?

6          A       When I ever spoke to him?

7          Q       Yes.

8          A       It was sometime in either late April or early

9     May.

10         Q       And prior to speaking with Mr. Lissitzyn, had

11    you spoken with any other lawyers about -- and I am not going

12    to ask you about the substance of the conversations.  But had

13    you talked to any other lawyers prior to Mr. Lissitzyn about

14    the claim that you ultimately asserted against BYK-Chemie?

15         A       I spoke to other -- in my search for a

16    qualified pension attorney, I spoke to a couple of law firms

17    who informed me that they didn't feel they were qualified to

18    handle my case, and I eventually was referred over to

19    Mr. Lissitzyn's law firm.

20         Q       And roughly when did you speak with those

21    other law firms?

22         A       Could have been -- I don't know.  It could

23    have been February or March.

24         Q       Of 2002?

25         A       Of 2002, correct.

```
 1              Q      Now in your letter dated May 29th, you are
 2    asserting, are you not, a claim for additional benefits under
 3    the retirement plan?
 4                        MR. LISSITZYN:  Excuse me.  Could I see
 5                        29?
 6                        MR. BRADEN:  Exhibit 13.  I am sorry.
 7                        The May 29th letter.  What did I say?  Did I
 8                        say Exhibit 29?
 9                        (Whereupon the last question was
10                        read by the court reporter.)
11                        MR. LISSITZYN:  Read it.
12                        THE WITNESS:  Read it?  "I received the
13                        information that Carol" --
14                        MR. LISSITZYN:  To yourself.
15    BY MR. BRADEN:
16              Q      If you need to read it, feel free to read it.
17              A      If you're referring to additional benefits by
18    the fact that I am complaining that the calculation was not
19    high enough, yes, I am asking for an additional higher
20    pension payment.
21              Q      So what you were seeking in Exhibit 13 was
22    greater benefits under the retirement plan.  Is that safe to
23    say?
24              A      Yes.
25              Q      Now did you have any communications with
```

1    anyone at BYK-Chemie about your claim prior to the time you

2    sent Exhibit 13?

3            A       I had conversations with Carol Foley.

4            Q       And when did you speak with her?

5            A       Well, I think we discussed --

6            Q       I mean are you talking about more than one

7    conversation?

8            A       Yeah.

9            Q       Why don't we try to make this easier.  Do you

10   remember when you first spoke with Miss Foley about your

11   potential claim and the subject matter of your claim?

12           A       Are you referring to after I left the company?

13           Q       The first time you spoke.

14           A       I first spoke to her?

15           Q       Yes.

16           A       Well, I believe I spoke to her around the time

17   that I sent her the e-mail, and I think that was in October.

18           Q       October of 2001?

19           A       October or November.  I forget.

20           Q       So late fall of 2001?

21           A       Right, late 2001.

22           Q       And do you remember what your communication

23   with her was at that time?

24           A       Well, the general -- I think the general

25   conversation was about whether stock options should be

1    included in the final -- calculation of final average pay and
2    I asked her to look into it.
3            Q      And what did she -- what did she do?  Did she
4    get back to you?
5                        MR. LISSITZYN:  I object to this.  This
6                    has got nothing to do, Greg, with the claims
7                    procedure which is the standard to which you
8                    repeatedly held me in my conversations in my
9                    interview, my deposition of Miss Foley.
10                       MR. BRADEN:  Well, what I am trying to
11                   figure out is when his claim arose, matured.
12                       MR. LISSITZYN:  The answer to that
13                   question is embodied in documents that
14                   Mr. Bin-Meyer and Miss Foley sent to him; and
15                   they have both stipulated that his claim
16                   occurred on May 29, 2002, embodied in his
17                   letter of that date.
18                       MR. BRADEN:  Well, that was when he sent
19                   his letter, yes, no question about it.
20                       MR. LISSITZYN:  And that was treated by
21                   Mr. Bin-Meyer and Miss Foley as the date of
22                   his claim.
23                       MR. BRADEN:  That's fine.  It's not that
24                   important to me.
25    BY MR. BRADEN:

1         Q     All right.  As far as Exhibit 14 goes, let me

2  just ask you whether you recognize Exhibit 14?

3         A     Yes.

4         Q     And you did receive it sometime shortly after

5  June 13th of 2002?

6         A     Yes.

7               MR. LISSITZYN:  Let the record reflect

8               that Exhibit 14 is the version of Miss Foley's

9               letter with a handwritten date on it, but in

10              fact the copy that Mr. Linder received by Miss

11              Foley's testimony was Exhibit 14-A.

12               MR. BRADEN:  All of which is previously

13              on the record.

14  BY MR. BRADEN:

15         Q     Now you did testify that you received it

16  shortly after June 13th, correct?

17         A     Yes.

18         Q     And you received it certified mail, didn't

19  you, return receipt requested?

20         A     I believe so.

21         Q     So you have no reason to believe that this

22  letter was not prepared on June 13th, do you?

23         A     That it wasn't?

24         Q     You have no reason to believe that Exhibit 14

25  was not prepared on June 13th -- not sent on June 13th?

1       A       I don't know when it was sent.  I know when I
2       received it.
3               Q       And it was shortly after --
4               A       Yes, shortly after.
5               Q       Let me show you a document that's previously
6       been marked as Exhibit 15.  Do you recognize that document,
7       Exhibit 15?
8               A       Yes.
9               Q       And you received a copy of it from your
10      attorney, I assume?
11              A       Yes.
12              Q       Let me show you a copy of Exhibit 17.  Let me
13      ask you whether you received a copy of Exhibit 17?
14              A       Yes.
15              Q       And your attorney did in Exhibit 18
16      subsequently submit the additional information that was
17      referred to Exhibit 17?
18              A       Yes.
19              Q       And I assume you received a copy of Exhibit 18
20      as well?
21              A       Yes.
22              Q       Now what happened, to the best of your
23      recollection, after Exhibit 18 was sent which was on June
24      27th of 2002?
25              A       What happened to what?

1        Q       To your claim.

2                MR. LISSITZYN:  I don't understand the

3                question, sir.

4   BY MR. BRADEN:

5        Q       Well, Exhibit -- it's reasonably

6   straightforward.  Exhibit 18 is a response to Miss Foley's

7   request for additional information; isn't that correct,

8   Mr. Linder?

9        A       Yes.

10               MR. BRADEN:  I almost said Mr. Lissitzyn.

11               You have been wanting to answer all the

12               questions.

13               MR. LISSITZYN:  They are interchangeable.

14               MR. BRADEN:  They are in this deposition.

15               MR. LISSITZYN:  Thank you, Counsel.

16  BY MR. BRADEN:

17       Q       Now after this letter was sent by your

18  attorney on June 27th, are you aware of what happened next

19  with respect to the subject matter of that letter?

20       A       I believe nothing happened until Mr. Lissitzyn

21  sent an e-mail to Mr. Bin-Meyer.

22       Q       Do you know when that was?

23       A       I believe that was either September or

24  October.

25       Q       Were you copied on the e-mail?

35

1        A    Yes.

2        Q    And do you remember what the e-mail said?

3        A    It said that a response is long overdue and

4  respond.  Please respond.

5        Q    And what happened next?

6        A    We filed a lawsuit.

7        Q    Do you remember when that was?  Shortly

8  thereafter?

9        A    Early November.

10       Q    Early November.  Okay.  Did you have any

11  conversations with anybody at BYK-Chemie between June 27th

12  and the time you filed your lawsuit?

13       A    No.

14       Q    Did you have any conversations with anybody at

15  BYK-Chemie after you filed your lawsuit?

16       A    No.

17            MR. BRADEN:  I don't think I have any

18            further questions.  Let me just go back over

19            my notes quickly.

20          (Whereupon a recess was taken.)

21            MR. BRADEN:  I have no further questions.

22

23               CROSS-EXAMINATION

24  BY MR. LISSITZYN:

25       Q    Gil, you left employment with BYK-Chemie on

1    31st January of 2002; is that correct?

2           A     Yes.

3                     MR. BRADEN:  Objection; leading.

4                     MR. LISSITZYN:  Excuse me?

5                     MR. BRADEN:  Objection; leading.  This is

6                 direct examination.  I just crossed him.  It

7                 was an objection to a leading question, but go

8                 ahead.

9                     MR. LISSITZYN:  I gave you a bit of

10                latitude on the scope of your examination,

11                Counselor.

12   BY MR. LISSITZYN:

13          Q     Were you asked to leave?

14          A     Yes.

15          Q     Why were you asked to leave?

16          A     I was terminated in a management

17   restructuring.

18          Q     With respect to the administrative committee

19   on which you served in the year 2000 or thereabouts, there

20   were other members of that committee, were there not?

21          A     Yes.

22          Q     Would you identify the other members of the

23   committee?

24          A     Zach Levine.

25          Q     Stop.  What did Mr. Levine do at the company?

1       A       He was the president.

2       Q       Was he your superior officer?

3       A       Yes.

4       Q       And was he your superior officer at or about

5    the time you were on the committee?

6       A       Yes.

7       Q       Who was the other person on the administrative

8    committee?

9       A       Jeff Converse.

10      Q       What job did he have at BYK-Chemie?

11      A       He was vice president of marketing.

12      Q       Was he superior to you?

13      A       No.

14      Q       Who was the third person on the committee?

15      A       Myself.

16      Q       And who was the last person, Mr. Zinnert?

17      A       No.  Mr. Zinnert had retired several years

18   earlier.

19      Q       But you served with Mr. Zinnert while a member

20   of the administrative committee; is that correct?

21      A       No.

22      Q       What rank did Mr. Zinnert hold during the time

23   he was on the administrative committee?

24      A       Well, he was president of the company prior to

25   Mr. Levine; but again, I don't believe there was ever a

38

1    committee so I don't believe that Mr. Zinnert would have

2    considered himself to be a member of the administrative

3    committee.

4                    MR. LISSITZYN:  No further questions.

5                    MR. BRADEN:  Nothing further.

6                    (Whereupon the proceedings concluded

7                    at 1:51 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J U R A T

I have read the foregoing 38 pages and
hereby acknowledge the same to be a true and
correct record of the testimony.


_____

GILBERT E. LINDER



Subscribed and sworn to_____

Before me this_____day of_____,2003.



_____

Notary Public

My Commission Expires:

40

```
 1
 2                    C E R T I F I C A T E
 3
 4          I hereby certify that I am a Notary Public, in and
 5     for the State of Connecticut, duly commissioned and qualified
 6     to administer oaths.
 7          I further certify that the deponent named in the
 8     foregoing deposition was by me duly sworn, and thereupon
 9     testified as appears in the foregoing deposition; that said
10     deposition was taken by me stenographically in the presence
11     of counsel and reduced to typewriting under my direction, and
12     the foregoing is a true and accurate transcript of the
13     testimony.
14          I further certify that I am neither of counsel nor
15     attorney to either of the parties to said suit, nor am I an
16     employee of either party to said suit, nor of either counsel
17     in said suit, nor am I interested in the outcome of said
18     cause.
19          Witness my hand as Notary Public the   11th day
20     of   April      , 2003.
21
22                                _____
23                                MEGHAN M. ENGLISH, LSR
                                       Notary Public
24
25     LSR NO. 211
       My Commission Expires October 31, 2007
```

41

1                    INDEX OF EXAMINATIONS

2                                                    PAGE

3    DIRECT EXAMINATION BY MR. BRADEN.....................4

4    CROSS-EXAMINATION BY MR. LISSITZYN.................35

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25