### ORIGINAL

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FILED

2005 DEC 21  A 11: 51

U.S. DISTRICT COURT
NEW HAVEN, CT

| | |
|---|---|
| **GILBERT E. LINDER,** | : **CIVIL ACTION NO. 02-CV-1956(JGM)** |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **BYK-CHEMIE USA, INC., in its** | : |
| **Capacity as Plan Sponsor of the** | : |
| **RETIREMENT PLAN OF BYK-CHEMIE** | : |
| **USA INC., and the SUPPLEMENTAL** | : |
| **RETIREMENT PLAN OF BYK-** | : |
| **CHEMIE USA INC.,** | : |
| | : |
| **Defendants.** | : **DECEMBER 20, 2005** |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

Importantly, Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") establishes that there are no disputed facts precluding the entry of summary judgment. But contrary to the result urged in Plaintiff's Motion, the undisputed facts require entry of summary judgment dismissing Plaintiff's claims.

This case raises a simple question of the interpretation of an ERISA plan, a question well suited for summary judgment. Defendant believes that the plain language of the Plan requires the exclusion of Plaintiff's stock option income from the compensation used to calculate his pension benefits. But even if the Court chooses to look outside the provisions of the Retirement Plan, Plaintiff's Motion establishes that there is no fact of record from which the Court could reasonably infer that Defendant intended to include stock option income in the calculation of pension benefits. Indeed, the extrinsic evidence cited by Plaintiff *supports* the Defendant's interpretation.

ATL01/12084001v4

For these reasons and those more fully set forth below, Plaintiff's Motion must be denied and Defendant's Motion must be granted.

## ARGUMENT AND CITATION OF AUTHORITY

When this Court considers a litigant's motion for summary judgment pursuant to Rule 56, it must examine all evidence in the light most favorable to, and draw all factual inferences and construe all ambiguities in favor of, the opposing party. Make The Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004); Boy Scouts of Am. v. Wyman, 335 F.3d 80, 88 (2d Cir. 2003). "The principles governing admissibility of evidence do not change on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). "Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Id. "When considering cross-motions for summary judgment, a court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " Make The Road by Walking, 378 F.3d at 142 (citations omitted).

"Summary judgment is appropriate only when there is no genuine issue as to any material fact." Boy Scouts, 335 F.3d at 88. "A genuine issue of fact exists when 'a reasonable [fact-finder] could return a verdict for the [opposing] party,' and facts are material to the outcome if the substantive law makes them so." Light Sources, Inc. v. Cosmedico Light, Inc., 360 F. Supp. 2d 432, 434 (D. Conn. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). "The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986)).

2

I. **THE PRINCIPLE OF *CONTRA PROFERENTUM* IS INAPPLICABLE TO PLAINTIFF'S CLAIMS.**

Not surprisingly, Plaintiff's Motion does not address his Release. As demonstrated in Defendant's Motion (Def. Mem. at 10-16), Plaintiff knowingly and voluntarily signed a release of any and all claims, including the claims at issue here, and the Release is dispositive of his claims. (See DApx. Tab 16, Ex. C.) Instead, Plaintiff devotes a considerable portion of his summary judgment brief to arguing that the Court should apply the *de novo* (rather than arbitrary and capricious) standard of review to his claims for pension and supplemental retirement income benefits. He then fast forwards directly to *contra proferentum*, claiming that this Court should construe all provisions of the Plans against Defendant. In short, he claims that, since *de novo* review applies, he wins because all issues are resolved in his favor.

Plaintiff's argument is fundamentally flawed, however, because it leaps over the basic principles of contract interpretation to embrace a doctrine the Second Circuit has declared to be a " 'principle[] of last resort, to be invoked when efforts to fathom the parties' intent have proved fruitless.' " I.V. Servs. of Am., Inc. v. Trs. of the Am. Consulting Eng'rs Council Ins. Trust Fund, 136 F.3d 114, 121n.8 (2d Cir. 1998) (quoting O'Neil v. Ret. Plan, 37 F.3d 55, 61 (2d Cir. 1994)). Given that the "[t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties," Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997), it would be inappropriate to construe plan provisions in favor of or against any party without having exhausted efforts to ascertain the parties' objective intent. Thus, the *contra proferentum* rule only applies in the absence of "evidence indicating the intention of the parties." Perreca v. Gluck, 295 F.3d 215, 223 (2d Cir. 2002). See also Taylor v. Cont'l Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1233-34 (3d Cir. 1991) (refusing to "adopt a rule that would construe ambiguities against the drafter without first attempting to ascertain the intent

3

of the parties"); <u>Record Club of Am. v. United Artists Records, Inc.</u>, 890 F.2d 1264, 1271 (2d Cir. 1989) (because the "objective of contract interpretation is to give effect to the expressed intentions of the parties," *contra proferentum* is a last-ditch option available only after the failure of all other efforts to divine the parties' intent).

The *contra proferentum* rule applies only where the plan document in question is ambiguous and the Court is unable to determine the proper interpretation from the extrinsic evidence. If the document's language is unambiguous, however, the Second Circuit enforces and interprets it "according its plain meaning." <u>Aramony v. United Way of Am.</u>, 254 F.3d 403, 412 (2d Cir. 2001) (internal quotation marks and citation omitted). "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.' " <u>Aetna Cas. & Sur. Co. v. Aneiro Concrete Co., Inc.</u>, 404 F.3d 566, 598 (2d Cir. 2005) (quoting <u>Eskimo Pie Corp. v. Whitelawn Dairies, Inc.</u>, 284 F. Supp. 987, 994 (S.D.N.Y. 1968)).[1] Closely related to this explanation is this Court's admonition that "'[w]ell established principles of contract construction . . . require that all provisions of a contract be read together as a harmonious whole, if possible.'" <u>Lyons v. Fairfax Props., Inc.</u>, 285 F. Supp. 2d 124, 131 (Conn. 2003)(ellipsis in original) (quoting <u>Kinek v. Paramount Communications, Inc.</u>, 22 F.3d 503, 509 (2d Cir. 1994)).

---

[1]    "However, '[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning.' " <u>Aneiro Concrete</u>, 404 F.3d at 598 (brackets in original) (quoting <u>Seiden Assocs. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir. 1992)).

4

Plaintiff has not identified any Plan provisions which he contends are ambiguous, and, as set forth in Defendant's moving papers, the plain language of the Plans and SPD excludes stock option compensation. All of the extrinsic evidence of record plainly indicates that Defendant intended to exclude stock option compensation.[2] These governing principles take precedence over "last resort" canons such as *contra proferentum* and demonstrate that *contra proferentum* has no application in this case.

## II.    PLAINTIFF'S CONCLUSORY ASSERTIONS REGARDING THE PROPER INTERPRETATION OF THE PLAN FAIL TO ESTABLISH THAT PROCEEDS FROM THE EXERCISE OF STOCK OPTIONS CONSTITUTE COMPENSATION UNDER THE RETIREMENT PLAN AND SERP.

Instead of pointing to any genuine issue of material fact regarding the scope of "Compensation" in the Plans, Plaintiff proffers a series of factually and legally unsupported, conclusory contentions. Plaintiff fails, however, to address the exclusions from the definition of "Compensation" that dispose of his claim, *i.e.*, the exclusion of "the Employer's cost for any . . . employee benefit plan" and "fringe benefit" remuneration, defined in the SPD to specifically exclude stock-based compensation. (Plaintiff's Motion, pp. 9-10.) Rather than tackle the (insurmountable) task of explaining why these exclusions, which both include stock option remuneration, do not apply, Plaintiff instead implores the Court to lump the Stock Option Plan

---

[2]    (See Def. Mem. at 25-28; DApx. Tabs 4, 14-15.) Moreover, even though Defendant has proffered evidence to demonstrate the intent of the settlors of the Plans at issue in this case, evidence of the parties' intent does not need to be explicitly stated in the contract:

> Under "general principles of contract law, a failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction. Contracting parties often express their agreements imprecisely or incompletely. In such cases, if the interpreting court can discern from the contract as a whole what the parties "must have intended," it should enforce that intention despite a lack of express terminology.

Dobson v. Hartford Fin. Servs. Group, 389 F.3d 386, 399 (2d Cir. 2004).

5

into the category of "special pay" or "bonus." As a matter of law, the interpretation advocated by Plaintiff is unsustainable.

### A.   The Term "Compensation" Is Not All Encompassing As Plaintiff Contends.

Plaintiff first argues that since the Plans' definition of "Compensation" "is broad," and does not explicitly exclude proceeds from the exercise of stock options, then it must *include* them. (Plaintiff's Motion, p. 13.) Not only does Plaintiff fail to offer any support for this position, but the Second Circuit has already rejected this *identical* argument.  In O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55 (2d Cir. 1994), the plaintiffs argued that because the plan documents did not explicitly exclude stock option proceeds from the definition of "earnings," then "the only permissible conclusion . . . was that the . . . payments were 'Earnings.'" 37 F.3d at 58.  The Second Circuit made short work of this argument, holding that "Summary judgment would have been proper *only* if the RKO Plans unambiguously *included* SICP payments as 'Earnings.'"  Id. (emphasis added).  Accordingly, pursuant to O'Neil, Plaintiff's contention that this Court should grant summary judgment in his favor because stock option proceeds "must be included as compensation" (Plaintiff's Motion, p. 13) was dead wrong.

More importantly, and as set forth more fully in Defendant's moving papers, the Plan itself *does* exclude stock option income. (*See* Def. Mem. at pp. 19-27.) The term Compensation is specifically limited to "*regular* remuneration," *excluding* "fringe benefits" and the "cost" of benefits under *all* employee benefit plans (except 401(k) contributions). Thus, while income derived from the exercise of stock options is in no way "regular" (its receipt is subject solely to an employee's control),[3] the Court need not entertain Plaintiff's attempt to debate the

---

[3]    Options must also be held for a minimum of two years before they can be exercised, and the grant of options is purely discretionary, unlike regular compensation that must be paid when

"regularity" of such income because "regular" or not, stock option income is specifically excluded. (Plaintiff's Motion, pp. 13-14.)

**B.   The Predecessor Plan's Definition Of Compensation Does Not Support Plaintiff's Position.**

Again ignoring the Retirement Plan's clear exclusions, Plaintiff argues that because a predecessor plan allegedly defined compensation as "base salary excluding bonuses," and because the Plans presently define "Compensation" as "regular remuneration including bonuses," the settlor "clearly intended to incorporate . . . all types of compensation, including" proceeds from stock options. (Plaintiff's Motion, p. 15.) This argument fails on two fronts. First, aside from Plaintiff's bald assertion, he fails to proffer *any evidentiary* support for this statement – the predecessor plan is not part of the record in this case. It is black letter law that a party cannot support a summary judgment motion with conclusory allegations of this nature. *E.g., D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful").

In fact, neither the "predecessor Plan" nor the original version of the Retirement Plan adopted in 1984 is part of the record and, given the numerous changes in the tax qualification rules since 1984 requiring numerous Retirement Plan restatements, the Court could not infer that the current definition of "Compensation" appeared verbatim in the 1984 version of the Retirement Plan.

More importantly, even if Plaintiff had any evidentiary foundation for this assertion, it still does not support his claim. Assuming *arguendo* that the current definition of Compensation

---

earned. (DApx Tab 21, Foley Decl. at ¶ 4. See also, Pl's Appx. Tab 14, p. 2; Tab 15, p. 4; Tab 16, p. 3.)

ATL01/12084001v4

was adopted when the Retirement Plan was established in 1984, inferring that the Defendant thought about stock options at all in 1984, much less about including them in the definition of Plan compensation, would be absurd since the Stock Option Plan was not adopted until nearly 16 years later. (Pl's Appx. Tab 8, p. 3; Tab 14, p. 1.)

**C. Stock Option Income Is Not "Regular Remuneration" Simply Because It Is Reported On Form W-2.**

Plaintiff's assertion that stock option income must be "regular remuneration" because it is reported on an Internal Revenue Service ("IRS") Form W-2 is meritless. Plaintiff's stock option income was included on his W-2 because the individual income tax rules require that, "[i]n the case of an employee, the amount includible in income under IRC § 83 with respect to nonqualified stock options is also subject to FICA, FUTA, and income tax withholding and must be reported on Form W-2." IRS Information Letter, 2001-0047, March 30, 2001 (citing applicable regulations). While this requirement governs the timing and reporting of taxable income to the employee on exercise of a stock option, it has nothing whatsoever to do with the question of whether stock option income is included in the definition of compensation under the tax qualified Retirement Plan or the SERP.

In fact, the IRS has issued regulations specifically stating that stock option income is *excluded* from the compensation taken into account in determining benefits under tax qualified pension plans. IRC § 415(c)(3) and Treasury Regulation § 1.415-2(d) define the "compensation" that must be taken into account in determining benefits and specifically exclude:

> Amounts realized from the exercise of a non-qualified stock option, or when restricted stock (or property) held by an employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture (see section 83 and the regulations thereunder).

8

Treas. Reg. § 1.415-2 (d)(3)(ii). Obviously, if the Court chooses to look beyond the plain

language of the Retirement Plan, it should take into account the tax qualification regulations

applicable to the Plan, not individual income tax regulations applicable solely to the Plaintiff. In

short, the fact that Plaintiff's stock option compensation is included in his W-2 earnings says

nothing about the appropriate treatment of this income under the Plan. On the other hand, the tax

qualification regulations applicable to the Plan squarely address stock option compensation and

specifically exclude it from the definition of compensation.

    D.   **The Treatment Of The Stock Option Plan In Defendant's Financial Statements**
            **Supports The Defendant's Interpretation.**

     Plaintiff's next argument consists of pointing to Defendant's financial statements and

contending that, because they refer to the stock option plan as "compensation," it has to be

deemed compensation under the Retirement Plan. (Plaintiff's Motion, pp. 17-18.) In fact, the

financial statements do not characterize the stock option plan generally as "compensation"[4] and

Plaintiff's contention that they are "carried as a 'Compensation Expense'" simply underscores

the fact that stock option income is *excluded* under the Plan. (Id.) As noted several times above,

the Plan expressly excludes the "Employer's cost for any . . . employee benefit plan." Therefore,

Plaintiff's argument – that the stock option plan cost is reflected as an expense in the financial

statements – places it squarely within the exclusion for "the Employer's cost for any . . .

employee benefit plan."[5]

---

[4]     Neither the 1999 or 2000 Annual Reports state that the stock option proceeds constitute a
compensation expense. (See Pl's Appx. Tabs 8, 9.) While the 2001, 2002, 2003 and 2004
Annual Reports mention compensation expense, they are clearly referring to the value of the
options at the time they were granted and not when they were exercised. (Pl's Appx. Tab 10, p.
4; Tab 11, p. 6; Tab 12, pp. 3-4; Tab 13. pp. 1-2.)

[5]     The financial statements show that stock option expenses were charged against earnings
when the options were *granted*, not when they were *exercised* (as Plaintiff contends). For
example, in 1999, the first year the stock option plan was offered, the Company took a charge

**E.    Stock Option Income Is Not Special Pay Or A Bonus.**

Plaintiff's contentions that stock option proceeds constitute "special pay" or "bonuses" fare no better.[6]  As set forth in the unrebutted affidavit of Carol Foley, Defendant has never treated stock option proceeds as either special pay or a bonus because they do not have the characteristics of either.  (DApx. Tab 21, Foley Decl. at ¶ 4.)  Nor would a literal interpretation of the Plan language suggest stock option income should be deemed "bonus" or "special pay" rather than "the employer's cost for any . . . employee benefit plan . . . [or] . . . the value of any fringe benefits provided by the Employer. . . ."

Indeed, option holders are required to make and maintain an initial investment in Company stock as a prerequisite to participating in the Stock Option Plan and must purchase the shares when they exercise their options.  (DApx. Tab 9, p. 3; Tab 21 ¶ 4.)  The proceeds from the exercise of options are categorized as "miscellaneous pay" for Form W-2 purposes, which is the category used for other fringe benefits.  (Tab 21 at ¶ 5.)

"Bonuses" in ordinary parlance are cash compensation paid through regular payroll and that interpretation has been undisputedly followed by Defendant.  (DApx. Tab 21, Foley Decl. ¶ 3; Tab 2 Linder Dep. p.10.)   The Company has never used the Special Pay category for any compensation paid to employees.  (Id. Tab 21 at ¶ 3.)  In sum, there is nothing in the literal

---

against earnings to reflect the cost of stock purchased to cover the options even though none of the options were exercisable.  (Pl's Appx. Tab 9, pp. 7-8. See also Tab 10, p. 4; Tab 11, p. 6.) This simple fact destroys Plaintiff's entire theory and, in fact, supports Defendant's interpretation because it demonstrates that the Company does not treat income realized on the *exercise* of options as compensation chargeable against earnings, but rather it charged the estimated future value of the options when they were granted (in an amount drastically different from the amount Plaintiff claims should be included in his "Compensation").

[6]      Clearly, Plaintiff himself does not believe that stock option proceeds constitute "bonuses."  At his deposition, he explained that he received a bonus through "an annual bonus plan which fluctuated based on my performance and company performance," and that the amount of his bonus for his final year of work was $40,000.  (DApx. Tab 2 at 10.)

language of the Plan and there is nothing in the extrinsic evidence of record that would support

characterizing stock option income as a "bonus" or "special pay." The evidence is squarely to

the contrary.

F. **Plaintiff Cannot Use The Subsequent Clarifying Amendment To The Plan Language To Support His Interpretation Of The Plans.**

Plaintiff contends that an e-mail message from Ms. Foley to Plaintiff stating that

corporate officials overseas had rejected Plaintiff's claim to include stock option proceeds in his

pension and supplemental retirement income, and would be amending the Plans to clarify the

exclusion, is "proof positive that all parties concerned recognized that Stock Option

Compensation was included in the term 'compensation.'" (Plaintiff's Motion, p. 16.) Thus,

Plaintiff asks the Court to infer from the *denial* of Plaintiff's claim to have his stock option

income included in his pensionable earnings that, in fact, such income is included in pensionable

earnings. This argument should require no response. In fact, the only reason the issue was ever

addressed is because Plaintiff insisted, contrary to the terms of the Plans, that his stock option

income be included.

Plaintiff next contends that an April 24, 2002, amendment to the Plans, promulgated to

clarify BYK-Chemie's original intent when establishing the Plans "clearly establishes that the

proper reading of the term 'compensation' prior to Mr. Linder's raising the issue was that the

term included Stock Option Compensation." (Id.) Plaintiff's argument is clearly foreclosed by

the text of the Amendment itself, which provides, in relevant part: "the Company wishes to

amend the Plan to *clarify* the definition of Compensation in Section 1.10 of the Plan." (See

Plaintiff's Ex. 5 (emphasis added).)[7] Thus, on its face, the Amendment purports to "clarify" not

---

[7]    Again, the sole reason Defendant amended the Plan was to make clear to Mr. Linder what
the words already said, but apparently not clearly *to him.*

11

alter or change the definition of Compensation.  Indeed, this position finds ample support in Plaintiff's deposition testimony.   At his second deposition, Plaintiff admitted that he considered the issue of whether income derived from the exercise of stock options was included in the definition of "Compensation" under the Retirement Plan and SERP as unresolved as of his last day of work.  (DApx Tab 15 at ¶¶ 5-6 and Ex. A; Tab 11; Tab 12; Tab 2 at pp. 24, 41-42.)  Given that Plaintiff himself never believed that the inclusion of stock option proceeds was "clearly established," it makes little sense for Plaintiff to argue now that a *later* Plan amendment is "proof positive" of some view he never firmly embraced.

Finally, this evidence is clearly inadmissible for the purposes it is being proffered. Federal Rule of Evidence 407 prohibits the negative inference Plaintiff draws from the April 2002 amendment.  The April 2002 amendment constitutes a "subsequent remedial measure," and thus under Rule 407 Plaintiff cannot use the amendment as evidence of " 'negligence or culpable conduct.' "  In re Joint E. Dist. & S. Dist. Asbestos Litig., 995 F.2d 343, 345 (2d Cir. 1993) (quoting Fed. R. Evid. 407).  According to the Second Circuit, "[t]he admission of post-[incident] corrective measures is a prejudicial error and has been found to require a new trial in other cases."  Id. at 346 (citations omitted).  Further, "[e]xceptions to the rule are to be narrowly read in order to preserve the 'important policy of encouraging subsequent remedial measures.' " Williams v. Security Nat'l Bank, 358 F. Supp. 2d 782, 794 (N.D. Iowa 2005) (quoting Albrecht v. Baltimore & Ohio R. Co., 808 F.2d 329, 332 (4th Cir. 1987)).

Although the prototypical application of Rule 407 is in tort litigation,[8] federal courts including the Second Circuit have concluded that post-incident amendments to contracts or other

---

[8]     See Fish v. Georgia-Pacific Corp., 779 F.2d 836, 839-40 (2d Cir. 1985); Cann v. Ford Motor Co., 658 F.2d 54, 59 (2d Cir. 1981); 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5284 (1980 & Supp. 2005).

ATL01/12084001v4

documents fall within the scope of Rule 407 and have therefore precluded parties from drawing adverse inferences from these amendments. <u>E.g.</u>, <u>Malone v. Microdyne Corp.</u>, 26 F.3d 471, 480 (4th Cir. 1994) (citing <u>SEC v. Geon Indus.</u>, 531 F.2d 39, 52 (2d Cir. 1976)); <u>Noble v. McClatchy Newspapers</u>, 533 F.2d 1081, 1090 (9th Cir. 1976), <u>vacated</u> <u>on</u> <u>unrelated</u> <u>grounds</u>, 433 U.S. 904 (1977). For example, the Second Circuit has held that Rule 407 forbade a plaintiff from drawing a negative inference out of a letter from a union to its locals recommending the rewording or removal of certain language from contracts. <u>R.M. Perlman, Inc. v. N.Y. Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89-22-1</u>, 33 F.3d 145, 156 (2d Cir. 1994). Treating the letter recommending changes in contractual language "as a subsequent remedial measure," the Second Circuit held that the content of the letter was "not probative of" culpable conduct by the union. <u>Id.</u>

Here, Plaintiff is trying to misuse the April 2002 amendment in the same way the plaintiff in <u>Perlman</u> tried to misuse the union's letter. Plaintiff contends that because the April 2002 amendment was promulgated after he questioned whether pension and supplemental retirement income calculations include stock option proceeds, then the Plans' settlor must have had a different intent prior to the amendment. But the Second Circuit repudiated a parallel argument in <u>Perlman</u> as contrary to Rule 407, and this Court should do likewise with regard to Plaintiff's argument.

## <u>CONCLUSION</u>

For the reasons set forth above, and more fully in Defendant's moving papers, the Court should deny Plaintiff's Motion for Summary Judgment.

Respectfully submitted on December 20, 2005,

THE DEFENDANT,

ATL01/12084001v4

BY: _____

GREGORY C. BRADEN
MICHAEL G. MONNOLLY

FOR:  Alston & Bird LLP
      1201 West Peachtree Street
      Atlanta, GA 30309
      (404) 881-7000

      Charles F. Corcoran, III
      Carmody & Torrance LLP
      195 Church Street, P.O. Box 1950
      New Haven, CT 06509-1950
      (203) 777-5501
      Federal Bar No. ct04299

14

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, on December 20, 2005, to:

Lawrence H. Lissitzyn, Esq.
Dominic Fulco III, Esq.
Reid and Riege PC
One State Street
Hartford, CT  06103-3185

Michael G. Monnolly

ATL01/12084001v4